Jonathan Turley (*Pro Hac*)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001
jturley@law.gwu.edu

Adam Alba, 13128
2167 N. Main St.
Centerville, UT 84014
(801) 792-8785
adam.alba@gmail.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KODY BROWN, MERI BROWN, JANELLE BROWN, CHRISTINE BROWN, ROBYN SULLIVAN, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>**CIVIL RIGHTS COMPLAINT**<br>) |
| v. | )<br>JUDGE : _____<br>) |
| GARY R. HERBERT, in his official capacity as Governor of Utah; MARK SHURTLEFF, in his official capacity as Attorney General of Utah; JEFFREY R. BUHMAN, in his official capacity as County Attorney for Utah County, | )<br>**CIVIL NO.** _____<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

Kody Brown, Meri Brown, Janelle Brown, Christine Brown, and Robyn Sullivan

(hereinafter "Plaintiffs" or "Brown family") bring this Complaint and allege as follows:

## INTRODUCTION

1.  In *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J.
    dissenting), Associate Justice Louis Brandeis described "the right to be left
    alone" as "the most comprehensive of rights, and the right most valued by
    civilized men." It is a right embodied in the protections of association,
    religion, speech, and privacy guaranteed by the United States Constitution. It
    is the right at the heart of this action on behalf of the Brown family and, by
    extension, thousands of unorthodox or non-traditional families in Utah.

2.  The State of Utah does not (and presumptively cannot) criminalize consensual
    intimate relationships, including homosexual relationships, between
    unmarried adults.

3.  Like officials in all states, Utah officials deal routinely with adults living
    together in intimate relationships[1] without marriage licenses, including
    individuals who produce children out of wedlock or through adulterous
    affairs.

4.  Adults are allowed to live openly in such intimate relationships so long as
    they do not commit a collateral crime, such as acquiring multiple marriage
    licenses in violation of anti-bigamy provisions.

5.  While all other adults are allowed to live and have children in unmarried or
    adulterous relationships, those adults who live in such households pursuant to
    religious, as opposed to non-religious, reasons are subject to prosecution in

---

[1] The terms "intimate relations" or "intimate relationships" are used in this Complaint to
denote consensual adult relationships that include sexual contact.

Utah.

6.      The Brown family does not hold multiple marriage licenses, nor are its plural

relationships legitimated and sanctioned by the state.

7.      The Browns are a plural family in which only one couple, Kody Brown and

Meri Brown, holds an official marriage license.

8.      Despite the fact that the Browns have not obtained multiple marriage licenses,

they are subject to criminal prosecution (and have been threatened with such

prosecution) solely because they call themselves a family in the eyes of their

church.

9.      Utah Code Ann. § 76-7-101(1) makes it a crime when a person, "knowing he

has a husband or wife or knowing the other person has a husband or wife . . .

purports to marry another person or cohabits with another person." Utah Code

Ann. § 76-7-101 (West 2010) [hereinafter "criminal bigamy law"].

10.     The criminal bigamy law criminalizes not just polygamous marriages but also

an array of plural intimate relationships and associations of consenting adults.

11.     By criminalizing religious-based plural families and intimate relationships

under the criminal bigamy law, Utah officials prosecute private conduct

between consenting adults without requiring law enforcement officials to

show harm to society or those involved.

12.     The disparate treatment of polygamists denies them the basic liberties and

equal protection under the law guaranteed by the First and Fourteenth

Amendments of the United States Constitution.

3

13. For these reasons, the Plaintiffs ask this Court to enjoin, preliminarily and permanently, all enforcement of Utah's laws banning and criminalizing polygamy.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 (Federal Question) because this action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, a federal law; under 28 U.S.C. § 1343(a)(3) because this action is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; and under 28 U.S.C. § 1343(a)(4) because this action seeks equitable relief under 42 U.S.C. § 1983, an Act of Congress.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Herbert resides in this district and all the Defendants reside in the State of Utah. Venue is also proper in this Court because a substantial part of the events giving rise to the claim occurred in this district, including but not limited to the criminal investigation of the Brown family and the acts underlying the alleged crimes.

## NATURE OF THE ACTION

16. Through this action, pursuant to 42 U.S.C. § 1983, the Brown family seeks a declaration that Utah Code Ann. § 76-7-101 is unconstitutional under the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the

4

United States Constitution, and is unconstitutional under the Free Exercise,
Establishment, Free Speech, and Freedom of Association Clauses of the First
Amendment to the United States Constitution, applicable to the states through
the Fourteenth Amendment to the United States Constitution. The Browns
further seek a preliminary and permanent injunction preventing the
Defendants from enforcing the aforementioned provisions in this paragraph
against the Browns.

17.    To the extent that Article III of the Utah State Constitution, Utah Code Ann. §
30-1-2, and Utah Code Ann. § 30-1-4.1 are used as the basis for the
criminalization of plural relationships or families, the Brown family seeks a
declaration that these laws are unconstitutional under the Due Process and
Equal Protection Clauses of the Fourteenth Amendment to the United States
Constitution and the Free Exercise, Establishment, Free Speech, and Freedom
of Association Clauses of the First Amendment to the United States
Constitution, applicable to the states through the Fourteenth Amendment to
the United States Constitution. The Browns further seek a preliminary and
permanent injunction preventing the Defendants from enforcing the
aforementioned provisions in this paragraph against the Browns.

18.    The Brown family does not seek a declaration that Article III of the Utah State
Constitution, Utah Code Ann. § 30-1-2, or Utah Code Ann. § 30-1-4.1 are
unconstitutional to the extent that they merely prohibit the official recognition
of polygamous marriage or the acquisition of multiple state marriage licenses.

5

19.    The Browns have formed a plural family, motivated by their sincere religious beliefs and love for one another. They have not, however, sought official recognition of any polygamous marriage.

20.    The Browns have been open in both Utah and Nevada about their plural family and their shared commitment to raising their children as a plural family unit.

21.    The Browns have a long history of interaction with authorities, including but not limited to officials who participate in the "Safety Net" program, which works with polygamous families in various states, including Utah, and Canada.

22.    The criminal investigation of the Brown family was publicly announced after the Browns appeared on *Sister Wives*, a popular TLC network reality television program based on their family.

23.    The Browns remain subject to potential prosecution due to their status as a plural family and have suffered personal injuries, including termination of employment, due to the possibility of such prosecution.

24.    Utah Code Ann. § 76-7-101 contravenes the right of consenting adults to create a family environment of their choosing—whether it is based on religious or non-religious values—including but not limited to the mere co-habitation of adults in a single household.

25.    The Browns continue to visit relatives and associates in Utah on a regular basis and live only a couple of hours from the border of Utah.

26.    The Browns are also tied to Utah by their membership in the Apostolic United

Bretheren ("AUB"), which is centered in Salt Lake City, Utah.

27.    Due to the low number of AUB members in Nevada, the Browns cannot fully

perform their religious practices outside of Utah and must return to Utah to

engage in certain religious practices.

28.    The Brown family expects to move back to Utah in light of its strong

connections to that state.

29.    To enforce the rights afforded by the United States Constitution, the Brown

family brings this action pursuant to 42 U.S.C. § 1983 for declaratory and

injunctive relief against enforcement of Utah's laws banning and

criminalizing polygamy. The Browns also seek to recover all of their

attorneys' fees, costs, and expenses incurred in this action pursuant to 42

U.S.C. § 1988, and any other relief that this Court may order.

30.    The Brown family acknowledges that the Supreme Court previously held in

*Reynolds v. United States*, 98 U.S. 145 (1879) that a state could criminalize

polygamous marriages. The Browns believe, however, that Utah Code Ann. §

76-7-101 violates later decisions, including but not limited to *Lawrence v.

Texas*, 539 U.S. 558 (2003). Moreover, even under *Reynolds*, the Browns

believe that the scope of the criminal bigamy law goes beyond the permissible

criminalization of multiple marriage licenses and intrudes upon purely private

consensual associations and intimate expression between adults.

31.    As stressed by the Supreme Court in *Lawrence v. Texas,* 539 U.S. 558, 578

7

(2003):

> The present case does not involve minors. It does not
> involve persons who might be injured or coerced or who
> are situated in relationships where consent might not
> easily be refused. It does not involve public conduct or
> prostitution. It does not involve whether the government
> must give formal recognition to any relationship that
> homosexual persons seek to enter. The case does involve
> two adults who, with full and mutual consent from each
> other, engaged in sexual practices common to a
> homosexual lifestyle. The petitioners are entitled to
> respect for their private lives. The State cannot demean
> their existence or control their destiny by making their
> private sexual conduct a crime. Their right to liberty
> under the Due Process Clause gives them the full right to
> engage in their conduct without intervention of the
> government. It is a promise of the Constitution that there
> is a realm of personal liberty which the government may
> not enter. The Texas statute furthers no legitimate state
> interest which can justify its intrusion into the personal
> and private life of the individual.

*Id.* (citations omitted) (internal quotation marks omitted).

## PARTIES

## PLAINTIFFS

32.  Plaintiff Kody Brown was a resident of Lehi, Utah, where he was civilly

married to Plaintiff Meri Brown, and spiritually married to Plaintiffs Janelle

Brown, Christine Brown, and Robyn Sullivan. In January 2010, he and the

Co-Plaintiffs fled Utah for fear that Utah law enforcement officials would

prosecute them under the state's criminal bigamy statute for maintaining a

plural family. He lived in Utah with his spiritual wives as a plural family.

33.  Plaintiff Meri Brown resided in Lehi, Utah, where she was civilly married to

Plaintiff Kody Brown and joined in a plural family with all of the Co-Plaintiffs. In January, 2010, she and the Co-Plaintiffs fled Utah for fear that Utah law enforcement officials would prosecute them under the state's criminal bigamy statute for maintaining a plural family.

34. Plaintiff Janelle Brown resided in Lehi, Utah, where she considered herself spiritually married to Plaintiff Kody Brown and joined in a plural family with the Co-Plaintiffs. In January, 2010, she and the Co-Plaintiffs fled Utah for fear that Utah law enforcement officials would prosecute them under the state's criminal bigamy statute for maintaining a plural family.

35. Plaintiff Christine Brown resided in Lehi, Utah, where she considered herself spiritually married to Plaintiff Kody Brown and joined in a plural family with the Co-Plaintiffs. In January, 2010, she and the Co-Plaintiffs fled Utah for fear that Utah law enforcement officials would prosecute them under the state's criminal bigamy statute for maintaining a plural family.

36. Plaintiff Robyn Sullivan resided in Lehi, Utah, where she considered herself spiritually married to Plaintiff Kody Brown and joined in a plural family with the Co-Plaintiffs. In January, 2010, she and the Co-Plaintiffs fled Utah for fear that Utah law enforcement officials would prosecute them under the state's criminal bigamy statute for maintaining a plural family.

### DEFENDANTS

37. Defendant Gary Herbert is the Governor of Utah. In his official capacity, the Governor is the chief executive officer of the State of Utah. It is his

responsibility to ensure that the laws of the State are properly enforced. The Governor resides in the Governor's Mansion in Salt Lake City, Utah. He also maintains an office in the State Capital in Salt Lake City, Utah.

38. Defendant Mark Shurtleff is the Attorney General of Utah. In his official capacity, the Attorney General is the chief legal officer of the State of Utah. It is his duty to see that the laws of the State are uniformly and adequately enforced. The Attorney General maintains an office in the State Capital in Salt Lake City, Utah.

39. Defendant Jeffrey R. Buhman is the County Attorney for Utah County, where the Brown family resided before moving to Nevada. It is Buhman's duty to ensure that the laws of the State are adequately enforced in Utah County. Buhman has publicly stated that his office has investigated the Brown family and reserves the right to prosecute the Browns under the state criminal bigamy law. The County Attorney for Utah County maintains an office in Provo, Utah.

40. The Defendants, and those subject to their supervision, direction, and control, are responsible for enforcing Utah's criminalization of polygamy. The relief requested in this action is sought against each of the Defendants; against each of the Defendant's officers, employees, and agents; and against all persons acting in cooperation with the Defendants, under their supervision, at their direction, and under their control.

## CONSTITUTIONAL PROVISIONS

41.   The First Amendment to the United States Constitution provides: "Congress

      shall make no law respecting an establishment of religion, or prohibiting the

      free exercise thereof; or abridging the freedom of speech, or of the press; or

      the right of the people peaceably to assemble, and to petition the Government

      for a redress of grievances." U.S. Const. amend. I.

42.   The Fourteenth Amendment to the United States Constitution provides in part:

      "All persons born or naturalized in the United States, and subject to the

      jurisdiction thereof, are citizens of the United States and of the State wherein

      they reside. No State shall make or enforce any law which shall abridge the

      privileges or immunities of citizens of the United States; nor shall any State

      deprive any person of life, liberty, or property, without due process of law; nor

      deny to any person within its jurisdiction the equal protection of the laws."

      U.S. Const. amend. XIV, § 1.

## FACTS

### THE SCOPE OF PLURAL FAMILIES IN UTAH

43.   Plural families within Utah cover a wide range of religious and non-religious

      relations that include relations based on *polygyny*, *polyandry*, and other forms

      of "group marriages."

44.   The term "polygamy" generally refers to any form of plural marriage. While

      polygamy is often used to denote marriages composed of one husband and

      multiple wives (as opposed to monogamy), it can refer to any of three

                              11

common forms of plural marriage—*polygyny, polyandry,* and "group marriages."

45.   *Polygyny* is specifically a plural marriage of a man and more than one wife, as in the case of the Brown family.

46.   *Polyandry* is specifically a plural marriage of a woman with more than one husband.

47.   Finally, there are some families with multiple husbands and wives that are arranged in what are commonly referred to as "group marriages." These families are often based on shared social, political, or merely personal values.

48.   While polygyny, polyandry, and group marriages are the three principal groups of polygamy, there is a fourth group that has a distinct history and meaning: *polyamorists.*

49.   *Polyamory* is subject to more varied definitions, but generally refers to consensual relationships where participants have more than one sexual partner, including long term commitments to multiple adult partners.

50.   Under Utah laws, polyamorist relationships qualify as cohabitation and thus are treated as polygamy or bigamy.

51.   None of these four forms of plural relationships are exclusively based on religious tenets. Each has appeared in non-religious contexts and can be motivated by social, political, or simply personal concerns.

52.   Polyandry and group marriages are particularly found in non-religious settings. Polyandrous families (and polyamorist relationships) were not

uncommon in the San Francisco area in the 1960s, and group families were found throughout the United States and Canada during that decade.

53. Polygamy is currently practiced by millions of people around the world and remains common in some countries.

54. Utah officials estimate that there may be almost 30,000 polygamists in Utah.

55. Historically, polygamy was found on virtually every continent at one time.

56. Many Native American tribes or nations practiced forms of polygamy, particularly polygyny, and many early Europeans in the frontier adopted the same practices.

57. Polygamy was particularly common among southeastern and Plains Native American tribes or nations. Notably, many of these tribes or nations were also communal and matrilineal, where descent is traced through the female line.

58. While polygyny is more common than polyandry, the latter has also been long practiced and is particularly present in both the United States and Canada.

59. Indeed, polyandrous families have been given legal protection in Saskatchewan. *Winik v. Wilson Estate*, [1999] 1999 Sask. R. LEXIS 424, *21. Polyandry is also found in other parts of Canada.

60. The Canadian Supreme Court in British Columbia is currently considering a challenge to its criminalization of polygamy as a possible violation of human rights.

61. The Utah criminal bigamy statute uses the term *bigamy* as opposed to polygamy. Utah Code Ann. § 76-7-101.

13

62.   Bigamy is generally the act of marrying one person while still legally married to another. Black's Law Dictionary 69 (3rd pocket ed. 2006).

63.   Unlike polygamy, bigamy is often done without the knowledge of one or more spouses, representing plural marriage without the consent of a partner.

64.   Unlike polygamy, bigamous defendants often seek and secure official recognition of their marriages.

65.   Bigamy can involve multiple wives or multiple husbands. While only a handful of states in the United States outlaw polygamy per se, many prohibit bigamy generally. *See* Ariz. Const. art. 20 ¶ 2; Me. Rev. Stat. Ann. tit. 17-A, § 551; Mass. Gen. Laws ch. 272, § 13; Mich. Comp. Laws Ann. § 750.441; Miss. Code Ann. 97-27-43; N.M. Const. art. 21, § 1; OK Const. art. 1; Utah Code Ann. § 76-7-101; Va. Code Ann. § 18.2-363.

66.   Bigamy in Utah is given a broad definition and has been applied against individuals who have not sought any official recognition of their plural families or relations.

67.   The Utah criminalization of bigamy is tied directly to Article III of the Utah Constitution, which prohibits "polygamy," declaring that "[p]erfect toleration of religious sentiment is guaranteed. No inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship; but polygamous or plural marriages are forever prohibited."

## POLYGAMY AS A RELIGIOUS PRACTICE

68.   While many polygamous families are not motivated by religious belief, the

14

practice of polygamy is one of the oldest religious-based practices in the world.

69.    The Old Testament of the Bible, the foundation for both the Jewish and Christian faiths, contains favorable references to polygamy. Polygamy is also incorporated into Islamic beliefs and faiths like the AUB and Fundamentalist Church of Jesus Christ of Latter Day Saints (FLDS).

70.    Many of the central biblical figures from the Old Testament were polygamists, including Abraham, who had three wives (*Genesis* 16:1, 16:3, 25:1); Moses, who had two wives (*Exodus* 2:21, 18:1–6; *Numbers* 12:1); and David, who had eighteen wives (1 *Samuel* 18:27, 25:39-44; 2 *Samuel* 3:3, 3:4–5, 5:13, 12:7–8, 12:24, 16:21–23).

71.    The Bible teaches that these figures were chosen by God to lead His chosen people. For many Christians, the Bible is the literal word of God, who, through the conduct of these central figures, is shown to approve of the practice of polygamy.

72.    This reading of the Old Testament was once an accepted view among Christians.

73.    Indeed, some Protestants described polygamy as the "ideal form of marriage." The preference for polygamy, for example, can be found in Europe among the Anabaptists in Münster in 1535–36.

74.    Martin Luther stated publicly that his reading of the Bible affirmed the validity of polygamy, noting that the authorities should leave such questions

to the personal choices of citizens:

> I confess that I cannot forbid a person to marry several
> wives, for it does not contradict the Scripture. If a man
> wishes to marry more than one wife he should be asked
> whether he is satisfied in his conscience that he may do
> so in accordance with the word of God. In such a case
> the civil authority has nothing to do in the matter.

75.  Some Protestants continue to form polygamous families as part of their

     Christian faith.

76.  The Jewish Talmud also makes reference to and apparent acceptance of the

     existence of polygamy among Jewish families. For example, passages in the

     Babylonian Talmud, Tractate Kethuboth 93a–93b, discuss how to deal with

     estates after a man dies with multiple wives.

77.  Polygamy is known to be practiced in Israel despite criminal provisions

     against it. Polyamory is also practiced among Jews in the United States.

78.  As with some fundamentalist Christian and Jewish adherents, many Muslims

     believe that polygamy, and specifically polygyny, is an important part of their

     faith.

79.  While the exact number of wives is in dispute, the Prophet Muhammad was a

     polygamist with at least four wives.

80.  Sharia law now generally enforces a limit of four wives for a Muslim man

     under Sura 4:3, but recognizes the right to plural marriage.

81.  In the United States, the religion most cited in modern cases for practice of

     polygamy is the LDS Church and, later, the FLDS.

82.  Joseph Smith, the prophet and founder of the Mormon Church, not only

attested to the divine origins of polygamy but was himself a polygamist.

83.  Mormons previously based their religious belief in polygamy on the same Old

Testament passages discussed above and in the divine revelations God made

to Smith.

84.  Smith publicly disclosed his revelations on July 12, 1843 in Nauvoo, Illinois

(although Smith originally experienced these revelations in 1831), according

to the official History of the Church ("H.C."). H.C. 5: 501–07.

85.  Under Smith's teachings, through "celestial marriage" and polygamy, men

could become gods. Brigham Young, 11 J. of Discourses 269.

86.  Joseph F. Smith, the sixth president of the LDS Church, directly tied the

practice of polygamy to attaining ultimate salvation and elevation under the

tenets of the faith:

> Some people have supposed that the doctrine of plural
> marriage was a sort of superfluity, or non-essential to the
> salvation or exaltation of mankind. In other words, some
> of the Saints have said, and believe, that a man with one
> wife, sealed to him by the authority of the Priesthood for
> time and eternity, will receive an exaltation as great and
> glorious, if he is faithful, as he possibly could with more
> than one. I want here to enter my solemn protest against
> this idea, for I know it is false.

87.  Joseph Smith's recorded revelations refer to the Old Testament and the

polygamous relations of figures such as Abraham and David.

88.  Building on the earlier passages related to Sarah (Sarai), the Mormon *Law of*

*Sarah* affirms that a man's first wife holds the right to consent to, or prohibit,

her husband's wishes to marry additional wives according to Section 132 of

the Mormon sacred text known as the *Doctrine and Covenants*. The first wife, however, is expected to grant such consent.

89. According to the *Doctrine and Covenants*, Section 132:1–6, those rejecting such divine guidance on plural marriages are to be "damned."

90. The LDS Church openly practiced Polygamy (and more specifically polygyny) for about 50 years, until roughly 1890.

91. Brigham Young, who replaced Joseph Smith as head of the LDS Church after Smith's assassination, reportedly had as many as 55 wives. Jeffrey Odgen Johnson, *Determining and Defining 'Wife' — The Brigham Young Households*, 20 Dialogue: A Journal of Mormon Thought 57, 58 (1987).

92. Around 1890, however, then-church president Wilford Woodruff issued a manifesto explicitly disavowing the continued practice of polygamy by LDS members.

93. Woodruff issued his manifesto while Utah was seeking to enter the Union as a state. At that time, anti-Mormon prejudice permeated the United States and led to many incidents of persecution and physical attacks on Mormons.

94. Congress made clear that the LDS Church would have to abandon the practice of polygamy if Utah wanted admission as a state. *See* Utah Const. art. III, § 1 (explicitly prohibiting polygamous and plural marriages).

95. Many Mormons found the rejection of polygamy to be against the founding principles of the LDS Church and subsequently left the congregation. These former Mormons created their own religious groups, including but not limited

18

to the FLDS.

96.    FLDS members are not part of the Mormon Church and therefore are not

       properly called Mormons.

97.    The Brown family is associated with the AUB movement and thus is not

       Mormon.

98.    Although the modern Mormon Church forbids polygamy, many LDS

       members still view the practice as having divine origins. They believe the

       practice was both instituted and later discontinued due to revelations from

       God.

99.    Currently, majoritarian religious groups, including Christians, Jews, and

       Mormons, are vehemently opposed on moral grounds to the practice of

       polygamy, including polygyny, polyandry, and polyamory.

### POLYGAMY AS A CULTURAL AND POLITICAL PRACTICE

100.   In addition to being a religious practice, polygamy must also be considered a

       cultural practice under international and domestic laws.

101.   Cultural traditions and practices are given protection under international law

       and both Canadian and U.S. law. *See, e.g.*, International Covenant on

       Economic, Social and Cultural Rights, art. 15, *adopted* Dec. 16, 1966, 993

       U.N.T.S. 3 (entered into force Jan. 3, 1976) (guaranteeing "the right of

       everyone . . . to take part in cultural life").

102.   International law specifically reaches minority cultural groups and practices.

       For example, Article 27 of the International Covenant on Civil and Political

Rights guarantees that insular minorities "not be denied the right, in community with the other members of their group, to enjoy their own culture." International Covenant on Civil and Political Rights, art. 27, *adopted* Dec. 16, 1966, 999 U.N.T.S. 171 (entered into force March 23, 1976). *See also Lovelace v. Canada*, (1981) HRC 36 U.N. GOAR Supp. (no. 40) Annex XVIII; U.N. Doc. A/36/40 (1981) (Human Rights Committee upholding minority right to culture over the enforcement of the Indian Act).

103.  Polygamous associations are based on long standing cultural norms that include the ceremonies, traditions and rites that structure the lives and families of their members.

104.  For many polygamists, the practice of plural marriages is integral to both their religion and their culture.

105.  Polygamists often structure their families and cultural practices around their belief in plural families and associations.

106.  The practice of polygamy is also a political and associational right, as characterized under domestic law and international norms.

107.  As noted above, there are many polygamists and polyamorists who participate in plural unions because of deep philosophical beliefs or strong associational ties shared with other families.

108.  For example, the Brown family members, including Robyn Sullivan, who had previously lived in a monogamous marriage, have spoken publicly about how they personally prefer living in a plural family.

109.   Many people believe strongly that monogamous unions are artificially restrictive and run counter to the biological and emotional needs of human beings.

110.   Unlike casual encounters, polygamous and polyamorist families maintain stable plural unions that are not confined (or defined) by the sexual relationship alone. Polygamists wish to treat each other as spouses while not seeking official recognition of such unions as marriages.

### THE BROWN FAMILY

111.   The Plaintiffs are members of the Apostolic United Brethren Church, a fundamentalist faith.

112.   As members of this faith, the Plaintiffs believe that only through celestial marriage can they ensure the salvation of their souls following death.

113.   Only Plaintiffs Kody and Merri Brown were civilly wed and sought state recognition of their marriage.

114.   Plaintiffs Janelle Brown, Christine Brown, and Robyn Sullivan wished to form a plural family with Kody and Meri Brown, though each had her own home in Utah.

115.   While in Utah, all of the homes of the Plaintiffs were connected except for Robyn Sullivan's home, which was about a mile away from the other homes.

116.   Plaintiffs Meri Brown, Janelle Brown, Christine Brown, and Robyn Sullivan were all over eighteen years of age when they chose their plural family with Kody Brown as the single husband and father.

117. While Janelle Brown, Christine Brown, and Robyn Sullivan did not seek state recognition of a marriage with Kody Brown, they considered themselves committed to him as "sister wives."

118. Kody Brown considered himself committed to his Co-Plaintiffs as the head of the plural family, a position imposing on him the duty to raise and father children with each of his spiritual wives.

119. The Brown family lived openly as a plural or polygamous family in Utah for many years before it became the subject of the popular *Sister Wives* program.

120. Despite years of investigation and total transparency by the Browns, Utah law enforcement officials have never found any evidence that the Browns committed any crime (beyond the allegation of bigamy).

121. The Brown family has never been accused of fraud, child abuse or spousal abuse.

122. Indeed, Lehi Police Lt. Darren Paul has publicly stated that there has never been "any major police involvement with the Browns." Dennis Romboy, *Bigamy Prosecutions of Polygamists Rare in Utah*, Deseret News, Sept. 28, 2010.

123. Like thousands of polygamists in Utah, the Brown family was known to local public officials but never investigated, let alone prosecuted, under the criminal bigamy statute.

124. Indeed, the Brown family was often asked to confirm their plural family, which state agencies officially took into consideration when denying them

some state benefits.

125. For example, in September, 2006, Madison, the daughter of Janelle and Kody Brown, was hospitalized for a ruptured appendix. Because Janelle was between jobs and had no insurance to cover Madison's roughly $35,000 hospital bill, Janelle Brown applied for emergency Medicaid.

126. State Medicaid officials asked Janelle Brown if she was in a polygamous relationship, and she answered truthfully in the affirmative. Officials told her that a polygamous relationship would not make her ineligible for aid, but they had to consider the relationship as part of a review of her income.

127. The state later denied Janelle Brown coverage because all of Kody Brown's income was applied against her and her children—even though Janelle and Kody Brown were not legally married and that income helped support sixteen people.

128. For years before the start of the *Sister Wives* program, Christine Brown was a recognized and outspoken advocate for polygamous families.

129. From 2007–2010, Christine Brown has been a member of the Principle Voices Board, a polygamist educational outreach group. She has spoken at many public conferences about the rights and responsibilities of polygamous families.

130. Christine Brown participated in public interviews, including a national interview in 2007 with HBO.

131. In May, 2008, Christine Brown publicly discussed her polygamous lifestyle in

a meeting attended by Defendant Shurtleff—stating before a couple hundred

people that she was tired of living in fear and secrecy.

132.    In May, 2008, the television show *48 Hours* interviewed Christine Brown

about her polygamist lifestyle.

133.    In May, 2009, Christine Brown spoke to a class at the University of Utah

about polygamy and her polygamist practices.

134.    In September, 2009, the United States Census Bureau hired Christine Brown

specifically because of her polygamous family and connections in the

polygamist community.

135.    In October, 2010, the United States Census Bureau gave Christine Brown an

award for her work with fellow polygamists during a meeting of the Safety

Net Committee in Utah.

136.    Defendant Shurtleff and his press secretary, Paul Murphy, were always

viewed as highly sensitive and civil to polygamous families and their needs.

Indeed, Defendant Shurtleff was justifiably credited with incorporating plural

families and reducing the tensions between the state and polygamous

communities.

137.    On at least three occasions in the year before *Sister Wives* aired, Kody Brown

spoke with Defendant Shurtleff and his press secretary about Brown's

polygamist lifestyle and his desire to go public.

138.    On February 11, 2009, Kody and Christine Brown, along with almost fifty

other fundamentalists, attended "Legislative Education Day for

24

Fundamentalist Mormons," held at the State Capitol building in Salt Lake City, Utah.

139. Defendant Shurtleff spoke with Kody Brown at the event.

140. Kody Brown told Defendant Shurtleff that he was considering going public with the details and realities of his plural family.

141. Kody Brown asked Defendant Shurtleff if Shurtleff would pursue him criminally if he went public, and Defendant Shurtleff answered that he would not.

142. At this February 2009 meeting, Defendant Shurtleff told Kody Brown that Utah lacked the resources to prosecute polygamists and that Kody Brown would not be prosecuted unless he was committing crimes such as marrying child brides, promoting incestuous relationships, or committing welfare or tax fraud.

143. On September 25, 2009, both Kody Brown and Defendant Shurtleff attended the "Polygamy and The Law Conference," held in Park City, Utah.

144. At the September 2009 conference, Kody Brown again spoke to Defendant Shurtleff and asked if the Browns would be prosecuted for going public with details of their life and plural family. Defendant Shurtleff again said that they would not, absent evidence of marrying child brides or committing welfare fraud.

145. In December 2009, before any contract was signed for the *Sister Wives* program, and long before its first episode, Kody Brown spoke with Paul

Murphy, press secretary to Defendant Shurtleff, who again assured him that the policy of the existing administration was not to prosecute people for simply being polygamists—even if they are public in their plural family arrangements.

146.     Before the first episode of *Sister Wives* aired, Kody Brown notified Mr. Murphy that he and his family had decided to go public as previously discussed.

147.     Scott Troxel, spokesman for the Utah Attorney General, has publicly admitted that producers of the *Sister Wives* program called his office before the start of the show to determine if Utah prosecutors would prosecute the Browns and shut down the show. Dennis Romboy, *Lehi Police Investigating Utah Polygamists Featured in New TV Show*, Desert News, Sept. 28, 2010.

148.     Mr. Murphy also admitted publicly that he was informed of the show and stated that "polygamy is against the law," but expressed uncertainty over whether Utah prosecutors would pursue criminal charges against the family. Jennifer Stagg, *Utah County Prosecutors to Meet Tuesday to Discuss Bigamy Case Involving Lehi TV Family*, Deseret News, Oct. 18, 2010.

149.     Mr. Murphy has attended various Safety Net Committee meetings with the Browns, had lunch with Christine and Kody Brown, attended an event to watch the first episode of *Sister Wives*, and been to the Brown house to watch a sporting event.

150.     Christine Brown was actually invited to be part of the so-called Safety Net

Committee as a representative from a polygamist family, and she gave

interviews to several national press outlets as a polygamist wife.

151.  In one interview (posted on YouTube), Christine Brown interviewed Mr.

Murphy.

152.  Since 2003, Utah has belonged to the Safety Net Committee, which has

worked with polygamous families in an open and cooperative fashion.

153.  The Utah Attorney General's website still posts a description of the Safety Net

Committee that states:

> The Safety Net Committee began in 2003 and currently
> holds monthly meetings in Salt Lake City and St.
> George, Utah, Colorado City, Arizona and Creston,
> British Columbia. Government agencies, non-profits and
> interested individuals work together to insure that people
> associated with the practice of polygamy have the same
> educational opportunities and access to justice, safety
> and services as the general public. This is done through a
> coordinated effort to open communication, break down
> barriers and accomplish these original goals: provide
> training and develop materials for public awareness;
> reduce isolation, secrecy, abuses of power and crime;
> and find ways to provide access and education to
> members of polygamous communities. More
> information can be found in The Primer.

Description of the Safety Net Committee, Utah Office of the Attorney

General, http://attorneygeneral.utah.gov/polygamy.html (last visited May 2,

2011).

154.  *The Primer* is found on the Utah Attorney General's website and explains that

governmental Safety Net Committee members ought not to prosecute

polygamous families, but should instead work with them. *See* Utah Attorney

General's Office et al., *The Primer* 5, 9–10 (2009), *available at*

http://attorneygeneral.utah.gov/cmsdocuments/The_Primer.pdf. According to

the Safety Net Committee's "Mission Statement":

> The Safety Net Committee brings together government
> agencies, non-profit organizations and interested
> individuals who are working to open up communication,
> break down barriers and coordinate efforts to give
> people associated with the practice of polygamy equal
> access to justice, safety and services.

*Id.* at 9.

155.    The goals of the Safety Net Committee, as stated in *The Primer*, include:

> • Coordinating resources and services to underserved
>    Fundamentalist communities
> • Arranging for the medical, financial, educational, legal,
>    and emotional needs of plural families
> • Providing support groups for any needed issue (e.g.
>    family conflict, loss and grieving issues, etc.)
> • Holding events and information fairs to provide job-
>    related or social service supportive resources to the
>    Fundamentalist communities

*Id.* at 9–10.

156.    Christine Brown is one of the individuals that helped draft *The Primer*.

157.    The *Sister Wives* program first aired in 2010 on TLC.

158.    Almost immediately after the first episode aired, prosecutors in Lehi, Utah

commenced an official investigation of the Browns for possible criminal

prosecution.

159.    The Utah Attorney General's Office also announced a criminal investigation

of the Browns for violating Utah's criminal bigamy law.

160.    Prosecutors have repeatedly stated publicly that the Browns are not only under

28

investigation but are in open violation of the criminal bigamy law.

161. Prosecutors acknowledged that they had conducted a field investigation and shared the results with both the Utah County Attorney and the State Attorney General's Office for possible prosecution.

162. Prosecutors have admitted that the criminal investigation of the Browns was commenced in response to the Browns' participation in the *Sister Wives* program.

163. Deputy Utah County Attorney Julia Thomas is quoted in publications as stating that prosecutors began investigating the Browns when they saw promotional trailers for *Sister Wives* airing on TV. Vince Horiuchi, *Going Public 'Was a Risk Worth Taking,' Utah Polygamists Say*, Salt Lake City Trib., Sept. 29, 2010.

164. Ms. Thomas admitted in the same publications that prosecutors are fully aware of a significant number of polygamist families in Utah but "we typically don't have them on TV admitting to breaking the law." *Id.*

165. For example, Donna Kelly, Deputy County Attorney for Utah County, publicly stated that "the Browns have definitely made it easier for us by admitting to felonies on national TV." Johnny Dodd, *Prosecutors in 'No Rush' to Complete Sister Wives Investigation*, People Magazine, Nov. 22, 2010.

166. Even after the Browns' move to Nevada, prosecutors have continued to stress that their investigation of the Brown family is ongoing and that they reserve

the right to prosecute the family.

167.   Utah County Attorney Jeff Buhman has publicly stated that, despite the move

to Nevada, his office may still opt to prosecute the Browns. Dennis Romboy,

*Polygamous 'Sister Wives' Family Moves to Nevada; Bigamy Charges Still*

*Not Filed in Utah*, Deseret News, Jan. 18, 2011.

168.   Mr. Buhman has stated that the move to Nevada "doesn't change anything that

we are doing." *Id.*

169.   The Brown family moved to Nevada in part due to the continuing threat of

arrest and prosecution.

170.   Ms. Thomas, however, also expressed concern over the constitutionality of the

criminalization of polygamy for families like the Browns who have no

evidence of any collateral crime such as fraud or child abuse. Johnny Dodd,

*TV's* Sister Wives: *Four Wives and a Firestorm*, People, Oct. 25, 2010

("'There are a lot of considerations we need to assess before we make a

determination, including the constitutionality of this statute,' says Julia

Thomas, deputy attorney for the Utah County Attorney's Office.").

171.   Utah Attorney General spokesman, Scott Troxel, has publicly stated, "[i]t has

been our office's position not to pursue cases of bigamy between consenting

adults." Jennifer Dobner, *'Sister Wives' Family Investigated for Bigamy*,

MSNBC.com, Sept. 29, 2010.

172.   While they would like to return to Utah, the Browns fear that they will be

arrested and separated from their children if they do so.

173. Utah also has the ability to seek extradition of the Browns on the basis of the criminal investigation and the conduct of the Browns while still in the state.

174. The Browns also fear that they will continue to be subject to criminal investigation in Utah to the disruption of their family, including their children.

175. The criminal investigation of the Brown family, and the related public statements by prosecutors, has had a pronounced effect on the family, including publicly labeling them as presumptive felons.

176. Meri Brown was terminated from her long-held job by a company, which stated that, despite Meri Brown's exemplary record with the company, the criminal investigation was viewed as a liability and embarrassment for the company.

177. Meri Brown's employer was previously aware of her plural family, and company officials stated that they were not concerned about her status as a polygamist.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF: DUE PROCESS

178. The Plaintiffs incorporate here by reference paragraphs 1 through 177, *supra*, as if fully set forth herein.

179. Utah Code Ann. § 76-7-101 violates fundamental liberties that are protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, both on its face and as applied to the Plaintiffs.

180. As stated in *Lawrence v. Texas*, 539 U.S. 558, 562 (2003):

> Liberty protects the person from unwarranted
> government intrusions into a dwelling or other private
> places. In our tradition the State is not omnipresent in
> the home. And there are other spheres of our lives and
> existence, outside the home, where the State should not
> be a dominant presence. Freedom extends beyond spatial
> bounds. Liberty presumes an autonomy of self that
> includes freedom of thought, belief, expression, and
> certain intimate conduct. The instant case involves
> liberty of the person both in its spatial and more
> transcendent dimensions.

181.   Utah Code Ann. § 76-7-101 criminalizes the private conduct of adults

exercising their liberty under the Due Process Clause.

182.   It further denies individuals the protected right to freely make personal

decisions relating to procreation, contraception, family relationships, and child

rearing.

183.   It further denies due process by branding consenting adults as criminals on

account of their private choices as to how they arrange their intimate familial

relationships.

184.   Utah Code Ann. § 76-7-101 also violates the Due Process Clause as void for

vagueness because it fails to give adequate guidance to citizens as to the scope

of prohibited conduct under the law and fails to define the crime of bigamy

with "appropriate definiteness."

185.   Utah Code Ann. § 76-7-101 further allows for selective prosecution because

the scope of prohibited cohabitation, and thus the law's applicability to plural

unions, is unclear.

## SECOND CLAIM FOR RELIEF: EQUAL PROTECTION

186.  The Plaintiffs incorporate here by reference paragraphs 1 through 185, *supra*, as if fully set forth herein.

187.  Utah Code Ann. § 76-7-101 violates fundamental liberties that are protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, both on its face and as applied to the Plaintiffs.

188.  Utah Code Ann. § 76-7-101 has been used to single out polygamists for investigation or prosecution while other citizens are allowed to have children by multiple partners in both adulterous and non-adulterous relations.

189.  Utah Code Ann. § 76-7-101 is also used to prosecute polygamists who privately commit to multiple partners while allowing other adults to live together and procreate so long as they do not claim lifetime commitments.

190.  Utah Code Ann. § 76-7-101 also treats similarly situated persons differently based on religious distinctions.

191.  While the Plaintiffs call each other spouses under their private religious beliefs, they would not be prosecuted if they claimed no religious obligation and merely had casual or purely sexual associations.

192.  Even as a non-religious distinction, there is no rational basis for the disparate treatment given plural families and other citizens with multiple sexual partners.

193.  Monogamists are allowed an infinite number of sexual partners, and consequently have the right to bear children with multiple partners, so long as

they do not claim to be committed to such partners in a union or family.

194. The disparate treatment given polygamists is based on historical and religious animus toward polygamists, who are an insular minority in both the State of Utah and nationally.

**THIRD CLAIM FOR RELIEF: FREE EXERCISE**

195. The Plaintiffs incorporate here by reference paragraphs 1 through 194, *supra*, as if fully set forth herein.

196. Utah Code Ann. § 76-7-101 violates fundamental liberties that are protected by the Free Exercise Clause of the First Amendment to the United States Constitution, both on its face and as applied to the Plaintiffs.

197. Utah Code Ann. § 76-7-101 is not neutral and generally applicable. Indeed, the historical context of its passage demonstrates that the law was intended to target religious practices.

198. Utah Code Ann. § 76-7-101 is not supported by a compelling state interest, and is not narrowly tailored in pursuit of state interests.

199. Utah Code Ann. § 76-7-101 further violates fundamental liberties by denying polygamists the right to organize their private relations in conformity with their long-established religious beliefs.

200. By branding polygamists as criminals, the law forces those who have engaged in polygamy for spiritual purposes to suppress the open practice of their faith.

201. Utah Code Ann. § 76-7-101 also imposes majoritarian religious beliefs concerning private unions on minority groups like polygamists.

## FOURTH CLAIM FOR RELIEF: FREE SPEECH

202.   The Plaintiffs incorporate here by reference paragraphs 1 through 201, *supra*, as if fully set forth herein.

203.   Utah Code Ann. § 76-7-101 is the basis for the investigation and threatened prosecution of the Plaintiffs.

204.   State and county prosecutors did not begin their investigation of the Plaintiffs until after the first episode of *Sister Wives* aired, despite the fact that the Brown family was known to state officials as a plural family.

205.   Indeed, state and county prosecutors have expressly cited the fact that the Brown family chose to appear on the *Sister Wives* program as the impetus for the criminal investigation and possible prosecution of the Plaintiffs.

206.   The only difference between the Brown family and thousands of known polygamists in Utah is that the Brown family has exercised their free speech rights by discussing their lives and being transparent to the world about their plural family.

207.   The use of public statements as a determinative factor for investigation or prosecution violates the First Amendment to the United States Constitution.

208.   Likewise, the criminal investigation of the Plaintiffs is calculated, or has the effect of, chilling the Brown family's speech by linking possible prosecution to public statements or appearances.

209.   Finally, Utah law enforcement officials are using Utah Code Ann. § 76-7-101 as a vehicle to threaten, deter, or chill the speech of any polygamist or plural

family that publicly discusses its faith or religious practices.

210. Utah Code Ann. § 76-7-101, as applied in this case and as interpreted by the Defendants, violates the First Amendment to the United States Constitution.

### FIFTH CLAIM FOR RELIEF: FREEDOM OF ASSOCIATION

211. The Plaintiffs incorporate here by reference paragraphs 1 through 210, *supra*, as if fully set forth herein.

212. Utah Code Ann. § 76-7-101 violates the right of association protected under the First Amendment to the United States Constitution.

213. The Defendants initiated a criminal investigation of the Plaintiffs after the Plaintiffs agreed to establish a national television program that reached out to millions of viewers and began a national dialogue over the treatment of polygamists.

214. The program has received national accolades for challenging stereotypes of plural families and raising questions of unfairness in the treatment of such families.

215. The Brown family has demonstrated that many plural families do not live in secluded compounds and include modern adults who are fully integrated into society.

216. Many such families see the *Sister Wives* program as a common ground to organize and reach out to the wide society for recognition of their rights.

217. The *Sister Wives* program has served as a rallying point for other plural families who are interested in going public and joining this debate.

218.   The acknowledged fact that the Defendants launched their investigation in response to the program threatens to undermine and suppress any similar public associations between the Plaintiffs and both polygamous and non-polygamous individuals.

219.   The threat of prosecution has stymied the efforts of the Brown family to use the program as a rallying point for citizens from both polygamous and non-polygamous communities.

220.   The investigation and threat of prosecution under the criminal bigamy law has denied the Plaintiffs the right to associate with other like-minded citizens who believe that consenting adults should be able to maintain private relations and unions without interference from the state.

221.   Utah Code Ann. § 76-7-101, both as written and as applied in this case, violates the First Amendment to the United States Constitution.

**SIXTH CLAIM FOR RELIEF: ESTABLISHMENT OF RELIGION**

222.   The Plaintiffs incorporate here by reference paragraphs 1 through 221, *supra*, as if fully set forth herein.

223.   Utah Code Ann. § 76-7-101 violates fundamental liberties protected by the Establishment Clause of the First Amendment to the United States Constitution, both on its face and as applied to the Plaintiffs.

224.   The Plaintiffs represent an insular minority of both religious and cultural polygamists who are viewed as immoral under majoritarian Judeo-Christian beliefs.

37

225.    The criminalization of the private associations of polygamous families

        constitutes an effort to force compliance with majoritarian moral beliefs.

226.    The isolation of polygamous families—as opposed to casual plural relations—

        reflects hostility toward their belief structure and the imposition of a

        majoritarian moral code.

227.    The Judeo-Christian basis for the criminalization of polygamy has been

        expressed in prior cases as well as public commentary.

228.    The Judeo-Christian insistence on monogamy contradicts the deeply held

        moral beliefs of not just FLDS members, but many Muslim and other minority

        religious groups.

229.    Utah Code Ann. § 76-7-101, both as written and as applied in this case,

        violates the First Amendment to the United States Constitution.

### SEVENTH CLAIM FOR RELIEF: 42 U.S.C. § 1983

230.    The Plaintiffs incorporate here by reference paragraphs 1 through 229, *supra*,

        as if fully set forth herein.

231.    Insofar as they are enforcing the terms of Utah Code Ann. § 76-7-101, the

        Defendants, acting under color of state law, are depriving and will continue to

        deprive the Plaintiffs of numerous rights secured by the Fourteenth

        Amendment to the United States Constitution in violation of 42 U.S.C. §

        1983.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray that this Court:

1. Enter an order declaring that Utah Code Ann. § 76-7-101 violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the Free Exercise, Establishment, Free Speech, and Freedom of Association Clauses of the First Amendment, and 42 U.S.C. § 1983.

2. Order a preliminary and permanent injunction enjoining enforcement or application of Utah Code Ann. § 76-7-101 against the Brown family on the basis of their consensual plural family association.

3. Award the Plaintiffs reasonable attorneys' fees and costs incurred in maintaining this action pursuant to 42 U.S.C. § 1988.

4. Award such other relief as it may deem just and proper.

Respectfully submitted,

Jonathan Turley (*Pro Hac*)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001
*Lead Counsel for Plaintiffs*

Adam Alba (Bar #13128)
2167 N. Main St.
Centerville, UT 84014
*Local Counsel for Plaintiffs*

39