Jonathan Turley (*Pro Hac*)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001
jturley@law.gwu.edu

Adam Alba, 13128
2167 N. Main St.
Centerville, UT 84014
(801) 792-8785
adam.alba@gmail.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KODY BROWN, MERI BROWN, JANELLE BROWN, CHRISTINE BROWN, ROBYN SULLIVAN, <br><br> Plaintiffs, <br><br> v. <br><br> GARY R. HERBERT, in his official capacity as Governor of Utah; MARK SHURTLEFF, in his official capacity as Attorney General of Utah; JEFFREY R. BUHMAN, in his official capacity as County Attorney for Utah County, <br><br><br> Defendants. | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Judge Waddoups <br><br> Civil No. 2:11-cv-00652-CW |

## INTRODUCTION

Defendants Gary Herbert, Mark Shurtleff and Jeffrey R. Buhman (hereinafter

"Defendants") have filed a motion to dismiss the instant action of Kody Brown, Meri Brown,

Janelle Brown, Christine Brown, and Robyn Sullivan (hereinafter "Plaintiffs" or "Brown

family") for lack of standing under Federal Rule of Civil Procedure 12(b)(6).  The motion was filed outside the time allotted by the Court[1] and fails to meet the standard for such challenges. Indeed, the Defendants omit the actual standard for review for such a Rule 12(b)(6) motion and, by extension, any application of that standard to this case.  What remains are vague and conflicting statements about the possibility of prosecution for bigamy of the Brown family pursuant to an investigation that the Defendants admit has been going on for years.  The thrust of the Defendants' motion is the argument that a family cannot seek judicial review even after a state declares the family (and similarly situated families) presumptive felons, expressly denounces the family as committing felonies "every night," and publicly declares the family to be under investigation for criminal charges.  This extreme argument is maintained to avoid review of a facially unconstitutional statute that has forced thousands of families to live in fear of arrest and prosecution.  If successful, the state could literally declare any religious group or practice to be criminal and avoid any independent review – leaving insular minority groups subject to official condemnation and the continual threat of arbitrary and capricious prosecution.

---

[1] Plaintiffs filed their complaint on July 13, 2011.  Each defendant was personally served with the complaint on July 15, 2011.  As per Federal Rule of Civil Procedure 12, each defendant had 21 days from the date of service to respond to the complaint, that is, until August 5, 2011.  This 21-day limit was noted on the summons served to each defendant.  On August 2, 2011, the Attorney General asked Plaintiffs to stipulate to a 20-day extension, or until August 25, 2011, to respond to the complaint.  Plaintiffs stipulated.  However, no motion for an extension was ever filed with the court.  On August 29, 2011, four days past the deadline of the original extension, the Attorney General asked local counsel for Plaintiffs to stipulate to another extension.  Local counsel indicated he would to stipulate but asked the Attorney General why he needed another extension and whether any motion had been previously filed or order secured for the extension.  These questions were never answered.  The Attorney General filed the motion to dismiss on September 2, 2011 – one month past the original date with no court order filed.  Both lead and local counsel customarily agree to such extensions with the obvious understanding that the schedule must be set by order of the Court.  Absent such an order, this motion is out of time and a default would be appropriate.  However, since Plaintiffs recognize that this is a constitutional challenge and the Plaintiffs were willing to give the first extension.  At a minimum, the Plaintiffs believe this motion should simply be denied and the Defendants ordered to answer the Complaint within five (5) days or the appropriate period established by the Court.

The closing of the courthouse to such families runs against the very grain of the American

constitutional system and the core guarantees of an independent judiciary in our tripartite system

of government.

## BACKGROUND

While all well-pleaded facts must be accepted as true under the standard below, it is

important to note the facts that are not contested as including, but not limited to the following:

1. The Brown family follows a good-faith religious practice in ordering their private lives as a plural or polygamous family.  Compl. ¶ 19.
2. There is no evidence of any child abuse or other crime alleged against the Browns beyond the criminal statute against plural families.  Compl. ¶¶ 120-22.
3. The Browns have never had multiple marriages licenses between Kody Brown and Meri Brown, Janelle Brown, Christine Brown, and Robyn Sullivan.  Compl. ¶¶ 19, 113.
4. Other citizens in Utah live in plural relationships and have children by multiple partners for religious as well as non-religious reasons.  Compl. ¶ 54.
5. The Browns have been publicly called criminals by state prosecutors for continuing to live as a plural family.  Compl. ¶ 160.
6. The Browns continue to be under a publicly announced criminal investigation and prosecutors are expressly reserving the right to prosecute them.  Compl. ¶¶ 166-68.
7. The sole reason that the Browns were placed under investigation was their participation in *The Sister Wives* program on national television.  Compl. ¶ 162.
8. All citizens living in plural families are labeled as criminals by the state statute, even though the plural relationship is purely expressed in spiritual rather than legal terms.  Compl. ¶ 24.
9. Citizens have been prosecuted in the past for bigamy based on their plural family relations.  *See infra* Part I.A.

As stated in the Complaint (and acknowledged by the Defendants), state officials knew

the Browns were a plural family before publicly condemning them for state crimes committed on

the *Sister Wives* television program.  Compl. ¶¶ 20-22.  Before their program aired, the Browns

had repeated contacts with the Defendants to determine whether the program would be used as

grounds to break up their family and prosecute the adults.  Compl. ¶¶ 139-48; K. Brown Decl. ¶¶

8-18.  After the first program aired, however, the Utah country prosecutors made a public

announcement that they were beginning an investigation of the Browns.  Compl. ¶¶ 158-59.

Speaking as a representative of Mr. Buhman and his office, Deputy Utah County Attorney Julia

Thomas is quoted in publications as stating that prosecutors began investigating the Browns

when they saw promotional trailers for *Sister Wives* airing on TV.  Compl. ¶ 163.  Donna Kelly,

Deputy County Attorney for Utah County, publicly stated that "the Browns have definitely made

it easier for us by admitting to felonies on national TV."  Compl. ¶ 165.

   All plural families live under the label of being declared felons under the challenged law.

However, the Browns were specifically identified by the Defendants as under investigation and

admitted felons.  As was obvious at the time of these public statements, the public condemnation

of the Browns placed the family under tremendous social and economic stress.  *See* K. Brown

Decl. ¶¶ 32-33; J. Brown Decl. ¶¶ 9, 23-24.  The adults were told that the criminal investigation

and comments of the prosecutors would present barriers to their employment.  M. Brown Decl.

¶¶ 13-14, 34.  Their children faced repeated statements about the possibility of their family being

broken up and their parents being sent to jail.  *Id.* ¶¶ 11, 40.  Ultimately, the Brown family

moved to Nevada in search of jobs and to better insulate themselves and their children from the

Defendants' public comments and threat of prosecution.  *Id.* ¶ 32.  Even after the Browns moved

to Nevada, prosecutors have continued to stress that their investigation of the Brown family is

ongoing and that they reserve the right to prosecute the family.  Utah County Attorney Jeff

Buhman has publicly stated that, despite the move to Nevada, his office may still opt to

prosecute the Browns.  Compl. ¶ 167.  Mr. Buhman has stated that the move to Nevada "doesn't

change anything that we are doing."  Compl. ¶ 168.  In his declaration to the instant motion, Mr.

Buhman again reaffirms that he may prosecute the Browns even after their move to Nevada.

Buhman Decl. ¶¶ 5, 12.  This has served to extend the coercive reach of the law – creating a

barrier to the Browns in securing new employment in Nevada and continuing to harm their professional and social standing.

## STANDARD FOR DISMISSAL UNDER RULE 12(b)(6)

In considering a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(6), the court must accept "as true all of the well-pled factual allegations." *Coll v. First American Title Insur.*, 642 F.3d 876, 886 (10th Cir. 2011) (citing *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010)). All inferences in this analysis are read in favor of the Plaintiffs. *Kay v. Bemis*, 500 F.3d 1214, 1217 (10th Cir. 2007). The inquiry under Rule 12(b)(6) is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiffs must "give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Schneider*, 493 F.3d at 1177.

## ARGUMENT

## I.   THE BROWN FAMILY HAS PROPERLY ALLEGED FACTS THAT ESTABLISH STANDING UNDER RULE 12(b)(6).

The Supreme Court has established three factors for courts to consider in evaluating standing. First, a plaintiff must have an "injury in fact" which is concrete and particularized as opposed to purely conjectural. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Second, there must be a causal connection between the injury and the underlying conduct. *Id.* Third, and finally, it must be "likely" that the injury will be redressed by a favorable decision from the court. *Id.* The Defendants do not contest the third factor in their motion to dismiss, so this opposition will focus on the first two factors.[2]

_____

[2] As stated in the attached declarations, the injuries alleged in this case are directly linked to the challenged law and the investigation launched pursuant to that law. With the declaration sought

A.    **The Brown Family Has Established Injury In Fact Stemming From the State Law Criminalizing Their Religious and Familial Practices As Well As The Public Investigation and Statements of the Defendants.**

As properly alleged in their Complaint and reaffirmed in the two attached declarations, the Browns have suffered concrete, actual injuries due to the criminal bigamy statute and the public, ongoing investigation under it.  The Browns have experienced direct impacts on their employment, income, and reputations.  These injuries constitute "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'' " *Lujan*, 504 U.S. at 560-61 (internal citations omitted).

Standing to challenge the criminal bigamy statute can be based on fear of prosecution, even if no actual prosecution has taken place.  *Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th Cir. 2007) ("[A] plaintiff need not risk actual prosecution before challenging an allegedly unconstitutional criminal statute.").  A plaintiff challenging the "validity of a criminal statute under which he has not been prosecuted . . . must show a 'real and immediate threat' of his future prosecution under that statute to satisfy the injury in fact requirement." *Id.* (quoting from *D.L.S. v. Utah,* 374 F.3d 971, 974 (10th Cir.2004)).  To support standing, the threat of prosecution must be "credible" and create an "objectively justified fear of real consequences." *Id.*  A threat is definitely credible when the enforcement agency directly threatens the plaintiff with arrest or prosecution and definitely not credible when the enforcement agency directly states that there will be no arrest or prosecution.  *See id.* at 1108 (surveying case law to establish "those pre-enforcement claims for prospective relief that occupy the ends of the injury-in-fact continuum").  Courts have previously rejected claims that prosecutors' actions (and underlying unconstitutional laws or policies) are beyond the reach of the courts so long as the prosecutors do not move from

in this challenge, the county and state prosecutor would not be able to threaten this family with a criminal charge simply because the adults treat eachother and live together as spiritual spouses in a plural family.

investigation to indictment.  *See, e.g., Smith v. Meese*, 821 F.2d 1484, 1494 (11th Cir. 1987) ("In considering a case where a stated governmental investigatory policy discriminates against a specific group of people and thereby chills that group's associational and political rights, the second component -- that the alleged injury be fairly traceable to the officials responsible for the policy -- is easily alleged for the purposes of a standing inquiry on a motion to dismiss."); *see also Presbyterian Church v. U.S*., 752 F.Supp. 1505 (D.Ariz.1990) (finding standing for churches challenge to investigations by the Immigration and Naturalization Service (INS) and Department of Justice), *Scott v. Rosenberg*, 702 F.2d 1263 (9th Cir 1983) (finding standing for policy that curtailed free exercise of religion of church).

The Browns face a real and immediate threat of prosecution.  Prosecutors in Lehi, Utah and the Utah Attorney General's office have commenced official investigations of the Browns.  Compl. ¶ 158-59.  Concrete steps have been taken in this investigation, as prosecutors have already conducted a "field investigation" and shared the results with the Utah County Attorney and the State Attorney General's Office.  Compl. ¶ 161.  Prosecutors with the Utah County Attorney have publicly stated that criminal charges under the statute are not only possible, but that the Brown family is committing felonies under the act every night on television.  Indeed, the Defendants have filed declarations in this case that are most conspicuous in the absence of any statement that the Browns will not be prosecuted under the provision or that future families will be prosecuted.  Instead, the declarations make highly generalized statements about the declarants' lack of personal knowledge of such cases and admit that a decision on whether to prosecute has not yet been made.  Shurtleff Decl. ¶ 9; Buhman Decl. ¶¶ 5, 12.  Indeed, Defendant Buhman states that criminal charges are still being contemplated after over two years.  *Id.* at ¶ 12.

The State argues that, despite these ominous actions and statements, no threat of prosecution exists because other polygamists have not been prosecuted. *See* Mot. to Dismiss at 10-12. Both the motion and the declarations are carefully crafted to avoid an "assurance of non-prosecution." *Bronson,* 500 F.3d at 1108. Instead, the State sheepishly "acknowledge[s] that the Utah County Attorney has not stated that the Browns will not be prosecuted. He just has not said anything publically [*sic*] about it one way or the other." Mot. to Dismiss at 12; *see also* Buhman Decl. ¶¶ 5, 12. This statement itself is incredibly misleading since Buhman's aides have made much more aggressive statements in their official capacities, as detailed in the Complaint, and Buhman has never denied or denounced such public statements. Compl. ¶¶ 163-68.

The Defendants also represent to the Court that "Plaintiffs cannot point to even one case in which someone has been prosecuted under Utah's bigamy statute in the last 50 years – not only in Utah County, but in the entire State of Utah. Simply stated, there is a lack of history of prosecution of polygamy in Utah since the 1950s except when it is in conjunction with some other crime." This claim stands in conflict with the legal position of the State in court and prior reported cases. *See, e.g., In re Steed*, 2006 UT 10, 131 P.3d 231, 231-32 (holding polygamist Utah judge's removal proper under the criminal bigamy law with no evidence or claim of any collateral crime). Other such cases may not be published in the federal reporter series due to the fact that they are handled on the summary calendar or simply pleaded out. One such case appears to be the prosecution of Mark Easterday, a disabled veteran who had publicly discussed his polygamous family – prompting an investigation and prosecution in Utah's Sixth District Court in 1999. He is quoted as saying that prosecutors threatened him with jail time absent a plea agreement and noted that "I wish it hadn't ended this way. I wish I could practice my religion." *Plea Bargain Reached In Bigamy Case, Associated Press,* June 16, 1999, found at

http://www.deseretnews.com/article/702595/Plea-bargain-reached-in-bigamy-case.html.  Indeed, this case and other cases[3] have been cited as the result of public demands for bigamy to be prosecuted without collateral crimes – part of a pattern of enforcement that ebbs and flows with public opinion.  Even ignoring these cases and accepting the state's incorrect historical premise, the state has long maintained in court that there is no requirement of a collateral crime to be prosecuted under this statute.  The mere claim that such prosecutions have not occurred without collateral crimes in the past is no guarantee that prosecution would not (and will not) occur in this case.  Indeed, the prosecutors stated publicly that they viewed the Browns as presenting a particularly compelling case for prosecution.  Compl. ¶¶ 164-65.

The Defendants try to bolster their argument by comparing the Browns to the plaintiff in *D.L.S.* who was denied standing because Utah County had "not charged anyone with a violation of the challenged sodomy statute." 374 F.3d at 974.  This analogy ignores a number of salient points of distinction between the two cases.  First, unlike the plaintiffs in *D.L.S.*, the Browns were placed under public investigation, which has lasted for over two years.  Second, unlike the plaintiffs in *D.L.S.*, the prosecutors have declared the Browns to have committed criminal acts and broadcast that criminality on television.  *See* Compl. ¶¶ 164-165.  Utah officials further stated that the Browns' move to Nevada did not remove the possibility of prosecution.  *See* Compl. ¶¶ 166-68.  These statements have led the Browns to believe that they are dissimilar from other polygamists in Utah and that they face a very real threat of prosecution under the criminal bigamy law despite its historical pattern of non-enforcement.  *See* K. Brown Decl. ¶¶

---

[3] Another case involved Steve Bronson.  *See Plea Bargain Reflects New Anti-Bigamy Tide*, Deseret News, May 14, 1999, found at http://www.deseretnews.com/article/696921/Plea-bargain-reflects-new-anti-bigamy-tide.html.  The declarations offer only anecdotal evidence to support a claim of a lack of prosecution, but published reports contradict both the declarations and the representations in the memorandum.  The fact is that prosecutions have occurred regularly and, even in making these claims, the prosecutors do not expressly state that such prosecutions will not occur in this case or other cases in the future.

20, 26; M. Brown Decl. ¶ 34; J. Brown Decl. ¶ 22.  The criminal investigation and the public statements have caused direct and concrete injuries for the Brown family – injuries that go far beyond what other polygamists have experienced.

The State has had numerous opportunities to assure the Browns that they would not be prosecuted before this suit was filed.  It has done the opposite: affirmatively stating that it reserves the right to prosecute the Browns and commencing an investigation of them.  *See* Compl. ¶¶ 164-68.  The Browns are thus much more similar to the plaintiff in *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1156 (10th Cir. 2006), who was granted standing when the "City . . . plainly indicated that it [intended] to require Dr. John's compliance" with an ordinance by stating that, if he did not comply, "appropriate legal action [would] be commenced."  Even assuming that an assurance of non-prosecution would be determinative in this case (which the Plaintiffs dispute), the Defendants have had over two years to make such an assurance and have filed two declarations that notably declined to do so.  The result is an effort to reserve the right to prosecute while trying to secure a dismissal on the basis of an assurance not given to either the family or the Court.

It is important to note that standing, and all of the injuries discussed above, is analyzed at the commencement of a case.  The Defendants do not claim that any of the Browns' injuries have found adequate remedy since the commencement of this action or that their claims are now moot.  Even if such a mootness argument were to be made with the final termination of the investigation and an assurance of non-prosecution, it would fail.  First, as argued below, the investigation itself is not the only basis for standing.  Second, the courts have been clear that the type of transparent and opportunistic claims that make up the Defendants' declarations are not a basis for a moot-ness motion: "it is well settled that 'a defendant's voluntary cessation of a challenged practice

does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting from *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).  In a warning that seems crafted for this case, the Court stressed that defendants should not be able to make convenient assurances to avoid review of the merits of an allegation since, "'if it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *Id.* at 289 n.10 (citing *United States v. W.T. Grant Co.,* 345 U.S. 629, 632 (1953)).  Moreover, the Supreme Court has declined to apply mootness in cases involving constitutional considerations "capable of repetition, yet evading review."  *E.g. S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515 (1911).  Finally, in *F.E.R. v. Valdez*, 58 F.3d 1530, 1533 (10th Cir. 1995), the Tenth Circuit specifically separated claims for damages and injunction from claims for declaratory relief, as in this case. [4]

    It remains unclear how the Defendants' declarations materially advance their motion for dismissal since they do offer any assurance that the Browns will not be prosecuted under the bigamy statute, even assuming such an assurance would be determinative. Instead the declarations

---

[4] With regard to claims for declaratory relief, the court found questions of private rights not moot even when the more tangible damage claims had expired:

>     [Plaintiffs] ask the court to determine whether a past constitutional violation occurred. In this dispute the alleged liability-producing act has already occurred. Because the question still exists as to whether the defendants violated the Patients' right to privacy, a controversy on the Patients' right to privacy still exists.

    *Id.* A controversy on whether the threat of prosecution violated various constitutional rights of the Browns still exists and they are seeking declaratory relief in this case.  *See also Faustin v. City, County of Denver, Colorado*, 268 F.3d 942, 947-48 (10th Cir. 2001) ("Defendants contend Faustin lacks standing to challenge the application of section 3-1 to her conduct because the section 3-1 charge against Faustin was dismissed before this civil case was filed, and she is not being prosecuted under section 3-1 at this time.  Defendants are partially correct.  Faustin has standing to sue for damages based on her prosecution (including nominal damages, which she sought) and to seek declaratory relief with respect to her prosecution.").

offer anecdotal accounts that appear inaccurate and entirely non-binding.  They do not claim

mootness and appear to maintain that the law can be enforced against the Browns, and other fam-

ilies, at the whim or will of the prosecutors at any time of their choosing.   These are declarations

that appear designed to preserve the chilling effect of the law and the investigation while seeking

to protect the State from any judicial review of its law or actions.

> **B.    The Browns Have Suffered Injuries Stemming From the Criminalization of Their Family Structure and Harm to Their Economic, Social, and Religious Status**

While not ruling out prosecution of the Brown family (or other similarly situated

families) under the bigamy statute, the Defendants effectively ignore the impact of their public

investigation and statements against this family.  First, they ignore the impact of such

investigations and statements on the Browns' First Amendment rights.  *See Phelps v. Hamilton*,

122 F.3d 1309, 1326 (10th Cir. 1997) ("Because of the significance of First Amendment rights,

the Supreme Court 'has enunciated other concerns that justify a lessening of prudential

limitations on standing.'") (quoting from *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*,

467 U.S. 947, 956 (1984)).  When the threat of prosecution has a "chilling effect" on an activity

protected by the First Amendment, "the concern that constitutional adjudication be avoided

whenever possible may be outweighed by society's interest in having the statute challenged."

*Sec'y of State of Md.*, 467 U.S. at 956.  Standing is granted in these cases when a plaintiff has

"alleged an intention to engage in a course of conduct arguably affected with a constitutional

interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979).

The Browns have alleged an intention to engage in a variety of activities protected by the

First Amendment.  Indeed, it was their public disclosure of their plural family on the *Sister*

*Wives* program that triggered the investigation in this case. They have suffered a chilling effect on their First Amendment right to free speech because the looming investigation influences what they say and how they behave on the *Sister Wives* program. Compl. ¶ 208; K. Brown Decl. ¶¶ 36, 38; M. Brown Decl. ¶ 34; J. Brown Decl. ¶ 20. They have suffered a chilling effect on their First Amendment right to free association because the investigation limits their ability to use the *Sister Wives* program as a rallying point for similarly situated families. Compl. ¶¶ 219-20. They have suffered a chilling effect on their First Amendment rights to free exercise and establishment of religion because the investigation has forced them to live in a place in which they cannot fully perform their religious practices. Compl. ¶ 225; K. Brown Decl. ¶ 37; M. Brown Decl. ¶¶ 35-36; J. Brown Decl. ¶ 20.

The State claims in a subheading that "Incidental Chilling Effect on Plaintiffs' Speech Is Not Sufficient to Give Standing," but provides virtually no support for that position. Mot. to Dismiss at 12. Indeed, the entirety of the State's argument on this issue is two lines. They fail to address a single claim of First Amendment injury to the Plaintiffs – offering nothing for the Plaintiffs to rebut.[5] The State appears to believe that, so long as it prevails under the credible threat analysis, a "chilling effect" injury is impossible. *See id.* at 13 (quoting from *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006)). This conclusion ignores the lowered standing bar of *Sec'y of State of Md.*. 467 U.S. at 956. Furthermore, in relying exclusively on *Walker*, 450 F.3d at 1089, a case that discussed only free speech rights, the conclusion ignores the chilling effect on the Plaintiffs' other First Amendment claims. These claims include the curtailment of their religious practices and associations as detailed in the

---

[5]Plaintiffs can only object to raising a standing challenge with only two lines – leaving any expansion of arguments for the reply memorandum. They will assume that the Defendants will not introduce new arguments in reply to the disadvantage of the Plaintiffs and in violation of the federal rules of practice.

complaint and the attached declarations.  Compl. ¶ 225; K. Brown Decl. ¶ 37; M. Brown Decl.

¶¶ 35-36; J. Brown Decl. ¶ 20.

      As to the free speech claim, the State references a minor line of dicta from the *Walker*

court's background discussion of standing that refers to purely subjective claims of chilling

effects.  The State omits the actual holding on the issue that "plaintiffs in a suit for prospective

relief based on a 'chilling effect' on speech can satisfy the requirement that their claim of injury

be 'concrete and particularized' by (1) evidence that in the past they have engaged in the type of

speech affected by the challenged government action; (2) affidavits or testimony stating a present

desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they

presently have no intention to do so because of a credible threat that the statute will be enforced."

*Id.*  This three-part standard is met in the current case.  Plaintiffs were, as the Defendants readily

admit, outspoken in the past about their polygamist lifestyle.  Mot. to Dismiss at 6; Compl. ¶¶

129-33.  The Browns have said that they intend to continue to speak out about polygamy, but

fear the consequences for their family. K. Brown Decl. ¶ 35-36.  They have stated that they have

been subject to intense pressure to curtail their public statements and only became the focus of

the public investigation and public statements of the prosecutors after they were open about their

plural family on the program. K. Brown Decl. ¶¶ 19-20.  This claim is supported by facts that

must be accepted as true for the purposes of this motion (and stand uncontradicted in the filing).

These facts include the long knowledge of the Browns as a polygamous family before the airing

of the *Sister Wives* shows without any commencement of an investigation.  Compl. ¶¶ 20-22.

That changed only when the family appeared on the national program discussing their

polygamous union – the investigation began immediately with the first show. Compl. ¶¶ 129-33,

157-58, 169.  These First Amendment claims are further strengthened by the statements of the

prosecutors that it was the program that led them to declare that the Browns were committing criminal acts.[6]  Moreover, this is not the first time where prosecutors investigated polygamists in retaliation for discussing their plural family in public, including prosecution based solely on bigamy.  *See* http://www.deseretnews.com/article/702595/Plea-bargain-reached-in-bigamy-case.html.

Second, the Defendants have ignored the Browns' monetary damages and loss of employment.  Monetary harm is perhaps the most incontrovertible injury in fact.  *See*, *e.g.*, *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005) ("Monetary harm is a classic form of injury-in-fact . . . Indeed, it is often assumed without discussion.").  The Browns have suffered monetary harm not only in the form of lost jobs and income, but the costs of having to move from Utah to insulate their families from the public investigation and public condemnations of the prosecutors.  J. Brown Decl. ¶¶ 9-19.  They have further been forced to regularly make long trips back to Utah to practice their religion and visit their family members.  *Id.* ¶ 17; Compl. ¶¶ 25, 27.   This "most mundane of injuries" is often determinative on the question of injury.  *See, e.g., Amnesty International USA v. Clapper*, 638 F.3d 118, 133 (D.C. Cir. 2011).  The costs of avoiding detection or interception by the government has been specifically recognized as an injury-in-fact.  *Id.* ("Having accepted the truthfulness of the plaintiffs' declarations for purposes of the summary judgment motion, the government cannot now dispute whether the plaintiffs genuinely fear being intercepted, or whether the plaintiffs have actually incurred the costs they claim to have incurred.").

---

[6]Notably, Defendant Buhman maintains that his office continues to investigate the Brown family without specifying the range of alleged crimes.  However, they began the investigation of the family due to their public discussion of their plural family and have repeatedly referred to the television program as the basis for their conclusion that the family was engaged in ongoing criminal acts.  In addition to discrimination against them for their religious practices and faith, Defendant Buhman succeeds in strengthening the claims of selective prosecution in such sworn statements.

Finally, the Defendants have ignored the obvious damage done to the reputations of the Plaintiffs in not only being defined as criminals under the state statute, but being denounced as criminals by the prosecutors in public statements. Damage to a plaintiff's reputation is an injury in fact sufficient to grant standing. *See Meese v. Keene*, 481 U.S. 465, 473-74 (1987); *see also Riggs v. City of Albuquerque*, 916 F.2d 582, 585 (10th Cir. 1990) ("[Harm] to a plaintiff's reputation in the community is a cognizable injury which affords a plaintiff standing to bring suit."). Reputational standing cases often link immediate reputational damage to possible future damage to a plaintiff's career. *See Meese*, 481 U.S. at 473 (noting that a senator's "ability to obtain re-election and to practice his profession would be impaired" by injury to his reputation). This Circuit has not articulated a definite standard for reputational injury but has frequently used the doctrine in combination with First Amendment "chilling effect" damages to grant standing to plaintiffs. *See Riggs*, 916 F.2d at 585; *Walker*, 450 F.3d at 1095. Other Circuits have held that a plaintiff has standing based on reputational injury when he challenges a law that brands him as a criminal. *Foretich v. United States*, 351 F.3d 1198, 1213 (D.C. Cir. 2003) (granting standing when plaintiff claimed the Elizabeth Morgan Act, a parent visitation statute, embodied "a congressional determination that he is a child abuser and a danger to his own daughter.").[7]

Because the Browns are open about their polygamist lifestyle, the criminal bigamy statute has the effect of "publicly labeling them as presumptive felons." Compl. ¶ 175. The statute further brands them as immoral and societal outsiders. Compl. ¶¶ 224, 226. These reputational injuries have already caused the loss of employment and curtailment of activities and associations. M. Brown Decl. ¶¶ 38, 40; K. Brown Decl. ¶¶ 27-31. They are likely to have negative influences on the careers of the other family members. *Id.* Such curtailment of

---

[7]Notably, *Foretich* involved a statute that did not specifically name Dr. Eric Foretich and instead described a group of parents in his position.

activities in fear of injuries has been found sufficient to standing. *Friends of the Earth v. Laidlaw,* 528 U.S. at 181-82; *see also Amnesty Int'l USA v. Clapper,* 638 F.3d 118, 142 (2d Cir. 2011).

Notably, the Defendants also ignore the harm caused by the disparate treatment given to plural families in being defined in public laws and denounced in public statements as a criminal association. Despite the fact that the second claim for relief is founded on the Equal Protection Clause, the Defendants do not mention that claim or the specific injuries associated with disparate treatment.[8] The Defendants entirely ignore the implications of their sweeping argument on standing. Putting aside the actual harm from the investigation and public statements of the Defendants, this argument would allow the State to declare any religious practice or association a crime. So long as the State denies an intention to prosecute any family, citizens would be barred from seeking judicial review of those laws. Thus, Utah could declare Catholics receiving communion to be a form of cannibalism or declare baptisms among evangelical Christians to be a form of attempted murder. As ridiculous as such laws might be, and as damaging as they would be to these communities, no challenge could occur under the State's theory. The Defendants simply dismiss the harm to families in being defined in a criminal code as a criminal association. The criminal code can then become an unreviewable

---

[8] In addition to the general standing analysis above, the Supreme Court has created a separate standard for standing applicable only to equal protection cases. *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Ne. Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). Under this standard, a plaintiff is granted standing if he shows that he faces a barrier to receiving benefits that other groups do not face. *See id.* A plaintiff need not show that he definitely would have received a benefit but for this barrier, he need only show that he was subject to some unequal treatment. *Id.* ("[The] 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."). In this case, the statutory classification of the Browns as part of a criminal association affects a host of public programs that require their registration or description of family members. The state is asking for such families to admit to defined criminal acts or risk accusations of false statements in seeking public assistance or benefits.

form of majoritarian terror – declaring any group to be criminal because of their private or

religious practices.  The Defendants do not address the Plaintiffs' allegations that a significant

number of citizens are allowed to have multiple lovers and children by those lovers without fear

of prosecution.

      Unlike past litigants, prosecutors singled out the Browns to declare their family a

criminal association and the parents presumptive felons.  Such labeling of an entire family placed

them into a small and stigmatized group – a status magnified by the statements that prosecutors

decided to make in the national media.  Yet, despite that obvious harm, the State would like to

establish precedent that no citizens in such a position can gain access to the courts to review

these laws.  They seek to use the majority's disagreement with their faith to distract from the

implications of that precedent.  It is easy for the majority to declare a minority faith a "cult" or a

crime in the confidence that no such laws would dare criminalize elements of their own faith.

      The Browns have established a comprehensive array of concrete injuries ranging from

loss of work to loss of reputation to emotional distress to denial of religious practices.  Any of

these injuries would be sufficient to defeat this motion to dismiss for all of the counts contained

in the Complaint.  The attached declarations offer detailed accounts of such injuries in addition

to those properly alleged in the Complaint.  What remains is not a question of injury or standing,

but the constitutionality of the law that is the basis of the actions taken against this family.

## II.  PLAINTIFFS' INJURIES WERE CLEARLY CAUSED BY DEFENDANTS AND CAUSATION CANNOT BE DISPUTED WITH CONCLUSORY STATEMENTS IN A 12(b)(6) MOTION.

      The Defendants make a brief argument against the causation element of standing, though

(again) omit any specific arguments against the injuries alleged by the Plaintiffs and their causal

linkage.  Thus, as with earlier sections, the Plaintiffs are placed in the position of imagining

arguments that the Defendants might make specifically to refute their claim of standing. Indeed, the Defendants do little beyond presenting the brief facts and holdings of a few cases – cases which are clearly distinguishable on their facts.

To have standing, a plaintiff's injuries must be "fairly traceable to the challenged action of the defendant . . . " *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992)). When a plaintiff brings a pre-enforcement challenge to the constitutionality of a statutory provision, the causation element of standing is met if "the named defendants . . . possess authority to enforce the complained-of provision." *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007). If the defendants have authority to initiate *criminal* proceedings, the injury, fear of prosecution, is "fairly traceable" to the defendants. *See id.*

For example, in *Bronson*, the court considered a challenge to Utah's bigamy statute that named the Clerk of Salt Lake County, Utah as the only defendant. *Id.* at 1101. The court held that the named defendant did not "cause" injury to the plaintiffs because the Clerk had no authority to initiate criminal proceedings against them. *Id.* at 1110. The court noted that an injunction against the Clerk would not shield the plaintiffs from prosecution for bigamy. *See id.*

The defendants in this case, however, had and have the authority to initiate criminal proceedings, including the investigation of the Browns that they ordered and then publicly discussed as looking into established crimes by the family. As members of the executive branch, Governor Gary R. Herbert and Attorney General Mark Shurtleff are charged with enforcing Utah's criminal provisions. Additionally, Utah County Attorney Jeffrey R. Buhman has "primary responsibility for the prosecution of criminal actions." Utah Const. art. VIII, § 16. Because Defendants have authority to initiate criminal proceedings against Plaintiffs, the injury

to Plaintiffs is "fairly traceable" to Defendants.  *See also Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979) (noting that "an officer of a state is an appropriate defendant if he has some connection with the enforcement of the act.").

The Defendants argue that *Bishop v. Oklahoma*, 333 Fed. Appx. 361 (10th Cir. 2009) supports their position that Defendants have not caused Plaintiffs' injury.  This case is inapplicable.  In *Bishop*, two lesbian couples challenged Oklahoma's constitutional amendment prohibiting homosexual marriage and named Oklahoma's governor and attorney general as defendants.  *Bishop*, 333 Fed. Appx. at 365.  The plaintiffs in that case were essentially seeking state recognition of their homosexual union; they were not, however, under threat of *criminal prosecution* for their lesbian relationship.  The *Bishop* court actually highlighted this distinction when it noted that there were no criminal penalties facing the couples that could be brought by the defendants.  *Id.* at 365.  Indeed, a criminal penalty could only be applied to the issuer of the marriage license.  *Id.*  Thus, the defendants in that case could not have caused injury to the plaintiffs.  *Id.*  Moreover, the Browns are not seeking to force the State to recognize polygamous marriages. Rather, they are challenging the right of the State to criminalize private, religiously-based relations between consenting adults.

For similar reasons, *Rizzo v. Good*, 423 U.S. 362 (1976) is also inapplicable.  In that case, the plaintiffs sued a city, its mayor and police officials for civil rights violations committed by a small minority of policemen.  The plaintiffs, however, were not under the threat of criminal prosecution.  The court noted that there was "no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by [the defendants] . . . showing their authorization or approval of such misconduct."  *Id.* at 371.  The District Court had ordered sweeping equitable relief[9] binding the operation of the police department but the

---

[9]The thrust of this case is declaratory relief and not such sweeping equitable relief as was

parties did not name parties responsible for the violations.  Instead, they referenced "a small, unnamed minority of policemen might do to them in the future."  *Id.* at 372.  Because none of the defendants acted affirmatively in the deprivation of the plaintiffs' rights, there could be no Article III standing.  *Id.*  Unlike the plaintiffs in *Rizzo*, Plaintiffs here are under the threat of criminal prosecution that can be initiated by Defendants.

It is difficult to imagine any causation claim that would be satisfied under the Defendants' presumed arguments.  In this case, Defendants are the very prosecutors who are charged with enforcing an unconstitutional law and the very prosecutors who made public statements that this family is committing established crimes under that law.  Once again, the implications of Defendants' argument is staggering – moving whole areas of misconduct outside the jurisdiction of the judiciary and leaving citizens without legal recourse in the face of abuse.

## CONCLUSION

The Defendants struggle mightily in this motion to avoid judicial review of the state bigamy statute – a law that stands in flagrant contradiction of both the Constitution and federal precedent.  To accomplish this end, they would establish a standard for standing so high that citizens directly labeled as criminals by statute and by prosecutors would be forced to endure such abuse – and the threat of prosecution – in silence.  This is precisely the purpose of such laws directed at religious minorities, to place them in forced silence in fear of losing their children and families.  The Defendants would preserve this Sword of Damocles dangling over the heads of plural families; an ever-present danger hanging only by the thin thread of the State's own discretion.  If this law is constitutional as they say, so be it.  However, this family should have the opportunity to speak to this Court and hear that conclusion from an independent judiciary.

_____

reviewed in *Rizzo.*

Accordingly, the Brown family respectfully asks that this Court deny the Defendants'

Motion to Dismiss and order the Defendants to answer their Complaint.


Respectfully submitted,

Jonathan Turley (*Pro Hac*)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001
jturley@law.gwu.edu


/s/ Adam Alba_____

Adam Alba, 13128
2167 N. Main St.
Centerville, UT 84014
(801) 792-8785
adam.alba@gmail.com

*Attorneys for Plaintiffs*