Jonathan Turley (*Pro Hac*)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001
jturley@law.gwu.edu

Adam Alba, 13128
2167 N. Main St.
Centerville, UT 84014
(801) 792-8785
adam.alba@gmail.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KODY BROWN, MERI BROWN, JANELLE BROWN, CHRISTINE BROWN, ROBYN SULLIVAN, <br><br> Plaintiffs, <br><br> v. <br><br> GARY R. HERBERT, in his official capacity as Governor of Utah; MARK SHURTLEFF, in his official capacity as Attorney General of Utah; JEFFREY R. BUHMAN, in his official capacity as County Attorney for Utah County, <br><br> Defendants. | **DECLARATION OF KODY BROWN** <br><br> Judge Waddoups <br><br> Civil No. 2:11-cv-00652-CW |

**DECLARATION OF KODY BROWN**

I, Kody Brown, do declare:

1. I am a plaintiff in the above captioned action and the husband in a plural family composed of myself, Meri Brown, Janelle Brown, Christine Brown, Robyn Sullivan, and our respective children.

2. In our plural family, only one couple, myself and Meri Brown, holds an official marriage license.

3. I was a resident of Lehi, Utah, where I was civilly married to Plaintiff Meri Brown, and spiritually married to Plaintiffs Janelle Brown, Christine Brown, and Robyn Sullivan.

4. My family are members of the Apostolic United Brethren Church, a fundamentalist faith and plural marriage is central to our faith.

5. In January 2011, I left Utah for fear that Utah law enforcement officials would break up my family and prosecute the adults under the state's criminal bigamy statute for maintaining a plural family.

6. We also left the state to try to protect the family against the economic and reputational harm caused by the ongoing criminal investigation and the public comments by prosecutors labeling us criminals.

7. My family had lived for years in contact with state officials, who were aware that we were a plural family.

8. When we considered participation in the *Sister Wives* program on TLC, I had repeated contacts with state officials. In the course of those meetings I asked the defendants questions to determine if we be would subject to investigation or prosecution if we went public

9. On at least three occasions in the year before *Sister Wives* aired, I spoke with Defendant Shurtleff and his press secretary about our plural family and our desire to go public.

10. On February 11, 2009, Christine Brown and I, along with over fifty other fundamentalists, attended "Legislative Education Day for Fundamentalist Mormons," held at the State Capitol building in Salt Lake City, Utah.

11. Defendant Shurtleff spoke with me at the event.

12. I told Defendant Shurtleff that I was considering going public with the details and realities of our plural family.

13. I asked Defendant Shurtleff if Shurtleff would pursue me criminally if I went public, and Defendant Shurtleff answered that he would not.

14. At this February 2009 meeting, Defendant Shurtleff told me that Utah lacked the resources to prosecute polygamists and that I would not be prosecuted unless I was committing crimes such as marrying child brides, promoting incestuous relationships, or committing welfare or tax fraud.

15. On September 25, 2009, both Defendant Shurtleff and I attended the "Polygamy and The Law Conference," held in Snowbird Ski Resort, Utah.

16. At the September 2009 conference, I again spoke to Defendant Shurtleff and asked if we would be prosecuted for going public with details of our plural family. Defendant Shurtleff again said that we would not, absent evidence of marrying child brides or committing welfare fraud.

17. In December 2009, before any contract was signed for the *Sister Wives* program, and long before its first episode, I spoke with Paul Murphy, press secretary to Defendant Shurtleff, who again assured me that the policy of the existing administration was not to prosecute people for simply being polygamists—even if they are public in their plural family arrangements.

18. Before the first episode of *Sister Wives* aired, I notified Mr. Murphy that my family had decided to go public as previously discussed.

19. However, the day after the first episode aired, Lehi Police Department publicly announced that our family was under investigation under the bigamy statute and were subject to prosecution for our plural family structure.

20. What followed were public statements from prosecutors reaffirming that the state viewed my family as felons and that we were committing criminal acts by living as a plural family.

21. Deputy Utah County Attorney Julia Thomas stated that we were placed under investigation when prosecutors saw promotional trailers for *Sister Wives* airing on TV. Vince Horiuchi, *Going Public 'Was a Risk Worth Taking,' Utah Polygamists Say*, Salt Lake City Trib., Sept. 29, 2010.

22. Ms. Thomas also stated that we were breaking the law and effectively admitting to criminal acts every night. *Id.*

23. Likewise, Donna Kelly, Deputy County Attorney for Utah County, publicly stated that "the Browns have definitely made it easier for us by admitting to felonies on national TV." Johnny Dodd, *Prosecutors in 'No Rush' to Complete Sister Wives Investigation*, People Magazine, Nov. 22, 2010.

24. These statements and the very public investigation have had an immediate, continuing, and negative impact on my family.

25. Our children have been asked whether their parents are criminals and would go to jail.

26. We have had to prepare for the possibility that the adults could be taken from our family – leaving our children without support or parental guidance.

27. Efforts of some of the adults to find employment was hampered by our being labeled as felons and guilty of open and admitted criminal acts.

28. For example, the day after the investigation was announced, one of my largest sales accounts in my prior employment contacted my office manager in Orem and said "we can't have Kody be associated with us anymore and we need the account reassigned."

29. I had developed this account over the course of three years and it was one of the top five accounts that I had maintained as a sales representative working for Young Electric Sign Company. This banking institution was very close to signing a new sale with me.

30. I saw other sales drop after the public comments of the prosecutors and the criminal investigation into our plural family.

31. Other members of the family also had the criminal investigation (and public statements of of the prosecutors) raised with them at their work as undermining their continued employment.

32. The threat of prosecution and public statements had a profound impact on the family's health and lifestyle. The adults lost sleep and Robyn dropped dangerously in weight over the constant threat that our family could be destroyed at any time.

33. The coercive effect on the entire family was so pronounced that any appearance of a police cruiser on our street became a matter of alarm – not knowing whether prosecutors had chosen this moment to break up our family and arrest some or all of the adults.

34. I intend to continue to practice my religious faith, including polygamy, as does my entire family.

35. I also intend to continue to be public about our family practices and structure.

36. We have, however, been curtailed in our speech and associations due to the threat of prosecution and continued public comments from prosecutors.

37. We have been unable to fully participate in our religious community due to our separation from Utah and we curtailed some associations and religious activities to try to protect family and friends from similar treatment by state officials.

38. We have also avoided some public appearances and commentary out of fear that we could trigger a crackdown by prosecutors and have repeatedly consulted with counsel before we answer questions about our lives publicly.

39. Unable to find work and facing continued statements from prosecutors of their ongoing investigation, my family moved to Nevada in the hopes of insulating the family from these pressures and the harm caused by the threat of prosecution.

40. The costs to the family for the investigation has been considerable. We have spent

thousands of dollars in the move to Nevada as well as the costs of traveling back and forth to Utah to participate in religious and family activities.

41. Yet even after the move to Nevada, prosecutors have continued to stress that their investigation of our family is ongoing and that they reserved the right to prosecute the family.

42. Our continued labeling as presumptive felons has proven a barrier in finding new positions for the adults in Nevada

43. We continue to live with the stigma of being publicly identified as criminals by the prosecutors and a law that defines our personal relationships as a felony.

44. Our children continue to go to school and live with comments about their family being defined as criminals by state law – and parents identified as presumptive felons.

45. The state of Utah has defined our family in the criminal code as criminals and simply insists that they may or may not arrest the adults in our family based on their own discretion.

46. No family should have to live under a classification as criminals simply because the majority of citizens object to their private relationships or religious-based practices.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 17th day of October 2011 in Las Vegas, Nevada.

Kody Brown
9333 Chilly Pond Ave
Las Vegas, NV  89129