IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KODY BROWN, MERI BROWN, JANELLE BROWN, CHRISTINE BROWN, ROBYN SULLIVAN, <br><br><br> Plaintiffs, <br><br> v. <br><br> GARY R. HERBERT, MARK SHURTLEFF, JEFFREY R. BUHMAN, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No.  2:11-CV-0652-CW <br><br> Judge Clark Waddoups |

## <u>INTRODUCTION</u>

Plaintiffs have filed this case to challenge Utah Code Ann. § 76-7-101 (the "Anti-Bigamy Statute" or the "Statute") as unconstitutional and enjoining its enforcement.  Before the court is Defendants' motion to dismiss Plaintiffs' complaint for lack of standing.  Defendants' motion is GRANTED in part and DENIED in part.  For the reasons stated herein, the court finds that Plaintiffs do not have standing to bring this action against Defendants Gary R. Herbert, in his official capacity as Governor of Utah, and Mark Shurtleff, in his official capacity as Attorney General of Utah.  They are DISMISSED.  The court finds that Plaintiffs have standing to continue against Jeffrey R. Buhman, in his official capacity as County Attorney for Utah County.

## FACTUAL BACKGROUND

Plaintiffs Kody Brown, Meri Brown, Janelle Brown, Christine Brown, and Robyn Sullivan are self-described polygamists that publicly lived in Utah as a plural family. During this time, members of the family have participated in a number of outreach efforts to speak and educate others about their lifestyle. For example, Christine Brown was interviewed on national television by HBO in 2007, participated in the television show *48 Hours* in 2008, and spoke to a University of Utah class about polygamy and her polygamist practices in 2009.

Through these and other activities, Plaintiffs became aware that the State of Utah has a policy of not prosecuting individuals for violations of the Anti-Bigamy Statute, except in cases where other crimes accompany the bigamy charge. Relying upon certain assurances of state officials leading up to 2010, the Browns became involved with the television series *Sister Wives* on TLC, which is a reality show based on their polygamist family.

After the show aired, the Lehi City Police Department began receiving a number of calls inquiring what the department intended to do. The day after the first episode aired, the Lehi City Police Department publicly announced that it was investigating Plaintiffs for bigamy. Similarly, the Utah County Attorney's office stated that the Browns were placed under investigation after its attorneys saw the *Sister Wives* promotional trailer and commented that the Browns have made it easier for prosecutors because they admitted to felonies on national television. Although prosecutors have left the possibility of other charges open, Plaintiffs' allegations support an inference that these investigations have centered on their bigamist activities. In contrast to the State, Utah County does not have a policy against prosecuting bigamists solely for bigamy. Indeed, since making the initial announcement and remarks, Utah County has remained silent on its intentions to prosecute or not prosecute the Browns under the Statute. Based on these

statements, Plaintiffs fled from Utah to Nevada for fear that they would be criminally prosecuted for practicing bigamy. Despite not living and exercising their speech in Utah, they continue to visit relatives and associates in Utah. Once the threat of prosecution is lifted, however, they expect to relocate to the State of Utah.

## STANDARD FOR A RULE 12(B)(1) MOTION TO DISMISS

Before the court is Defendants' Fed. R. Civ. P. 12(b)(1) motion to dismiss for lack of standing. The Supreme Court has directed that "[f]or purposes of ruling on a motion to dismiss for want of standing . . . courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (U.S. 1975). Indeed, this pleading standard "does not require detailed factual allegations, but . . . [a] pleading that offers labels and conclusions . . . will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement . . . ." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

The Tenth Circuit has further explained:

Generally, *Rule 12(b)(1)* motions to dismiss for lack of subject matter jurisdiction take two forms. First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true. Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under *Rule 12(b)(1)*.

*Holt v. United States*, 46 F.3d 1000, 1002-04 (10th Cir. 1995) (citations omitted).

Accordingly, insofar as Defendants have not challenged Plaintiffs' factual assertions, the court will accept them as true and look to whether such facts, as alleged, are sufficient to establish Plaintiffs' standing as a matter of law. Where Defendants have challenged Plaintiffs'

factual allegations, the court will rely on the evidence to make a factual finding and then apply those facts to the law.[1]

## <u>DISCUSSION</u>

The Tenth Circuit has stated that "[e]ach plaintiff must have standing to seek each form of relief in each claim." *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007). Furthermore, the court has "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (citations omitted); *see also, Citizens Concerned for Separation of Church & State v. City & Cnty. of Denver*, 628 F.2d 1289, 1297 (10th Cir. 1980) ("A federal court must in every case, and at every stage of the proceeding, satisfy itself as to its own jurisdiction.").

In order to demonstrate the "irreducible constitutional minimum of standing," the Supreme Court requires that a plaintiff meet the following three elements:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision.
>
> *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (U.S. 1992) (citations omitted).

---

[1]    The court invited the parties to present evidence, either orally or in written form, to support the positions they have taken on standing.  All parties elected to submit the motions on the allegations in the complaint and the documents and declarations submitted in support of the written memoranda.

## I. PLAINTIFFS' STANDING TO CHALLENGE UTAH'S ANTI-BIGAMY STATUTE DUE TO A CREDIBLE THREAT OF PROSECUTION[2]

### A. *The Injury-in-fact Prong of Standing*

Precisely how injury-in-fact must be pled depends largely upon the cause of action asserted and the relief requested. For example, "standing for retrospective relief may be based on past injuries [but] claims for prospective relief require continuing injury." *PETA v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir. 2002). Because Plaintiffs pray for a declaratory judgment that Utah Code Ann. § 76-7-101 is unconstitutional, an injunction preventing the statute's enforcement, and the reasonable attorneys' fees and costs required to maintain this action, the relief requested would be considered generally prospective.

The Supreme Court has instructed:

> A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. But one does not have to await the consummation of threatened injury to obtain preventive relief . . . . When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he would not be required to await and undergo a criminal prosecution as the sole means of seeking relief.

> *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979) (citations omitted).

Even under this loosened standard, it is not sufficient for Plaintiffs to simply argue that they felt threatened. Indeed, the facts must demonstrate an "objectively justified fear of real consequences." *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004). The difficulty with adjudicating cases such as this is that "clarity prevails only at the poles." *Bronson v. Swensen*, 500 F.3d 1099, 1108 (10th Cir. 2007) (citations omitted). In recognizing this difficulty, the Tenth Circuit has further explained:

---

[2] This analysis relates to Plaintiffs' First Claim for Relief: Due Process and Second Claim for Relief: Equal Protection.

At the "credible threat" pole lies pre-enforcement claims brought after the entity responsible for enforcing the challenged statute actually threatens a particular plaintiff with arrest or even prosecution. These claims can be juxtaposed with those situated at the "no credible threat" end of the spectrum. There the affirmative assurances of non-prosecution from a governmental actor responsible for enforcing the challenged statute prevents a "threat" of prosecution from maturing into a "credible" one . . . .

*Bronson v. Swensen*, 500 F.3d 1099, 1108 (10th Cir. 2007) (citations omitted).[3]

In this case, Plaintiffs contend that they have been, and continue to be, threatened by the prosecution of Utah's Anti Bigamy Statute. (Compl., ¶¶ 32-36, 166) (Dkt. No. 1). There is no allegation, however, that Plaintiffs have been directly threatened with either arrest or prosecution. Nevertheless, Defendants have never provided sworn assurances to Plaintiffs that they will not be prosecuted. [4] As such, this case falls in a hazy area without a particularly well-

---

[3] Defendants attempt to distinguish this action from two past cases, *Steffel v. Thompson*, 415 U.S. 452 (1974) and *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150 (10th Cir. 2006). (Defs.' Mem. Supp., 8) (Dkt. No. 8). *Doctor John's* considered the case of an adult products store owner who instigated an action to challenge as unconstitutional certain burdensome regulations focused at sexually oriented businesses. The City counterclaimed seeking a court order requiring Dr. John's to comply. Because Doctor John's had to choose between compliance or penalties, the court found injury due to the credible threat of enforcement. In *Steffel*, petitioner and others were directly threatened with arrest if they did not stop handbilling. As such, both of these cases resulted in standing due to a direct threat of prosecution or arrest. They are therefore emblematic of the clear credible threat pole, but say nothing of those cases found somewhere in the middle.

[4] Many of Defendants' arguments against standing revolve around the affidavits of certain Defendants disaffirming any plan or desire to prosecute Plaintiffs for their bigamist activities. However, these post-complaint affidavits – swearing to such facts as they exist at the date of the affidavit – have no bearing on the standing analysis. Rather, they should be reserved for an argument of mootness. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("The confusion is understandable, given this Court's repeated statements that the doctrine of mootness can be described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).")(citations omitted); *see also, Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1155 (10th Cir. 2005) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint.") (citations omitted); *see also, Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011) ("[S]tanding is determined at the time the action is brought, and we generally look to when the complaint was first filed, not to subsequent events.") (citations omitted). Inasmuch as Defendants imply that certain Tenth Circuit cases use post-complaint affidavits in their standing analysis, the court construes them in a manner consistent with Supreme Court precedence.

It is worth noting that including such affidavits at this juncture would have serious implications. First, where it is a plaintiff's burden to establish standing, it is the defendant's "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Friends*, 528 U.S. at 189. Using such affidavits in the injury analysis inappropriately requires the plaintiff to maintain an ongoing-threat after the complaint and presumably throughout the litigation. Second, by doing so, the mootness analysis is effectively mooted itself, because the court would necessarily decline to hear many cases due to a lack of standing, thereby never reaching a determination as to whether the "dispute is capable of repetition yet [evades] review," or whether the change in circumstances is due to "voluntary cessation of an alleged illegal practice." *Id.*, at 190-91.

defined test or analysis.  In trying to provide more definition in this opaque area of the law, the court notes that the Tenth Circuit has, in certain cases, used the terms "credible" and "likely" somewhat interchangeably.  *See D.L.S.*, 374 F.3d at 974.  Thus, there is precedent for assuming that a test of probability is appropriate.  That said, there still exists a question of whether "likelihood" means "more likely than not," or something less than probable but still "likely enough" to constitute an objective threat.

The Supreme Court has stated that "[w]hen plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298-299 (U.S. 1979) (citations omitted).  From this it cannot necessarily be said that standing is established anytime a remote possibility of prosecution exists.  The implication, however, is that probable prosecution is not required.

Nothing suggests that a threat is calculated at the margin of certainty, but through the momentum of the substantive acts and its temporal relationship to the conduct taken against the complaining party.  The court, therefore, holds that the appropriate focus is whether a reasonable person would view the threat of prosecution sufficiently likely that he or she would be deterred from engaging in the prohibited conduct or moved to conceal or otherwise restrain a full and open acknowledgment, participation, support or encouragement of such conduct.  Such a threat must be supported by facts that would lead a reasonable person to believe that prosecution is likely.  Sufficient facts are sensibly established where affirmative actions taken by governmental officials may be reasonably interpreted as materially tending toward prosecution.[5]

---

[5]     Even if the test were "more likely than not," the court finds that the allegations and evidence are sufficient to meet this test.

### i.  Utah's Anti-Bigamy Statute as Moribund

In determining whether Plaintiffs' case fits this definition, the court begins with a baseline analysis of whether Utah's Anti-Bigamy Statute is moribund.  Where a statute is recently enacted and is not moribund, its existence alone may create a threat that is credible enough to create standing.  *See Babbitt*, 442 U.S. at 301-02 (finding standing to challenge the constitutionality of a statute that criminalized certain deceptive statements made during consumer publicity campaigns, even though the state argued that no criminal penalties had ever been imposed under the statute and might never be imposed); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (finding a class of doctors who performed abortions had standing to challenge a Georgia statute banning the procedure, even though no physician had ever been prosecuted or threatened with prosecution for violating the act).

In contrast, when a statute has been on the books for a significant time but has not been regularly enforced, plaintiffs must usually show that something beyond the mere existence of the statute creates a credible threat of prosecution.  *See Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) ("The mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute.").  Past instances of enforcement against the plaintiff or others in the plaintiff's situation are factors that can be considered when determining whether a threat of prosecution exists to support standing. *Humanitarian Law Project v. United States Treasury Dep't*, 578 F.3d 1133, 1142 (9th Cir. 2009) (noting that one factor in "evaluating the genuineness of [a] claimed threat of prosecution [is] . . . the history of past prosecution or enforcement under the statute").  Even where enforcement actions have been brought under a statute, a clear threat of prosecution may not exist if the other

enforcement actions were for conduct different from a plaintiff's violative actions.  *See Bronson v. Swenson*, 500 F.3d 1099 (10th Cir. 2007) ("[T]he credibility of a 'threat' is diluted when a factual dissimilarity exists between the plaintiff's intended future conduct and the conduct that triggered any prior prosecutions under the challenged statute."); [6] *see also, D.L.S.*, 374 F.3d at 974-75 (10th Cir. 2004) ("[A] plaintiff cannot show a real threat of prosecution in the face of assurances of non-prosecution from the government merely by pointing to a single past prosecution of a different person for different conduct.").

Plaintiffs and Defendants note a handful of cases that demonstrate past prosecutions of bigamists in Utah.  Inasmuch as the bigamy charges were brought in conjunction with other crimes, the court finds them inapposite.  The court will briefly note only those cases mentioned that do not fall into this category.

*In re Steed*, 2006 UT 10, 131 P.3d 231, 231-32 concerns the removal of a Utah Justice Court judge who was married in a religious ceremony to an additional wife after being appointed to the bench by the city council.  (Pls.' Opp'n, 8) (Dkt. No. 12); (Defs.' Reply, 7) (Dkt. No. 19). Although the judge's removal was due to his bigamy, it followed a recommendation by the Utah Judicial Conduct Commission in which no prosecutors were involved because the thrust of the complaint was the judge's failure to uphold the Utah Constitution and laws after having sworn to do so.  Accordingly, this case fails to support a threat of future prosecution.

---

[6]      In *Bronson v. Swensen*, 500 F.3d 1099 (10th Cir. 2007), Plaintiff sought to "end the *criminalization* of the practice of religious polygamy."  *Id.* at 1105.  The injury alleged, however, was simply a denial of marriage licenses. *Id.*  The court found (1) that Plaintiffs were never "charged, prosecuted, or directly threatened with prosecution." *Id.*; (2) that they had repeatedly admitted that "Utah's criminal law against polygamy is not being enforced;" and (3) that they had failed to show that the clerk had both the power and the likelihood of enforcing Utah's criminal laws against them.  *Id.* at 1109.  In contrast to *Bronson*, Plaintiffs here allege a number of actions taken by Utah County that suggest that a credible threat of prosecution exists.  Despite the fact that polygamists have rarely been prosecuted for polygamy, those actions undermine that no credible threat of prosecution exists.  Lastly, there is no doubt that the Utah County prosecutors' office has the power to enforce Utah's anti-bigamy laws.  As such, *Bronson* is distinguished from the instant case.

Plaintiffs also point to a 1999 case in which Mark Easterday pled guilty to bigamy.  (Pls.'
Opp'n, 8); (Defs.' Reply, 7).  According to the evidence, he was charged with bigamy and no
other crime.  Ultimately, he was threatened with jail time if he did not submit to a plea
agreement.  Thus, this case creates some threat of prosecution.[7]  However, because it is the only
notable case involving the prosecution of bigamy in the past thirteen years, the court finds that
Utah's Anti-Bigamy Statute may be generally considered moribund.  Plaintiffs must therefore
demonstrate that additional threatening activities were taken by government officials to show
that a credible threat of prosecution exists.

### ii.  Utah State Officials

Despite naming as Defendants Gary R. Herbert and Mark Shurtleff, Plaintiffs fail to
allege any actions by them, at their direction or, indeed, at the direction of the State of Utah that
could be construed as threatening Plaintiffs with prosecution for bigamy.  To the contrary, it is
undisputed that the State has a policy of not prosecuting polygamy, except in such circumstances
where other crimes are being committed.  (Compl., ¶ 142.)  For this reason, Plaintiffs were
assured by Defendant Shurtleff and his office on multiple occasions that they would not be
prosecuted for their participation in the *Sister Wives* series.  (Compl., ¶¶ 141-42, 144-45.)
Indeed, nothing suggests that the State of Utah has taken any action towards Plaintiffs that could
be interpreted as threatening prosecution.  The court, therefore, finds Plaintiffs' allegation that
the "Utah Attorney General's Office also announced a criminal investigation of the Browns for
violating Utah's criminal bigamy law" to be unsubstantiated and it must therefore be
disregarded.  (Compl., ¶ 159.)  Thus, it is clear that an objective threat of prosecution by the

---

[7]        Defendants note that Mr. Easterday was only prosecuted after his first wife alerted prosecutors.  This
ultimately cuts against Defendants' argument, because it establishes a willingness to prosecute bigamy when the
case is brought to a prosecutor's attention, despite not actively looking for such cases.  (Defs.' Reply, 7) (Dkt. No.
19).

State of Utah does not exist.  Accordingly, Defendants' motion as to Gary R. Herbert and Mark

Shurtleff is granted.[8]

### iii.  Utah County Prosecutors

Although the court finds that no Utah State Official has taken actions that credibly

threaten prosecution, this is *not* the case with the Utah County Prosecutor's office.[9]  Lt. Paul

stated that after the *Sister Wives* show aired, the Lehi City Police Department "started receiving

calls from all over the place, wondering what we intended to do."[10]  (Pls.' Supp. Authority, 3)

(Dkt. No. 28-1).  Then, "[t]he day after the show premiered . . . the Lehi City Police Department

announced it is conducting a bigamy investigation of the family."  (Kody Brown Aff., 2) (Dkt.

No. 13); (Pls.' Supp. Authority, 3) (Dkt. No. 28-1).  Indeed, Deputy Utah County Attorney, Julia

Thomas, is alleged to have stated publicly that the Browns were placed under investigation after

prosecutors saw a *Sister Wives* promotional trailer.  (Kody Brown Aff., 3.)  And Lehi City Police

Lt. Darren Paul indicated that bigamy was the focus of the investigation, stating, "Right now

we're looking at the bigamy aspect of it.  As the investigation goes on, we'll see where it goes

---

[8]      Defendants Herbert and Shurtleff may also be dismissed for Plaintiffs' failure to demonstrate the causation element of standing.  As stated, *infra*, the causation element in a pre-enforcement challenge to the constitutionality of a statutory provision is met if "the named defendants . . . possess authority to enforce the complained-of-provision."  *Bronson v. Swenson*, 500 F.3d 1099, 1110 (10th Cir. 2007).  Plaintiffs have failed to allege that Defendant Herbert, in his official capacity as Governor of the State of Utah, has such authority.  "General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law."  *Waste Mgmt. Holdings v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001); *see also, Day v. Sebelius*, 376 F. Supp. 2d 1022, 1031 (D. Kan 2005) (finding that the Kansas Governor's general enforcement power as prescribed in Kansas Const. Art. 1, § 3 is insufficient to confer jurisdiction in the challenge of a statute).  Like the Kansas Constitution, the Utah Governor's executive power is similarly stated: "The executive power of the state shall be vested in the Governor who shall see that the laws are faithfully executed."  Utah Const. Art. VII, § 5(1).  As such, Governor Herbert is not a proper defendant.

[9]      At the hearing held December 16, 2011, the court inquired into the fact that the Lehi City Police Department was alleged to have made the announcement, but was not listed as a defendant.  Plaintiffs explained that Jeffrey R. Buhman and the Utah County Prosecutors office is the prosecutorial arm for the Lehi City Police.  Defendants accepted the proffer without objection.  As such, the court finds that for purposes of standing, those actions taken by the Lehi City Police Department may be appropriately extended to Jeffrey R. Buhman in his official capacity as County Attorney for Utah County.

[10]      Despite the inherent evidentiary problems associated with news articles, each party has submitted such information without objection.  Accordingly, the court will not decide their admissibility.  Their factual content is deemed conceded for purposes of this motion.

from there."  (Pls.' Supp. Authority, 5) (Dkt. No. 28-1).  Based upon that announcement, all

Plaintiffs allege that they then "fled Utah for fear that Utah law enforcement officials would

prosecute them under the State's criminal bigamy statute for maintaining a plural family."

(Compl., ¶¶ 32-36.)  Considering the unchallenged allegations and evidence as presented, the

court finds that the allegations support an inference that the actions of the Lehi City Police

Department and Utah County prosecutors were in response to Plaintiffs' participation in the

*Sister Wives* television show, and that such actions focused directly and exclusively on Plaintiffs'

bigamist conduct.

Before deciding on whether this activity constituted a credible threat of prosecution, the

court notes that unlike the State, "Utah County does not have a formal, declared policy regarding

prosecution of polygamy."  (Buhman Aff., ¶ 6) (Dkt. No. 8-1).  Consistent with this lack of

policy, Mr. Buhman has sworn that he has "not stated publically that [he] will or will not

prosecute the Browns."  (Buhman Aff., ¶ 5); (Pls.' Supp. Authority, 7) (Dkt. No. 28-1).  That

said, Mr. Buhman has submitted nothing to the court that either counters Plaintiffs' account of

the events, or otherwise suggests that the prosecutorial door is not wide open.  Indeed, at oral

argument, Utah County expressly declined to disavow that Plaintiffs may be prosecuted for

bigamy and acknowledged that the investigation of Plaintiffs is continuing.  Rather, Defendants

simply argue that "the Utah County Attorney has never tracked [polygamists in Utah County]

and [that] the office is not currently tracking any of these polygamist communities."  (Buhman

Aff., ¶ 8.)  Defendants also argue that the lack of prosecution by Utah County demonstrates that

"the track record of Utah County belies any likely future prosecution."  (Defs.' Mem. Supp. Mot.

Dismiss, 11) (Dkt. No. 8).  Although such prosecutions may not actually be sought, Utah County

has no legal, practical or policy-based impediment against prosecuting bigamists that simply

become known to the prosecutors – such as through a reality television series.  In the end, no evidence suggests that the actions of Utah County officials tended toward anything but prosecution.

Utah County seeks to excuse their failure to disavow any prosecution by arguing that "there are good reasons why prosecutors have rules against commenting on a case during an investigation or prior to an arrest."  (Defs.' Reply, 5) (Dkt. No.19.)  The problem with this statement, however, is that it completely contradicts the fact that the prosecutors *did* comment on the case in announcing the investigation, before the eyes of the public.  (Pls.' Supp. Authority, 3) (Dkt. No. 28-1).  Indeed, members of the Lehi City Police Department have been interviewed or otherwise quoted for public statements in news and tabloid sources, including the *Deseret News*, *The Salt Lake Tribune*, and *People Magazine*.  (Compl., ¶¶ 163, 165, 167.)  Such statements have included threatening language, stating that Plaintiffs "have definitely made it easier for us by admitting to felonies on national TV." (Pls.' Supp. Authority, 6) (Dkt. No. 28-1), (Compl., ¶ 165),  (Kody Brown Aff., 3) (Dkt. No. 13).  As such, Utah County cannot now tenably argue that it has a right to wage a public relations battle in front of the bright-lights of the national media and then exercise the option to abscond to the shadows without consequence when before the court.

The entirety of actions by the Utah County prosecutors tend to show either an ill-conceived public-relations campaign to showboat their own authority and/or harass the Browns and the polygamist community at large, or to assure the public that they intended to carry out their public obligations and prosecute violations of the law.  Without any evidence to the contrary, the court assumes that these are consummate professionals making announcements of criminal investigations to apprise the public that they are doing their duty and seeking to enforce

the law.  Indeed, it makes no sense for Mr. Buhman and his office to make a public display of an investigation of a crime that, as Defendants note, needs little investigation due to Plaintiffs' own public admissions.  (Defs.' Reply, 3) (Dkt. No. 19) (stating, "[i]f the prosecutors were going to prosecute the Browns for polygamy, they do not need to do an investigation").

In *fine*, although this case does not lie at the extreme of the "credible threat" pole, it is very, very close.  Indeed, a public announcement by Utah County officials was substantial and done quickly in response to the airing of *Sister Wives*.  Their acts suggest that an actual prosecution of Plaintiffs is forthcoming.[11]  And without any mitigating evidence to counter-balance the affirmative actions of government actors which tend toward prosecution, the court finds that a credible threat of prosecution, although not certain, objectively and credibly exists.  Accordingly, Plaintiffs' have established injury-in-fact.

**B.   *The Causation Prong of Standing***

The causation element in a pre-enforcement challenge to the constitutionality of a statutory provision is met if "the named defendants . . . possess authority to enforce the complained-of-provision."  *Bronson v. Swenson*, 500 F.3d 1099, 1110 (10th Cir. 2007) (finding that the clerk did not cause injury by denying a marriage license because the clerk had no authority to initiate criminal proceedings).  It is undisputed that Jeffrey R. Buhman, in his official capacity as County Attorney for Utah County, has the authority to enforce Utah's Anti-Bigamy Statute.[12]  And, because it is alleged that Mr. Buhman and his office took the affirmative threatening acts, this prong is met.

---

[11]    The fact that ten months had passed at the filing of the complaint without an active prosecution is of no moment.  The fact that Mr. Buhman has continued to leave the prosecutorial door open, fails to mitigate the other acts and statements previously made.

[12]    The Utah Constitution provides that they are the "public prosecutors who shall have primary responsibility for the prosecution of criminal actions brought in the name of the State of Utah . . . ."  Utah Const. Art. VIII, § 16.

**C.  *The Redressability Prong of Standing***

The Tenth Circuit has stated that "the requirement of redressability ensures that the injury can likely be ameliorated by a favorable decision."  *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1233 (10th Cir. 2010).  Although Defendants have not disputed redressability, it is important to note that more is needed than a court decreeing a statute unconstitutional.

> If courts may simply assume that everyone (including those who are not proper parties to an action) will honor the legal rationales that underlie their decrees, then redressability will always exist. Redressability requires that the court be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power.
>
> *Rhodes v. Judiscak*, 653 F.3d 1146, 1150 (10th Cir. 2011) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring)); *see also Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) ("[W]here a plaintiff seeks a declaratory judgment against his opponent, he must assert a claim for relief that, if granted, would affect the behavior of the particular parties listed in his complaint.").

In other words, "it must be the effect of the court's judgment on the defendant that redresses the plaintiff[s'] injury, whether directly or indirectly."  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005).  Because Plaintiffs seek not only a ruling that Utah's Anti-Bigamy Statute is unconstitutional, but also seek to enjoin its enforcement against Defendants and, because such an injunction would relieve Plaintiffs' threat of prosecution, the redressability prong is met.  (Compl., 39.)

## II.  PLAINTIFFS' STANDING TO CHALLENGE THE ENFORCEMENT OF UTAH'S ANTI-BIGAMY STATUTE UNDER A CHILLING OF FIRST AMENDMENT RIGHTS[13]

Plaintiffs argue that because the Utah County criminal investigation followed their public discussion and transparency "to the world about their plural family," the investigation is therefore "calculated, or has the effect of, chilling the Brown family's speech . . . ."  (Compl., ¶¶ 206-08.)

"[B]ecause of the significance of First Amendment rights, the Supreme Court 'has enunciated other concerns that justify a lessening of prudential limitations on standing.'"  *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997) (quoting *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984)).  This is because "the mere threat of prosecution under [an] allegedly unlawful statute may have a 'chilling effect' on an individual's protected activity, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged."  *Id.*; *see also New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500 (10th Cir. 1995) ("First Amendment rights of free expression and association are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss.  In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill.").

---

[13]     This analysis relates to the following First Amendment claims: Third Claim for Relief: Free Exercise; Fourth Claim for Relief: Free Speech; Fifth Claim for Relief: Freedom of Association; Sixth Claim for Relief: Establishment of Religion.

A. ***The Injury-in-Fact Prong of Standing Under a First Amendment Chilling Theory***

The Tenth Circuit has articulated the standing requirements for a First Amendment "chilling" in *Walker*:

> We hold that plaintiffs in a suit for prospective relief based on a "chilling effect" on speech can satisfy the requirement that their claim of injury be "concrete and particularized" by (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so *because of* a credible threat that the statute will be enforced . . . . If the plaintiffs satisfy these three criteria, it is not necessary to show that they have specific plans or intentions to engage in the type of speech affected by the challenged government action.

> *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006).

"Allegations of a subjective chill on a plaintiff's speech are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006). The court now applies the facts as stated in the complaint and the evidence as offered in the hearing on this motion to the *Walker* prongs.

i. **First Prong: Plaintiffs engaged in the type of speech affected by the challenged government action.**

To meet the first prong of *Walker*, Plaintiffs allege that they have lived openly as a plural or polygamous family in Utah for many years and have continued to speak about their lifestyle in an effort to educate the public. (Compl., ¶¶ 119-20, 128-29.) For example, Plaintiff Christine Brown participated in public interviews, including a nationally televised interview with HBO in 2007, the television show *48 Hours* in 2008, and spoke to a University of Utah class about polygamy and her polygamist practices in 2009. (Compl., ¶¶ 130-33.) In 2010, the Browns

17

became involved with the *Sister Wives* television program, a popular TLC network reality

television series based on their family.  (Compl., ¶¶ 22, 157.)  The Browns have stated that "they

knew the dangers of going public with their lifestyle, but insisted it was worth the risk to educate

people about polygamy."  (Pls.' Supp. Authority, 6) (Dkt. No. 28-1).  As such, there is no doubt

that Plaintiffs "have engaged in the type of speech affected by the challenged government

action."  *Walker*, 450 F.3d at 1089 (10th Cir. 2006).  Accordingly, the first prong of *Walker* is

met.

### ii. Second Prong: Plaintiffs have a present desire, though no specific plans, to engage in such speech.

It is clear from the pleadings that the Browns participated in the *Sister Wives* program in

Utah, but after the alleged threats by Utah County they felt compelled to move to Nevada in

order to freely continue their participation in the television program.  Defendants argue that

Plaintiffs' speech has not been chilled because their participation in the program has continued.

This is incorrect.  Because Plaintiffs are challenging the constitutionality of a Utah statute under

a chilling theory, it is their speech in Utah that is material.  As such, it is unimportant whether

they continue their speech outside of Utah, or continue to simply visit relatives and associates in

Utah.  (Compl., ¶ 25.)

Lastly, it is clear that the Browns would like to return to Utah.  (Compl., ¶ 28.)[14]  Janelle

Brown has stated, for example, that if Utah's anti-bigamy law was found unconstitutional and

"this threat lifted from our family, we would feel free to finally return to Utah . . . ."  (Janelle

Brown Aff., ¶ 27) (Dkt. No. 15).  Based upon the evident desire to continue with the *Sister Wives*

program, and their desire to return to Utah, the court finds that Plaintiffs have expressed "the

---

[14]     The complaint alleges that "[t]he Brown family expects to move back to Utah in light of their strong connection to the state."  (Compl., ¶ 28.)  Because nothing suggests that the Browns have an actual plan or timeframe for doing so, the fact that they "expect" to move back to Utah is construed as simply an optimistic hope to return.

present desire, though no specific plans, to engage in [their] speech." *Walker*, 450 F.3d at 1089.

Accordingly, this prong is met.

### iii. Third Prong: A plausible claim that Plaintiffs presently have no intention to do so *because of* a credible threat that the statute will be enforced.

The Tenth Circuit has noted that most cases involving "standing based on a First

Amendment chilling effect arise in the context of criminal laws prohibiting various forms of

speech or expressive conduct." *Walker*, at 1088.  Chilling does not, however, only occur in the

direct regulation of expression context.  Indeed, "[a] plaintiff who alleges a chilling effect asserts

that the very existence of some statute discourages, or even prevents, the exercise of his *First*

*Amendment* rights." *Id.* at 1089.  Thus, for the chilling effect to amount to an injury, "it must

arise from an objectively justified fear of real consequences, which can be satisfied by showing a

credible threat of prosecution or other consequences following from the statute's enforcement."

*D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004) (citing *Ward*, 321 F.3d at 1267).  Such "other

consequences" can include softer harms, such as reputational damage.  *See Walker*, 1096 (citing

*Meese*, 481 U.S. at 472-73 (noting that the government's labeling of films as "political

propaganda" made it undesirable for Plaintiff to exhibit them, thus causing an objective chill on

his First Amendment right)).  Indeed, "*Meese* demonstrates that, in some cases, *First Amendment*

plaintiffs can assert standing based on a chilling effect on speech even where the plaintiff is not

subject to criminal prosecution, civil liability, regulatory requirements, or other direct effect, and

even where . . . the plaintiff has not asserted any legal interest that is subject to judicial

protection." *Walker*, at 1096.

This case differs in that Plaintiffs' "other consequences" (e.g. reputation, monetary

damages, lost jobs, etc.) do not extend from the simple existence of the anti-bigamy statute.  It

likewise follows that an injury stemming from a threat of enforcement is only cognizable if the

threat of enforcement is itself credible.  As such, the chilling analysis to establish standing in this action must focus on whether there is a credible threat of enforcement.  For the reasons previously articulated, *supra*, the court finds that this prong is met.

### B. The Causation and Redressability Prongs of Standing Under a First Amendment Chilling Theory

For the reasons discussed, *supra*, the court finds that the standing prongs of causation and redressability are met.

As a final note, the court reiterates the Supreme Court's comment that "when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged."  *Munson Co., Inc.*, 467 U.S. at 956.  This interest is no more prominently displayed than in a case such as this, where government officials make public comments regarding the instigation of a criminal investigation in direct response to a party's exercise of free-speech and then, seek to bar Plaintiffs' access to the courts and *de facto* strip them of any opportunity to be heard.  Such precedent would not create a simple slippery-slope, but an unfettered path towards government harassment and abuse.  Accordingly, Plaintiffs have established standing to bring their First Amendment claims against Utah County.

### III. THE COURT'S ORDER TO SHOW CAUSE

On October 28, 2011, the court issued an order to show cause why the United States should not be joined as a required party due to its interest in Utah's prohibition of polygamous or plural marriages as a condition for granting statehood, as stated in the Utah Enabling Act of 1894, ch. 138 § 3,28 Stat. 107,108.  Having reviewed the briefs, the court determines that notice will be given to the United States to determine if it wishes to intervene.

## <u>CONCLUSION</u>

For the reasons stated herein, Defendants' motion as to Defendants Gary R. Herbert, in his official capacity as Governor of Utah, and Mark Shurtleff, in his official capacity as Attorney General of Utah, is GRANTED.  These Defendants are dismissed.  Defendants' motion with regard to Jeffrey R. Buhman, in his official capacity as County Attorney for Utah County, is DENIED.

DATED this 3rd day of February, 2012.

BY THE COURT:

Clark Waddoups
United States District Court Judge