IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| KODY BROWN, MERI BROWN, | ) |
| JANELLE BROWN, CHRISTINE | ) |
| BROWN, ROBYN SULLIVAN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )Case No. 2:11-CV-652CW |
| | ) |
| GARY R. HERBERT, MARK | ) |
| SHURTLEFF, JEFFERY R. BUHMAN,| ) |
| | ) |
| Defendants. | ) |

Transcript of Motions for Summary Judgment

BEFORE THE HONORABLE CLARK WADDOUPS

January 17, 2013

Karen Murakami, CSR, RPR
144 U.S. Courthouse
350 South Main Street
Salt Lake City, Utah 84101
Telephone: 801-328-4800

1

APPEARANCES OF COUNSEL:


For the Plaintiffs:   JONATHAN TURLEY
                      Attorney at Law
                      George Washington University
                      Law School
                      2000 H Street, NW
                      Washington, D.C. 22101

                      ADAM ALBA
                      Attorney at Law
                      610 Crestwood Circle
                      Bountiful, Utah 84010


For the Defendants:   JERROLD S. JENSEN
                      THOMAS D. ROBERTS
                      Assistant Attorneys General
                      160 East 300 South
                      Salt Lake City, Utah 84111

```
1        Salt Lake City, Utah, Thursday, January 17, 2013

2                        *   *   *

3              THE COURT:  We are here in the matter of

4   Brown and others v. Herbert and others, case

5   2:11-cv-652.  Will counsel please state their

6   appearance.

7              MR. TURLEY:  Good morning Your Honor,

8   Jonathan Turley and my colleague Adam Alba here

9   representing the Brown family.

10             THE COURT:  Thank you.

11             MR. JENSEN:  Good afternoon Your Honor,

12  Jerrold Jensen and Tom Roberts on behalf of the

13  defendant.

14             THE COURT:  Thank you.  We are here for

15  argument on cross-motions for summary judgment.  And in

16  order to fix the arguments clearly in my mind, it would

17  be helpful if we could start with the defendant.

18  Mr. Jensen, if you would come forward.

19             As a preliminary matter, as I have read the

20  papers and as I understand the position of the defense,

21  the defendant, there really are no disputed issues of

22  fact here; is that correct?

23             MR. JENSEN:  That's essentially correct,

24  yes.

25             THE COURT:  I understand you to make some
```

1   legal arguments as to the significance of some of those

2   facts, but there is no evidence presented to find that

3   the facts are otherwise than stated by the plaintiffs in

4   this case; is that correct?

5           MR. JENSEN:  We referenced a couple of facts

6   that we took some issue with, but the overall thrust of

7   it there's no dispute.

8           THE COURT:  Let's make sure that we're on

9   the same page as to those facts.  As I understand it,

10  you raised concerns about paragraphs 3, 11, and 32,

11  which were references that you disagreed with as to the

12  intent of the drafters of the criminal statute; is that

13  correct?

14          MR. JENSEN:  That's correct.

15          THE COURT:  And actually, while you disagree

16  with that statement, the state has provided no evidence

17  to support any contrary intent of the drafters other

18  than what's in the statutes themselves.

19          MR. JENSEN:  That's correct.

20          THE COURT:  The defendant also objected to

21  paragraph 20, which references statements made by the

22  office of the defendant, not directly by the defendant

23  himself.  As I understand your position, you're not

24  denying that the statement was made, simply that it was

25  not made with the intent of the defendant to be bound by

1   it.

2          MR. JENSEN:  That is mostly correct.

3   Mr. Buhman would probably word it slightly different,

4   Your Honor, and I don't know that it makes a big

5   difference.  But he would say, as it was reported in the

6   paper, he has no knowledge that those statements were

7   actually made or that they were made in the wording that

8   was reported in the press, but it's a minor issue.

9          THE COURT:  All right.  Now, second is in

10  its opposition to this the defendant has chosen -- well,

11  let me preface this.  The plaintiff has made arguments

12  that under six different clauses of the United States

13  Constitution that there is a violation -- or at least a

14  constitutional problem.  The defense chose in its

15  opposition not to respond separately to each of those

16  counts.  Do you now wish to make an argument as to each

17  of those counts, particularly the Due Process Clause,

18  the Equal Protection Clause, the Free Exercise Clause,

19  the Establishment Clause, the Free Speech Clause, and

20  the Freedom of Association?

21          MR. JENSEN:  Well, I think we addressed the

22  Due Process Clause in our reference to the Lawrence

23  case, which is that's what that is about.  I think we

24  addressed our Free Exercise Clause when we referenced

25  the Reynolds case.  The Potter case also deals with the

1    due process right of privacy.  So those were the ones we

2    focused on as the principal arguments of the plaintiff.

3    It was kind of a kitchen sink argument, Your Honor, I

4    mean we threw in everything plus the kitchen sink.

5              THE COURT:  Are you talking about your

6    opposition or are you talking about the plaintiffs'

7    analysis?

8              MR. JENSEN:  The plaintiffs.  There are a

9    litany of theories and --

10             THE COURT:  I think their argument, as I

11   understand it, is that they say there are problems under

12   each one of those clauses, and the defendant chose not

13   address most of the arguments.

14             MR. JENSEN:  The defendant chose to say that

15   the Tenth Circuit has dealt with this issue twice in the

16   last five years and has said that the precedent is clear

17   and controlling, that there is a wealth of precedent

18   that it is persuasive, and we relied upon those cases of

19   the Tenth Circuit.

20             THE COURT:  All right.  Well, I'm going to

21   give you a little further opportunity to explain your

22   position.  Let's start with the due process claim.

23   First of all, Lawrence I believe is the latest

24   expression of the Supreme Court of the rights under the

25   Due Process Clause.  And would you start as to what your

1    position is as to what the correct standard of review

2    under the Due Process Clause is.

3              MR. JENSEN:  The correct standard of review

4    in this case, because we're not dealing with a

5    fundamental right or a suspect class, would be a

6    rational basis.

7              THE COURT:  Tell me why you believe we're

8    not dealing with a fundamental right.

9              MR. JENSEN:  There is no court in this

10   country that has held that the practice of polygamy is a

11   fundamental right.

12             THE COURT:  Let me ask you, to further

13   understand your position on this, what is it that

14   constitutes -- what is the conduct that distinguishes

15   this behavior as being polygamist behavior?

16             MR. JENSEN:  Well, when you say "this

17   conduct," I'm --

18             THE COURT:  Let me explain further.  Let's

19   assume that a man chooses to have intimate relationships

20   with three different women, each of whom resided in

21   different residences, and he has children with all of

22   them, would that be violative of -- would that be

23   polygamist conduct?

24             MR. JENSEN:  Is he married to any of them

25   legally?

1                    THE COURT:  Isn't that the question?

2                    MR. JENSEN:  I mean you've stated a fact.

3       I'm trying to understand the clarification.

4                    THE COURT:  Let's assume that he does not

5       have a marriage license or recognized public document

6       saying he's married to any of them.

7                    MR. JENSEN:  That would not be -- I don't

8       think that would be termed polygamy because there's no

9       marriage.

10                   THE COURT:  Would that be a fundamental --

11      would his right to engage in that conduct be a protected

12      fundamental right under the Due Process Clause?

13                   MR. JENSEN:  Marriage is a fundamental

14      right.  I don't know that that conduct is a fundamental

15      right.  The Lawrence case stands for the principle --

16                   THE COURT:  Let me tell you what you say in

17      your brief.

18                   MR. JENSEN:  Okay.

19                   THE COURT:  You say that, As applying

20      Lawrence, the present case, the State of Utah is in

21      complete accord with applying the holding of Lawrence to

22      plaintiffs' intimate sexual conduct in the home.

23      Neither Utah's constitutional provision banning polygamy

24      nor the state's bigamy statute criminalizing polygamy

25      prohibit plaintiffs' private sexual conduct.  In the

1    hypothetical I've given you that would be the

2    plaintiffs' private sexual conduct, his intimate sexual

3    conduct in the home, his intimate relationships with

4    three different women, and having children with those

5    three different women, you seem to say that that's

6    recognized under Lawrence as a fundamental right.  Are

7    you now disagreeing with that?

8                MR. JENSEN:  No, I think that's right.

9                THE COURT:  So now what is the

10   distinguishing characteristic between that conduct and

11   the conduct that you argue is alleged to be criminalized

12   by this statute?

13               MR. JENSEN:  Well, the conduct is

14   criminalized by the statute where a man has a civil

15   marriage, or a recognized civil marriage with one of the

16   women.

17               THE COURT:  Now, when you say "recognized

18   civil marriage," you mean a legally-recognized civil

19   marriage.

20               MR. JENSEN:  Legally-recognized civil

21   marriage, and then has what they hold themselves out to

22   be as another marriage to additional spouses.

23               THE COURT:  Let's assume your situation,

24   that a man is legally by law recognized as married to

25   one woman and then he has intimate sexual relationships

1    continuing with two other women, but he doesn't make any

2    professions of any commitment to these women, he just

3    engages in adulterous conduct.  Does the statute come

4    into play in those circumstances?

5              MR. JENSEN:  I don't think it does.  The

6    cohabitation would apply if they were living in one

7    household and cohabitating as a man and plural wives.

8              THE COURT:  Now, let's suppose in that

9    same --

10             MR. JENSEN:  The situation you presented is

11   no different than someone having an affair, which --

12             THE COURT:  Okay.  Would strict scrutiny be

13   the appropriate standard under the Due Process Clause to

14   analyze this conduct?

15             MR. JENSEN:  To analyze the conduct of what?

16             THE COURT:  That we've just been talking

17   about, the man that's legally married to one woman but

18   has adulterous relationships and children with two other

19   women.

20             MR. JENSEN:  No, I don't think there's a

21   fundamental right to have an adulterous relationship.

22             THE COURT:  Isn't that what I just read from

23   your brief that you just said you agreed that there was

24   a fundamental right?

25             MR. JENSEN:  Well, but the Lawrence -- yes,

1    the Lawrence case says there is a fundamental right to

2    have intimate sexual relations.

3              THE COURT:  And it doesn't limit it to one

4    person.

5              MR. JENSEN:  No, doesn't limit it to one

6    person.

7              THE COURT:  So you would agree under that

8    circumstance if there was a law attempting to prohibit

9    that behavior it would have to be analyzed under strict

10   scrutiny.

11             MR. JENSEN:  Yes.

12             THE COURT:  Now, let's -- to understand your

13   position, let's assume the same scenario, legal marriage

14   to one woman, intimate relationships with two additional

15   women, but as to one of those women he makes a public

16   pronouncement that says I'm committed to this woman, I'm

17   going to take care of her for the rest of her life, does

18   that change the analysis?

19             MR. JENSEN:  Well, I don't know that it

20   changes the analysis.  The polygamy aspect of this

21   requires that there be a marriage of some sort, a second

22   or third or fourth marriage.

23             THE COURT:  But that's the problem is

24   deciding what constitutes a marriage for purposes of

25   this act.  Does the public pronouncement that I intend

1    to be committed to this woman, I will take care of her

2    and her children for as long she lives, is that enough

3    to make a marriage?

4           MR. JENSEN:  I'm not sure that's enough to

5    make a marriage, no.

6           THE COURT:  Okay.  Let's suppose that he

7    says the same thing, but he says it to his Jewish rabbi,

8    does that now become a polygamist marriage?  And the

9    rabbi says I bless you and recognize you as husband and

10    wife.

11           MR. JENSEN:  Well, if they are holding

12    themselves out as husband and wife, I would recognize

13    that as a marriage.

14           THE COURT:  So is it the recognition by a

15    religious organization that it believes that they are

16    living together in a recognized relationship by that

17    religion sufficient?

18           MR. JENSEN:  No, no, no.

19           THE COURT:  What is the defining conduct

20    that takes this out of being under strict scrutiny?

21           MR. JENSEN:  I think it's the representation

22    that they make to the world as to what is their

23    relationship.  If they make it as husband and wife, then

24    that constitutes marriage under the statute.

25           THE COURT:  If they say we're not husband

1    and wife, we just live together, then it's not under the
2    statute.
3              MR. JENSEN:  Then it's not governed under
4    the statute.
5              THE COURT:  Let's assume that you are
6    correct that a rational test applies there, tell me what
7    rationalization the state has to prohibit the difference
8    between a person saying I'm committed to this woman and
9    we live together as husband and wife, as opposed to I'm
10   committed to this woman, but we just live together, what
11   is the societal interest that you think is rationally
12   protected by criminalizing that conduct?
13             MR. JENSEN:  I don't think there's any
14   question about that, Your Honor.  What's rational about
15   criminalizing it is the children that are produced by
16   the polygamist marriages.
17             THE COURT:  There's no difference between
18   the two, as I can see it.
19             MR. JENSEN:  As far as --
20             THE COURT:  They're living together, they
21   have children together, he said I'll take care of you,
22   he just doesn't call her his wife.  Does the fact that
23   he calls her a wife entitle the state to criminalize the
24   conduct?
25             MR. JENSEN:  It does because of the

1    criminality that comes out of polygamous unions and in

2    the polygamist communities and the harm that is

3    perpetrated on women, and particularly young girls, but

4    it also applies to young boys.

5              THE COURT:  All of that is irrelevant to

6    this case.  Isn't your argument way overbroad?

7              MR. JENSEN:  No, because we're talking about

8    the polygamy statute, the bigamy statute.

9              THE COURT:  Yes, but we're --

10             MR. JENSEN:  Why does the state have a right

11   to criminalize that?  And the answer is is because of

12   the criminality that comes out of the polygamist

13   communities, and the stories are replete about that and

14   it goes on and this state has a history of it for a

15   hundred or more years.

16             THE COURT:  But all of that criminality has

17   separate statutes that deal with it in a manner that

18   there is no evidence that is not completely satisfactory

19   to address those problems.

20             MR. JENSEN:  Well, the problem is that

21   they're such insular societies that we -- that law

22   enforcement can't address those problems, so that the

23   means of doing it is to criminalize the actual

24   polygamist marriages.

25             THE COURT:  And the factor that you think

1   makes the difference is the fact that in one case the

2   man says she's my wife and in the other case he says I

3   just live with her.

4           MR. JENSEN:  Well, you know what, the law

5   has to draw a line somewhere.

6           THE COURT:  They have to be rational lines,

7   they have to be supported with some reason.  Tell me the

8   reasons.

9           MR. JENSEN:  Why is drunkenness at .08 and

10  not .07?  There is a line drawn somewhere.  And the fact

11  is people tend to be married when they have children.

12  Do we criminalize those who have children out of

13  marriage?  We do not.  But those who hold themselves out

14  to be married and have children, there are such harms

15  that we have seen in the history of this state that have

16  been generated from that that the legislature has made

17  the decision to criminalize those unions.  That's

18  perfectly rational to me, Your Honor.

19          THE COURT:  Could the state make the

20  decision that we're going to criminalize every person

21  that has an illegitimate child under the Constitution?

22          MR. JENSEN:  No, I think not.

23          THE COURT:  I think that's what the Lawrence

24  case stands for, you couldn't criminalize it.  So

25  there's got to be something at play here more than just

1    the fact that there are harms to children being born in

2    illegitimate relationships.  What I'm looking for is you

3    to help me find what is that distinguishing factor?  And

4    frankly on the face of this history it appears to be

5    religion.

6              MR. JENSEN:  Well, there is no question that

7    polygamy is associated with religion in this state.  Not

8    all of the cases that have been prosecuted in this state

9    are against people that assert religion as a defense.

10   There has been cases in which there was not religion.

11             THE COURT:  But aren't those cases all where

12   there was legally recognized marriages claimed as to

13   both spouses?

14             MR. JENSEN:  Yes, yes, yes.

15             THE COURT:  That's a different scenario than

16   what we're talking about here.

17             Let me go to the next matter, which is the

18   equal protection claim --

19             MR. JENSEN:  Let me come back to this,

20   though, because not all of the harms that are talked

21   about in our society dealing with the polygamist

22   communities relate to just children.  There are a lot of

23   harms that are imposed upon women, and the literature is

24   replete with it, and we can supply the court with those

25   stories if you want, but essentially the women are

1   subjected, they're exploited, they have children on a

2   repeated basis, they have no financial independence,

3   they are unable to assert themselves, they are unable to

4   leave that situation if they want, they have a high

5   degree of health problems, higher than normal in

6   society, they have a higher degree of trauma, they have

7   a higher degree of dissatisfaction in their marriages

8   because the marriages tend to be -- there's an age gap

9   between the women and the men.  They become widows at a

10   much earlier age, more of them are on welfare than in

11   the society at large.  I mean the list goes on and on.

12   They receive more Medicaid than in society at large.

13   There are harms that apply to them as well.

14          THE COURT:  Well, all of that may be true,

15   but you chose not to present any evidence to support any

16   of those positions in this case.

17          MR. JENSEN:  Well, I've talked about social

18   harms as to -- we've certainly talked about social

19   harms.

20          THE COURT:  But you've presented no evidence

21   to support your assertions that you just made.  You

22   accepted the facts of the plaintiffs in this case.

23          MR. JENSEN:  Well, we pointed out stories of

24   harms.

25          THE COURT:  But, yes, you argued them, but

1    you didn't provide any evidence to the court or did you

2    provide the plaintiffs an opportunity to test those

3    allegations with cross-examination or evidence of its

4    own.

5          MR. JENSEN:  We haven't ever had that

6    opportunity, Your Honor.

7          THE COURT:  Of course you did.  That's what

8    summary judgment is about.

9          MR. JENSEN:  This is a test, this is a

10   facial challenge to a statute of the State of Utah.

11         THE COURT:  And also as applied to these

12   specific plaintiffs.

13         MR. JENSEN:  Well, it hasn't been applied to

14   them at all.  It's a facial challenge.  It's not an as

15   applied challenge.  And the criteria for determining

16   whether or not the legislature has made a rational

17   decision in criminalizing the activity is not scientific

18   proof or putting before this court all of the evidence

19   that may be out there to determine that.  The question

20   is is there a rational reason for the legislature to

21   make the decision it's made.  And given the harms that

22   we've pointed out, I think that's highly -- we have a

23   page limitation, Your Honor, as to what can be submitted

24   here.

25         THE COURT:  Well, there was no page

1    limitation imposed on you.

2            MR. JENSEN:  Oh, I asked Mr. Turley if he

3    would allow me to file extended pages, after I granted

4    him that, and he refused.

5            THE COURT:  It's well accepted in the

6    community that I've never once denied anyone filing a

7    brief because of page limits.  That's not -- and your

8    page limit didn't even come close to the allowed page

9    limit.

10           MR. JENSEN:  On the original memorandum it

11   did not.  On the reply it did.  We had to cut out a lot

12   of material to comply with the page limitation.  We

13   could have gone on and on about the harms.

14           THE COURT:  Let's go to the next element,

15   which is the equal protection claim.  What's the

16   appropriate standard of review under the equal

17   protection claim?

18           MR. JENSEN:  Rational review.

19           THE COURT:  Why isn't it heightened

20   scrutiny?

21           MR. JENSEN:  I don't even see how the Browns

22   can assert equal protection.  I mean they're a class of

23   one.

24           THE COURT:  Well, you just told me there was

25   a whole class of many people practicing polygamy which

1    you believe provide a social harm.  Aren't they part of

2    a discrete and insular minority, people who believe in

3    and profess to practice polygamy?

4              MR. JENSEN:  Yes.

5              THE COURT:  Doesn't that standard require

6    that the court apply heightened scrutiny?

7              MR. JENSEN:  Well, maybe it does.  I would

8    think it's still -- I would think on this statute we're

9    still talking about a rational basis.

10             THE COURT:  Okay.  There's some suggestion

11   that even if it's not heightened scrutiny, it should at

12   least be intermediate scrutiny.  Have you given any

13   thought to whether that's the proper standard?

14             MR. JENSEN:  Well, I haven't given -- not on

15   the Equal Protection Clause.  I'm not even sure whether

16   the Equal Protection Clause even comes in in here.

17             THE COURT:  Well, but that's -- the

18   plaintiffs argue it does.  Is your argument you want me

19   to make the decision on your basis that you don't

20   believe the Equal Protection Clause applies?  Is that

21   the basis for the argument you want me to accept?

22             MR. JENSEN:  No.  The basis for the argument

23   we want you to accept is that --

24             THE COURT:  Under equal protection.

25             MR. JENSEN:  -- is that the Tenth Circuit

1    has declared that the Utah statute is constitutional.

2              THE COURT:  Has the Tenth Circuit ever

3    addressed the analysis under the Equal Protection

4    Clause?

5              MR. JENSEN:  I think that analysis has been

6    addressed -- I don't think it was addressed in Potter.

7    I think it's been addressed by the Utah Supreme Court in

8    the Holm case.

9              THE COURT:  The Holm case did address it but

10   not the Tenth Circuit.

11             MR. JENSEN:  Yes, that's right.

12             THE COURT:  Under the standard there must

13   serve important government objectives.  What would you

14   believe that the government objective for this statute

15   is?

16             MR. JENSEN:  Well, the governmental

17   objective of this statute is to prevent harms that have

18   been perpetrated on women, children, young girls and

19   young boys.  There isn't any question what the purpose

20   of statute is, Your Honor, it's to prevent a whole raft

21   of harms that are --

22             THE COURT:  What evidence or historical

23   support can you provide that that's why this statute was

24   adopted?  That's not why any of the legislation that

25   came about that was litigated in the Reynolds case came

1   about, came about for those reasons.  It came about

2   because of attempts to stamp out a religious practice.

3              MR. JENSEN:  Well, the Reynolds case talks

4   about evil consequences from -- that come about from

5   polygamy.

6              THE COURT:  Well, it says western society

7   has recognized that polygamy is not good, acknowledging

8   that Asiatic and African societies have recognized it.

9              MR. JENSEN:  Well, the court also talks

10  about the evil consequences.  That language is in that

11  case.

12             THE COURT:  But it doesn't talk about the

13  specific items that you just raised about abuse of

14  children and abuse of women.

15             MR. JENSEN:  Well, I would assume evil

16  consequences are abuse of children and abuse of women.

17  I don't know what other evil consequences there are.

18             THE COURT:  And that's the objective that

19  you argue that the court should consider in terms of

20  weighing whether or not it satisfies muster under the

21  Equal Protection Clause.

22             MR. JENSEN:  Whether or not there are harms

23  on society absolutely.  The government has a legitimate

24  interest in protecting people from being injured.  There

25  is no question about that.

1           THE COURT:  All right.  Let's go to the free

2   exercise claim.  Which standard do you believe applies

3   under the free exercise claim?

4           MR. JENSEN:  Again, my answer is the same.

5   We do not have a suspect class, we do not have a

6   fundamental right, therefore its the rational review.

7           THE COURT:  How would you deal with the fact

8   that, I think you just acknowledged, that the

9   legislation that we are dealing with arises out of a

10  strong history that has religious implications?

11          MR. JENSEN:  Well, the current statute that

12  was passed in 1973 comes about from the Model Penal

13  Code, which was the Utah Legislature went through their

14  criminal code in 1973 and they deleted polygamy from

15  their statute, they changed the language of the statute,

16  they made it a bigamy statute, and it conforms to the

17  Model Penal Code much like the other 49 states in this

18  country.

19          THE COURT:  The recent -- you reference the

20  fact that the Reynolds case has been cited recently.

21  Would you agree or disagree that it has been primarily

22  cited for the fact that a neutral law of general

23  applicability is not unconstitutional.  That's the

24  reason -- that's the basis the Reynolds case is largely

25  cited for?

1          MR. JENSEN:  Yeah.  It was cited in that

2    Smith v. Oregon case and --

3          THE COURT:  Would you also agree that that

4    is conditioned by the fact that it cannot incidentally

5    negatively affect a particular religion or religious

6    group?  In other words, the law of neutral applicability

7    can't be structured in such a way that it negatively

8    affects a particular religious group.

9          MR. JENSEN:  Oh, yeah, I would agree with

10   that.

11         THE COURT:  Doesn't this law have a problem

12   under that test?

13         MR. JENSEN:  No.  No, because it applies to

14   everyone practicing polygamy.  Not all of them are

15   religious.

16         THE COURT:  Do you think the court should

17   ignore the history as to how we got these laws?

18         MR. JENSEN:  Well, I think we can all agree

19   on how we got the laws.  But, you know what, Your Honor,

20   every state in the country has the law and not every

21   state in the country has Mormon polygamists.

22         THE COURT:  All right.  But that's how you

23   want the court to analyze it under that -- your argument

24   is I should assume that it is a neutral -- a law of

25   neutral applicability and it doesn't have any impact on

```
1   any particular religious group.
2           MR. JENSEN:  Absolutely.
3           THE COURT:  Let's go to the free association
4   claim, is your argument same?
5           MR. JENSEN:  The same.  I don't even see
6   where the free association captures this.  Free
7   association does not apply to marriages.  There's no
8   court that's held that when they discuss marriages that
9   they granted under the First Amendment free association.
10          THE COURT:  Are you aware of the Roberts v.
11  United States Jaycees case, the United States Supreme
12  Court 1984?
13          MR. JENSEN:  You know, I've seen that case.
14  I've not read it.
15          THE COURT:  I believe the court said that in
16  that case freedom of association applies in two distinct
17  instances, one, choices to enter into and maintain
18  intimate human relationships.  Doesn't that apply here?
19          MR. JENSEN:  Marriage is more than an
20  intimate human relationship.  Marriage is so much more.
21  And that's the problem we have with the Lawrence case,
22  it applies to intimate human relationships.  But
23  marriage is a different -- it's a different animal
24  altogether.  Does it include that?  It does.  But is it
25  more?  It is so much more.  It is the production of
```

1    children, it is holding yourself out to society, it

2    deals with our inheritance laws, it deals with our tax

3    laws, it's throughout our society.

4          THE COURT:  But the problem is we had

5    started out I was asking you your view of how it would

6    apply, is that this law doesn't appear to make any clear

7    distinction between conduct that may be harmful to

8    society simply because someone says that I call that

9    person my wife.  That's the problem, that's the

10    struggle.  If you can help me figure out how this is

11    different than the enumerable circumstances that are not

12    criminalized in which people live together, they have

13    children together, they have multiple partners with whom

14    they have children, and the state doesn't choose to

15    criminalize any of that behavior simply because they

16    don't call each other husband and wife.  Now, I'm trying

17    to understand what additional element comes into play

18    here that would justify the state criminalizing this

19    behavior.

20          MR. JENSEN:  I'll tell you what makes it

21    different, and that is the harms, the injuries to

22    people, particularly children, but also women, that come

23    out of the polygamist communities.  We have a history of

24    it in this state, we have seen it repeatedly, it goes on

25    and on, and the stories are in the thousands about the

1    harms to these people.  And it applies more to the

2    polygamist community than it does to society at large.

3    It applies to more the polygamist communities in this

4    state than it does to the people you're talking about

5    that have the illegitimate children and have the

6    cohabitation and are not married.  But the harms are

7    greater.  14-year old girls of an illegitimate union are

8    not forced to marry.  15-year old boys of an

9    illegitimate union are not kicked out of the community

10   and dumped on the streets of Las Vegas, Phoenix, and

11   St. George and told to fend for themselves.  Children of

12   illegal union -- of -- illegitimate children of those

13   unions in this state do not have a higher criminal

14   record than those in the polygamist communities.  The

15   polygamist communities in every one of those situations

16   has a higher level of criminality or harm that's caused

17   to them than any other group you're talking about.

18   That's why the state has chosen to criminalize it.

19            THE COURT:  How would you respond to the

20   fact that none of that is implicated by the behavior

21   that is raised by the plaintiffs in this case?

22            MR. JENSEN:  It's a facial challenge.  I

23   think it makes absolutely no difference.  So what.

24            THE COURT:  Okay.  I'll analyze it on that

25   basis.

1          Would you agree that the strict scrutiny

2     applies under the Establishment Clause challenge?

3          MR. JENSEN:  No, no.  Same answer.  It's not

4     a suspect classification, it's not a fundamental right.

5     I don't see how you get to the Establishment Clause.  It

6     makes no sense to me.  We're not -- the state isn't

7     establishing a religion by criminalizing bigamy any more

8     than the 49 other states are establishing a religion by

9     criminalizing bigamy.

10          THE COURT:  But the Establishment Clause

11     extends to laws that facially discriminate between

12     religions.  And I've heard your argument that you

13     believe that on its face it doesn't, but when you look

14     at the history you have to really wonder how you could

15     reach that conclusion, and the threat that it imposes to

16     particular religious communities primarily in this

17     state, isn't that a fact?

18          MR. JENSEN:  Well, sure.  Certainly.

19          THE COURT:  Anything further that you want

20     to add before I give Mr. Turley an opportunity to

21     address the court?

22          MR. JENSEN:  Well, give me a minute.

23     Mr. Turley states in his response memorandum that social

24     harm -- pursuant to the Lawrence case, social harm is no

25     longer a basis for a state intruding into the private

```
1    lives of citizens.  Absolutely dead wrong, and that is
2    probably the key here as to why he and I would disagree
3    on this, because the Lawrence case says just the
4    opposite.  It says that while the court is cautioned --
5    the court cautions the states and courts against setting
6    boundaries on personal relationships.  That guidance
7    applied only so far as there is no threat of, and I
8    quote, "no injury to a person or abuse of an institution
9    the law protects."  End of quote.  That's on page 567 of
10   the Lawrence case.  Injury and social harm to me are
11   synonymous terms.  The Lawrence court is saying that the
12   state can intervene when there is an injury to a person
13   or an institution that the law protects.
14           Now, my main emphasis here is on the injury
15   to a person because it seems replete to me in the
16   polygamist communities.  There are so many thousand
17   women in this state that will talk about the harms
18   they've received as a result of being in the polygamist
19   communities.  Those stories, if given the opportunity,
20   can be presented to the court.  But it's pretty common
21   knowledge in this state that those stories are out
22   there, and that's the basis upon which the legislature
23   has acted.
24           Secondly, we're talking about an institution
25   the law protects.  Now, I don't know precisely what the
```

 1   court meant by that, but it is possible that it means

 2   the institution of monogamous marriage.  Does the

 3   legislature have a right to pass laws that protect the

 4   institution of monogamous marriage?  It seems to me like

 5   the Lawrence court is saying that it does.  And I think

 6   that is fundamental to this case, protect individuals

 7   and, secondarily, protect the institution that the law

 8   protects.  There isn't any question the law protects

 9   that in this country.  All of the states have laws

10   banning the practice of polygamy.  Utah is not unique in

11   that.  We just have more history about it than anybody

12   else because of our unique history in that regard.

13            THE COURT:  Well, are there any further

14   facts you want to present or argument to the court as to

15   how you believe this law, given its breadth, protects

16   the institution of marriage, assuming that that's what

17   the Lawrence court meant, and by institution it meant

18   the institution of the monogamous marriage?  How do you

19   believe allowing consenting adults to live together and

20   make a commitment to each other to provide for each

21   other during their lives is damaging to the institution

22   of monogamous marriage?

23            MR. JENSEN:  If you're talking about one

24   person --

25            THE COURT:  I'm talking about one plaintiff

1   and his three other co-plaintiffs who all made

2   commitments to live together, take care of each other,

3   treat each other in that way, how is that a damage to

4   the institution of monogamous marriage?  It seems to me

5   it's just the opposite.  You've told me that the law

6   doesn't criminalize people who fail to make that

7   commitment, and because these people make the

8   commitment, it's criminalized.  Explain why that's

9   rational.

10          MR. JENSEN:  Well, with consenting adults, I

11  admit if you limit -- if you limit the relationship to

12  just consenting adults, I understand the argument, but

13  that is not our fact situation when the legislature is

14  looking at the practice of polygamy in this state.

15          THE COURT:  But that is the application of

16  the act -- of the statute to the plaintiffs in this

17  case.

18          MR. JENSEN:  But it's not being applied to

19  the plaintiffs in this case.  It's a facial challenge,

20  this is a facial challenge to the statute.  They haven't

21  been charged.

22          THE COURT:  But the statute is so broad that

23  it implicates these plaintiffs and criminalize them.

24  I've already found they have standing.  And you may be

25  right in particular cases there wouldn't be any

1    challenge at all, certainly wouldn't be in a case if the

2    minor is a girl or someone that was forced into a

3    marriage.  Those cases would be easy, but that's not our

4    case.  We have a statute that is broad enough to reach

5    out and embrace the very people you said you could

6    understand why the law shouldn't reach them.  Help me

7    understand why the law should be allowed to be that

8    broad.

9              MR. JENSEN:  Well, the fact of the matter is

10   the statute isn't enforced against that scenario.

11             THE COURT:  Doesn't that argue against it?

12             MR. JENSEN:  Well, yes.  I mean sure.  But

13   it works both ways.

14             THE COURT:  So the statute should be found

15   to be unconstitutional to the extent it is interpreted

16   so broadly as to apply to these people.

17             MR. JENSEN:  I'm sorry, I didn't hear all of

18   that, Your Honor.

19             THE COURT:  So the statute should be

20   interpreted to be unconstitutional to the extent it can

21   be interpreted so broadly to apply to these plaintiffs.

22             MR. JENSEN:  You never know when a situation

23   changes.

24             THE COURT:  But they should be entitled to

25   know whether or not their behavior is criminal or not

1    criminal.  That's a fundamental principle of the

2    applicability of a criminal law, it must be clear enough

3    so a person knows whether or not his behavior is

4    criminal or not criminal.

5              MR. JENSEN:  That is correct.

6              THE COURT:  How do these plaintiffs know

7    whether their behavior is criminal or not criminal?

8              MR. JENSEN:  Well, all I can say, Your

9    Honor, is that the Tenth Circuit repeatedly has upheld

10   this statute as constitutional.  And we submit to you

11   that --

12             THE COURT:  Never in a case like this.

13             MR. JENSEN:  Well, that's not true.  In the

14   Bronson v. Swenson case there were no children, there

15   was no record of abuse, none of that at all, and the

16   court -- the court goes through that case and very much

17   delineates the holding in Reynolds, the holding in

18   Potter, calls that controlling and persuasive and,

19   therefore, says that the statute is constitutional,

20   calls it clear precedent.  It then goes on and dismisses

21   the case on other grounds because of standing.

22             THE COURT:  It was all dicta.

23             MR. JENSEN:  Well, it's all dicta, but we

24   treat that as if it's meaningless.  It's not meaningless

25   at all.  The Tenth Circuit goes through that litany of

1    those cases and specifically states that it's

2    controlling precedent.  I mean the holding of it is on

3    standing, you're right, but the Bronson v. Swenson case

4    is that way.  The case cited a year and-a-half ago, the

5    Adgeh case.

6                THE COURT:  Same thing.  It wasn't cited on

7    the basis of facts applicable here.  It was cited on

8    another basis.

9                MR. JENSEN:  But it also said that Reynolds

10   and Potter were clearly controlling, clear precedent.

11               THE COURT:  For the principle that it has

12   neutral application.

13               MR. JENSEN:  Sure.

14               THE COURT:  Okay.  Anything further before I

15   give Mr. Turley an opportunity to speak?

16               MR. JENSEN:  That's all, Your Honor.

17               THE COURT:  All right.

18               Mr. Turley.  And probably the right place to

19   start is to start with Mr. Jensen's argument that the

20   legislature can look at a social harm and based on that

21   argument of social harm decide that a statute is

22   necessary to prevent broader harm.  How do you respond

23   to his critical argument on that point?

24               MR. TURLEY:  Well, first of all, Your Honor,

25   we have not argued that social harm can never be the

1    basis for a statute, what we've argued is that the

2    social harm arguments made by the government are

3    woefully inadequate.  You can't just say social harm and

4    say that that satisfies the standard.  To the contrary,

5    we've cited various cases where the Supreme Court has

6    said quite forcefully you can't just simply make

7    conclusory statements.  One of the cases would be the

8    Cleburne case that we cited where the court specifically

9    said that it will not allow these types of cited

10   justifications that are, quote, "so attenuated as to

11   render the distinction arbitrary or irrational."  And

12   with all due respect to my esteemed colleague, I would

13   suggest that what was on display here shows precisely

14   that, that the state is offering, quote, "stories,"

15   close quote, to the court that have not been presented.

16            I want to emphasize one thing, Your Honor,

17   the state summary judgment motion and brief was 11

18   pages.  Our opening summary judgment brief was 71 pages.

19   And I did express concern about extending pages when I

20   could not respond.  And, as you know, we also opposed

21   the timing of the filing which also weighed heavily in

22   that position.  But what the court -- what the state has

23   said is that it has stories in the thousands that

24   somehow the court should take judicial notice of, and

25   that is an invitation to take judicial notice of

1    stereotypes.  I can give you stories in the tens of

2    thousands of monogamous families where abuse has

3    occurred.  It's not appropriate in a summary judgment

4    motion before a federal court to ask the court to take

5    judicial notice of that type of evidence.  It's not

6    evidence at all.

7              Now, what I find particularly troubling is

8    that the state is suggesting that not only could you

9    assume whatever it means by social harm and it's not

10   required to put that evidence on, but that it's also

11   completely immaterial about who the plaintiffs are.  As

12   you know, we have brought both a facial and as applied

13   challenge.  But the most important thing about these

14   plaintiffs is that they demonstrate that there are

15   plural families where this type of abuse doesn't occur,

16   and there are these criminal statutes that allow for the

17   prosecution when things like child abuse do occur.  I

18   have no idea what the state is referring to when it says

19   that in just illegitimate unions, as he called it, you

20   don't have kids being forced out into the street.  I

21   have no idea where that type of evidence comes from.

22   It's something out of the head of Zeus, but it is not on

23   the record, and I don't think how you could possibly

24   find that anywhere on earth.  Obviously there's abuse in

25   families, obviously it's a tragedy.  But to simply say

1    you can assume it with regard to plural families, it's

2    not just unfair, it just can't be done under the federal

3    rules.

4            Now, the other thing I wanted to address on

5    that point, Your Honor, is that the state continually

6    comes back and says whatever social harms mean we're

7    particularly concerned because these communities are so

8    insular, which is quite maddening because the reason the

9    communities are so insular is because the state has made

10   the status of the relationships a crime.  And so this

11   becomes quite circular.  The state says if you have a

12   plural relationship you're a felon.  In fact, the

13   defendant in this case went public to say these people

14   are all committing felonies through his subordinates.

15   That might have something to do with the fact that these

16   communities remain insular.  If you don't want them to

17   be insular, the first step might be to say we're not

18   going to criminalize you just for your private

19   relationship.

20           The other problem that I see in these types

21   of arguments, Your Honor, and I would love to get to

22   Reynolds and to Lawrence in a second, is that the court

23   was probing the question of how you distinguish between

24   relationships.  That's been obvious, you know,

25   throughout this case that the state has a population

1    that clearly contains some that have adulterous

2    relationships, it clearly has people that are living

3    with people who are not their spouses.  This statute

4    criminalizes cohabitation.  And the state is locked into

5    one thing that comes out of the state system, it is not

6    required to follow the State Supreme Court and its

7    interpretation of the Federal Constitution, as you know.

8    But the State Supreme Court is given deference on what

9    the statute means.  And the court in Holm said it

10   doesn't require marriage.  It's all about cohabitation.

11   They adopted the broadest possible interpretation, and

12   that, I believe, does control.

13            Now, I also am a little confused with some

14   of the discussion of the individual counts, Your Honor.

15   With equal protection I heard the state recognize that

16   this is a discrete and insular minority.  I think it has

17   to be.  But then when we get to free exercise, the state

18   indicated that this was not a suspect class.  And then

19   when we got to establishment, it said the reason

20   establishment doesn't apply is because it's not a

21   suspect class.  Establishment doesn't require that you

22   have a suspect class.  That's not part of the test.

23            And, furthermore, when counsel says he

24   hasn't read Roberts that would explain a lot because

25   Roberts is the controlling case in this area for free

 1   association.  And what Roberts says about free

 2   association goes directly to these types of intimate

 3   relationships.

 4            Now, Your Honor, the court -- the

 5   government's limited argument in this case focuses

 6   almost entirely on Reynolds, what we call the "Hail

 7   Mary" pass, and it's a pass that is meant to clear

 8   Lawrence, which is the most recent discussion of the

 9   Supreme Court, and throw the ball back to the Nineteenth

10   Century and to rely on a case that is widely condemned

11   as one of the most vile and prejudicial cases in its

12   language that the court has ever handed down.  To

13   suggest that Reynolds is still good law, I have to

14   submit, with all due respect, is perfectly bizarre.

15   Reynolds was saying the very thing that the state

16   finally admitted it would not say in this case.  If you

17   look at the last series of briefs, the state said, to

18   its credit, that it will not argue nor can it argue that

19   morality alone can be the basis for a statute.  That's

20   exactly what Reynolds is arguing.  Reynolds, as we've

21   quoted, makes repeated reference to upholding the good

22   order in morals of society, to use the defendant's

23   language.  It is important to remember that Reynolds was

24   the same group of justices that handed down Pace v.

25   Alabama for the same reason when it allowed the

1    criminalization of marriages of mixed races.  That was

2    overturned in Loving.  And the only reason I raise that

3    is not only was it this particular court that handed

4    down Reynolds, honored almost consistently with reversal

5    in later years.  But if the state's argument is correct,

6    then Loving should never have happened, Lawrence should

7    never have happened.

8             Indeed, if you look at Reynolds, the court

9    asserts that it can, meaning the state, define the scope

10   of any marriage.  On page 166 it says, It is within the

11   legitimate scope of the power of every civil government

12   to determine whether polygamy or monogamy shall be the

13   law of social life under its dominion.  Now, we read

14   that today and it seems to come from a different planet.

15   But that's the statute that the state is citing.  Under

16   that analysis the State of Utah could literally

17   criminalize monogamy or it could go back and criminalize

18   mixed race marriages.  Obviously it can't do that.  And

19   obviously Reynolds has been tossed to the dustbin of

20   history.  It is still cited for the limited proposition

21   that a general and neutral statute falls under the

22   standard that the court discussed earlier.

23             Now, the other aspect of this "Hail Mary"

24   pass by the state is to make reference to the Tenth

25   Circuit, particularly the Potter case, which they put a

1    lot of emphasis on.  But the problem with Potter is it

2    came in 1985, and so that occurred before Lawrence.  It

3    would be rather odd to apply the ruling of the Tenth

4    Circuit as to the meaning of these questions, but not

5    the Supreme Court's decision in Lawrence 18 years later.

6    But I also note, by the way, that the reliance on Potter

7    is extensive, and I don't understand how, because at

8    most Potter would apply to the Free Exercise Clause and

9    privacy claim, but I don't see how it could possibly

10   apply to these other claims.

11          What we would submit to the court is that

12   the state summary judgment motion is woefully inadequate

13   to make out a case for summary judgment.  But, as you

14   know, this is a combined argument they folded in both

15   their opposition to us in our motion and as well as

16   making their motion.  And these arguments are, of

17   course, repeated.  And we would submit to the court that

18   we believe that the state's fundamentally wrong on these

19   standards and we think the court has spoken very clearly

20   on it.  But more importantly there is no way to get from

21   here to there for the state.  For the court to do what

22   the state is asking it would have to say that we are

23   living under Reynolds, it would have to take us back to

24   the Nineteenth Century.  We are not arguing in this case

25   for the recognition of plural marriage.  We've said that

1    over and over again.

2            When the state says every state has these --

3    this same law, that's simply not true.  The Utah law is

4    fundamentally different in its use of cohabitation.  If

5    you look at other states, they focus on multiple

6    marriage licenses, and we do not contest that you can

7    prosecute people for multiple marriage licenses and we

8    do not contest that you can prosecute people for a

9    collateral crime.  That's just not precedent in this

10   case.  And, more importantly, those are not distinctions

11   under the statute.

12           That's all we have right now, Your Honor.

13           THE COURT:  Let me ask a question to follow

14   up.  With respect to this court's requirement to follow

15   Tenth Circuit precedent and guidance, tell me your best

16   argument as to why this court is not required to accept

17   the Tenth Circuit's pronouncement that these laws have

18   been recognized as being constitutionally sound and I

19   should follow them.

20           MR. TURLEY:  Well, first of all, Your Honor,

21   the cases cited by the government do not involve the

22   majority of claims that we have brought.  Many of those

23   cases dealt with dicta, but they certainly did not raise

24   these specific claims.

25           Second, as we know, Potter came before

1    Lawrence.  Lawrence is controlling, not Potter.  And to
2    the extent that Potter did apply, it would only apply to
3    those two claims, but it doesn't apply to those claims
4    because the last time I checked, the Supreme Court was
5    the higher authority to the Tenth Circuit.  I don't see
6    any Tenth Circuit case that bars the relief that we're
7    asking for here.
8              THE COURT:  All right.  One final question,
9    on the free speech claims, as I understand the
10   government's argument, it is in this case that the
11   Browns brought the public investigation and accusations
12   upon themselves and, therefore, because they did that,
13   they shouldn't be allowed to argue that this is somehow
14   an imposition of their free speech claims.  How do you
15   respond to that argument?
16             MR. TURLEY:  Well, Your Honor, I find that a
17   curious argument because that's basically saying, look,
18   if you didn't speak, you wouldn't have a free speech
19   problem.  That's what it basically comes down to.  It's
20   your fault.  You should have stayed quiet.  And there's
21   no question the Browns wanted to show people that a
22   plural family is not one of these compound monstrosities
23   that the state keeps on describing.  There's a great
24   number of plural families that are law abiding, they
25   live within society, they don't commit these collateral

1    crimes.  But all the state can say is, you know, if you

2    had simply not done the television show, you wouldn't

3    have a problem.  That's exactly what Chief Justice

4    Roberts strongly condemned in FEC v. Wisconsin Right to

5    Life when he said you can't analyze a free speech case

6    by considering whether they would have been treated

7    differently, quote, "by changing what they say."  That's

8    ultimately what the state wants.  The state is saying,

9    look, if you just didn't have a show about you and did a

10   show about making duck calls, or living on the Jersey

11   shore, we wouldn't have any problem with you.  Well,

12   that's just not the test.  The test is do they have a

13   right to speak and is it because of that speech that

14   they have been prosecuted.  And the state has not been

15   particularly subtle.  They have said from the beginning

16   we started the investigation because of this television

17   program, and then they went out publically and said they

18   are committing felonies every night on this television

19   program.  It was the state that actually established

20   this close nexus.

21           THE COURT:  I've thought of a couple more

22   questions.  One, how would you believe that this court

23   should deal with the Enabling Act?

24           MR. TURLEY:  Your Honor, we note in our

25   brief, in one of the footnotes in our brief, the

1    Enabling Act does not limit the State of Utah in this

2    regard for a couple of reasons.  One is, first of all,

3    even if the Enabling Act has any continuing control over

4    the state or authorities, it is promising not to

5    recognize a polygamist marriage.  We're not asking for

6    recognition.  We're asking what Louis Brandeis said was

7    the most important right under the Constitution, is the

8    right to left alone.  There's only one marriage license

9    in the Brown family, and they haven't even sought any

10   more licenses, nor do they expect to or want to.

11           Second, as the district court has said

12   previously, as we cited in the brief, once you're in the

13   union, you're in the union, and it does not impose

14   continuing limitations.  In fact, you know, we fought a

15   civil war to say that you can't get out of the union.

16           THE COURT:  Would your argument be the same

17   under the so-called irrevocable ordinance?

18           MR. TURLEY:  It would.  The state clearly

19   has the authority to do what the other states have done,

20   and that is to prohibit multiple marriage licenses, but

21   to get out of the business of telling people what is

22   criminal about their private relationships.

23           THE COURT:  One of the principles that the

24   courts are admonished to follow is to construe and

25   interpret the case on the narrowest constitutional

1    ground possible.  What do you believe the narrowest

2    ground on which this court can find for the plaintiffs

3    is?

4              MR. TURLEY:  Well, Your Honor, I think that

5    of all of the constitutional claims I would have to say

6    the Due Process Clause is the most direct because if you

7    look at what Lawrence says, it seems to be talking about

8    this case.  If you -- at the end of one of our briefs we

9    note that the Supreme Court said, The petitioners are

10   entitled to respect for their private lives.  The state

11   cannot demean their existence or control their destiny

12   by making their private sexual conduct a crime.  Their

13   right to liberty under the Due Process Clause gives them

14   the right to engage in their conduct without

15   intervention of the government.  It is a promise of the

16   Constitution that there is a realm of personal liberty

17   which the government may not enter.  The Texas statute,

18   they conclude, furthers no legitimate state interest

19   which can justify its intrusion into the personal and

20   private life of the individual.  To me there is no

21   distinction to draw in that respect.

22             Now, in terms of striking down the statute,

23   it will be rather difficult.  The state can simply pass

24   a statute, as have the other states, and make it a crime

25   to give multiple marriage licenses.  That's a very easy

1    thing to do.  They just can't use this statute.  And

2    quite frankly I think that they will have to come to

3    grips with it, if they haven't already.  The statute is

4    well outside the lines of anything described by the

5    Supreme Court.

6                 THE COURT:  Thank you.

7                 MR. TURLEY:  Thank you, sir.

8                 THE COURT:  Mr. Jensen, I'll give you an

9    opportunity to respond, and I would appreciate one

10   response particularly.  As counsel has argued, this

11   court is required to give deference to the Utah Supreme

12   Court in its interpretation of the breadth of the

13   statute.  Do you agree that this court must give

14   deference to the Holm court in terms of interpreting how

15   broadly this state interprets the statute?

16                MR. JENSEN:  Yes.

17                THE COURT:  So whether or not it passes

18   constitutional muster is a different question for this

19   court and which I'm not required to follow the Utah

20   Supreme Court; would you agree with that?

21                MR. JENSEN:  Yes.

22                THE COURT:  Okay.  The second question I

23   would like you to respond to is Mr. Turley has argued

24   that the narrowest ground upon which this court can find

25   for the plaintiff is under the Due Process Clause.  As I

1    understand your argument, primarily it is that this

2    statute is adequate to protect the institution of

3    marriage, that's your sole argument under the Due

4    Process Clause.

5            MR. JENSEN:  No, not under the Due Process

6    Clause, under the right of privacy.  I mean I think

7    injury to persons.  There's no right that -- the state

8    can step in, even under the Due Process Clause to

9    protect injury to persons.  That's not our sole

10   argument, to protect the institution of marriage of

11   monogamous marriage.

12           THE COURT:  What is -- interpreted as

13   broadly as it does applied to consenting adults who

14   choose to live together and acknowledge their

15   relationship, what is the injury to person that you're

16   talking about?

17           MR. JENSEN:  Well, I've enumerated the

18   injuries to persons.

19           THE COURT:  I'm talking -- remember we're

20   talking about the breadth with which I'm stuck because

21   of the Utah Supreme Court.  I've got to interpret this

22   as broadly as the Utah Supreme Court did, and at the

23   very broadest extreme end this applies to three

24   consenting -- four consenting adults who choose to be

25   involved in intimate relationships and acknowledge those

1   relationships.  So how --

2              MR. JENSEN:  I think that is an incorrect

3   view of this case.  That is taking it as an applied

4   challenge.  This is a facial challenge.

5              THE COURT:  They do make an applied

6   challenge.  Mr. Turley made that point very clear.

7              MR. JENSEN:  Well, he does.  But just

8   because -- I mean he says a lot of things that aren't

9   true.  Just because he says that, doesn't make it true.

10  The Browns have never been charged.  This is not an

11  applied challenge.

12             THE COURT:  Tell me why you believe it's not

13  an applied challenge.

14             MR. JENSEN:  Because the Browns have never

15  been charged under the statute.

16             THE COURT:  They were clearly threatened.

17             MR. JENSEN:  Well, kind of.

18             THE COURT:  Well, kind of is probably

19  enough.

20             MR. JENSEN:  There was an investigation that

21  was started, there was kind of -- there was an

22  investigation that was started, but that doesn't --

23             THE COURT:  I've already crossed that

24  bridge.

25             MR. JENSEN:  You've crossed that as to

1   standing, not as to applied challenge.  That's

2   different.

3             THE COURT:  Okay.  Tell me why it's

4   different.

5             MR. JENSEN:  Because the Browns have never

6   been charged.

7             THE COURT:  Your view of an applied

8   challenge requires that there must be an actual claim

9   filed -- or case filed against them before they can make

10  that challenge.

11            MR. JENSEN:  Well, I could get the specific

12  language, but there's got to be a threatened --

13  threatened prosecution, and that has never happened.

14            THE COURT:  Can the state provide -- or can

15  the government in this case provide any basis to

16  conclude that the Browns could not reasonably conclude

17  that they were threatened by the statute?

18            MR. JENSEN:  They were never threatened by

19  the statute.  There was an investigation that was

20  started.

21            THE COURT:  Their conduct clearly falls

22  within the Holm definition.  You would have to agree

23  with that.

24            MR. JENSEN:  I agree with that, you're

25  right.

1            THE COURT:  So, as interpreted by the state

2    and applied to their fact situation, how do I find that

3    their constitutional rights have not been violated under

4    the Due Process Clause?

5            MR. JENSEN:  I think you have to look at

6    whether or not the statute has a reasonable basis, a

7    rational basis.

8            THE COURT:  That's why I'm asking you that

9    extended to them in this fact situation what's the

10   rational basis for criminalizing the Browns' conduct?

11           MR. JENSEN:  You have to look at it as the

12   broad community as a whole.

13           THE COURT:  Any other arguments you wish to

14   make?

15           MR. JENSEN:  Well, just one, and I maybe

16   ought not to get to it because it's relatively minor,

17   but the issue as to cohabitation in the statute, and I

18   think the statute has to be looked at clearly, the

19   cohabitation in the statute only applies when someone

20   holds themselves out to be married.  That is a different

21   situation than cohabitation that generally exists in the

22   state.

23           THE COURT:  How do you possibly reach that

24   conclusion in the language of the statute?

25           MR. JENSEN:  Okay.  Let me read the statute,

1   and we'll go through it.  A person is guilty of bigamy

2   when knowing he has a husband or wife, or knowing the

3   other person has a husband or wife, the person purports

4   to marry another person or cohabitates with another

5   person.

6           THE COURT:  Cohabits can't mean marriage

7   because --

8           MR. JENSEN:  No, it's not marriage, but they

9   know the other person is married.  So they're

10  cohabitating.  That is different than just cohabitation.

11  Two people can go out and cohabitate, and let's admit,

12  it goes on all the time.  But in this situation under

13  the statute they're not prosecuted unless the one

14  cohabitating knows that person is married.  It's the

15  same as with the marriage.

16          THE COURT:  So it applies to an adulterous

17  relationship.  By definition, adultery is a person who

18  is married and has intimate relationships with another

19  person to whom he is not married.  That's what you've

20  just described.

21          MR. JENSEN:  All right, Your Honor.  But

22  let's look at how this really works in practice.  In

23  practice there is the marriage, it may not be recognized

24  by the state, but it is a marriage, it's performed,

25  there is a wedding ceremony performed, there are vows

1   exchanged.  The problem is proving it.  The federal

2   government had that problem in the 1880s.  That's why

3   they added cohabitation to the Edmunds Statute.  The

4   same thing with the Utah statute.  The problem was

5   proving that they were married, so they have added

6   cohabitate, but the person has to cohabitate knowing

7   that other person is married.

8               THE COURT:  That sounds like adultery to me.

9               MR. JENSEN:  Well, but they're married.

10              THE COURT:  You told me earlier that

11  adultery is not the intent of this statute.

12              MR. JENSEN:  Adultery is not the intent of

13  this statute.

14              THE COURT:  So tell me what's different

15  between adultery and what you've just described.

16              MR. JENSEN:  The one is that they claim to

17  be married.  But just because the state can't prove it

18  doesn't mean it hasn't happened.  That's what's

19  happening in the polygamist communities.

20              THE COURT:  So it's the expression of the

21  fact that the person is a wife that makes it illegal.

22              MR. JENSEN:  Yes.

23              THE COURT:  Okay.

24              MR. JENSEN:  Yes.

25              THE COURT:  Anything further?  Mr. Turley,

1   anything further from you?

2                    MR. TURLEY:  No, Your Honor.

3                    THE COURT:  Thank you, counsel, for your

4   arguments.  It has been invigorating and mostly helpful.

5   I appreciate your participation.  This is a difficult

6   issue, and I will rule on it as soon as I can.

7                    We will be in recess.

8                    (Whereupon, the matter was concluded.)

9                              *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3   State of Utah

4   County of Salt Lake

5

6          I, Karen Murakami, a Certified Shorthand Reporter

7   for the State of Utah, do hereby certify that the

8   foregoing transcript of proceedings was taken before me

9   at the time and place set forth herein and was taken

10  down by me in shorthand and thereafter transcribed into

11  typewriting under my direction and supervision;

12         That the foregoing pages contain a true and

13  correct transcription of my said shorthand notes so

14  taken.

15         IN WITNESS WHEREOF, I have hereunto set my hand

16  this 1st day of February , 2013.

17

18

19                          Karen Murakami

20                    Karen Murakami, CSR, RPR

21

22

23

24

25
```