IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KODY BROWN, MERI BROWN, JANELLE BROWN, CHRISTINE BROWN, ROBYN SULLIVAN,<br><br><br>Plaintiffs,<br><br>v.<br><br>JEFFREY R. BUHMAN, in his official capacity as County Attorney for Utah County,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br><br>Case No.  2:11-cv-0652-CW<br><br>Judge Clark Waddoups |

## TABLE OF CONTENTS

Introduction
Procedural Background
Factual Background
Historical Background
Analysis
    I.     No Genuine Dispute As To Any Material Fact
    II.    Cohabitation in the 1973 Statute
        A.    The Utah Supreme Court's Interpretation of "Marry" in the Statute
        B.    Strict or Heightened Scrutiny
            1.    Heightened Scrutiny under the *Glucksberg* Framework
                a.  Polygamy
                b.  Religious Cohabitation
            2.    Strict Scrutiny under the Free Exercise Clause
                a.  Polygamy
                b.  Religious Cohabitation
                    i.    Common-law marriage affected religious cohabitation in the nineteenth century.
                    ii.  The Statute is facially neutral under *Hialeah*.
                    iii. The Statute is not operationally neutral under *Hialeah*.
                    iv. The Statute is not generally applicable under *Hialeah*.
                    v.  The cohabitation prong is not narrowly tailored to advance a compelling state interest.

3.      Heightened Scrutiny under *Smith*'s Hybrid Rights Analysis
C.      Rational Basis Review under the Due Process Clause
D.      Void for Vagueness under the Due Process Clause
III.    "Purports to Marry" in the 1973 Statute
A.      Construction of the Statute
B.      Understanding the Enabling Act and the Irrevocable Ordinance
Conclusion

## INTRODUCTION

Before the court are the parties' cross motions for summary judgment relating to Plaintiffs' facial and as-applied constitutional challenges to Utah's bigamy statute, Utah Code Ann. § 76-7-101 (2013) (the "Statute"): Plaintiffs' Motion for Summary Judgment (Dkt. No. 49) and Defendant's Cross-Motion for Summary Judgment (Dkt. No. 55). For the reasons discussed below, the court GRANTS Plaintiffs' Motion for Summary Judgment (Dkt. No. 49) and DENIES Defendant's Motion for Summary Judgment (Dkt. No. 55). Accordingly, in Part II below the court finds the Statute facially unconstitutional and therefore strikes the phrase "or cohabits with another person" as a violation of the Free Exercise Clause of the First Amendment to the United States Constitution and as without a rational basis under the Due Process Clause of the Fourteenth Amendment, both in light of established Supreme Court precedent. As further analyzed in Part III below, after striking the cohabitation provision the Statute is readily susceptible to a narrowing construction of the terms "marry" and "purports to marry" to remedy the constitutional infirmity of the remainder of the Statute. The court also terminates as moot Plaintiffs' Motion to Strike Defendant's Cross-Motion for Summary Judgment. (Dkt. No. 60.)

## PROCEDURAL BACKGROUND

Plaintiffs named Utah Governor Gary R. Herbert, Utah Attorney General Mark Shurtleff, and Utah County Attorney Jeffrey R. Buhman in a lawsuit challenging the Statute as unconstitutional filed on July 13, 2011. The court ruled in its Memorandum Decision and Order

dated February 3, 2012 that Plaintiffs had standing to pursue the action against Defendant Buhman but dismissed Defendants Herbert and Shurtleff from the case, finding that Plaintiffs lacked standing to sue them in this action. (Dkt. No. 31.) Plaintiffs filed their Motion for Summary Judgment presenting detailed arguments on seven constitutional claims including due process, equal protection, free speech, free association, free exercise, the Establishment Clause, and 42 U.S.C. § 1983. (Dkt. No. 49.) Defendant Buhman responded by filing a Motion to Dismiss for Mootness at that time. (Dkt. No. 46.)

On the date designated for response briefing Defendant Buhman then filed his Cross Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment (Dkt. No. 55)[1] and a Motion to Stay Plaintiffs' Motion for Summary Judgment Proceedings Pending a Determination of Mootness (Dkt. No. 58). After the court heard and resolved Defendants' motions, Defendant completed briefing on the motions for summary judgment. The court was intrigued by the sheer lack of response in Defendant's filing to Plaintiffs' seven detailed constitutional claims. In fact, Plaintiffs pointed out that "[t]he lack of any substantive response to the instant motion puts Plaintiffs in the awkward position of replying to a non-response." (Pls.' Reply Mot. Summ. J. 2 [Dkt. No. 71].) Finally, outside of the briefing schedule ordered by the court, Defendant filed a Reply (Dkt. No. 73) in which he, for the first time, provided academic discussion about "social harms" arising from religious cohabitation in Utah, though no admissible evidence was proffered with his Cross-Motion, Response, or Reply, or in oral argument on the motions held on January 17, 2013.

---

[1] Defendant's memorandum supporting his Cross-Motion and Response contained merely 7 pages of total Argument both in support of his own Cross-Motion for Summary Judgment and in response to Plaintiffs' 50 pages of detailed Argument in support of their Motion for Summary Judgment on seven substantive constitutional claims.

**FACTUAL BACKGROUND**

The court described the relevant facts underlying this lawsuit in its Memorandum

Decision and Order dated February 3, 2012 and refers here to that discussion for a general

review of the background. (Dkt. No. 31.) Weighing heavily in favor of the court's disposition of

these motions for Plaintiffs, the court finds no genuine dispute of the material facts outlined by

Plaintiffs in their Motion. (*See* Pls.' Mem. Supp. Mot. Summ. J. 1-7 [Dkt. No. 50].)

As noted by Plaintiffs in their Reply Memorandum, Defendant only objects "to parts of

four paragraphs in the factual background section" of Plaintiffs' Memorandum supporting their

Motion for Summary Judgment. (Pls.' Reply 2-3 [Dkt. No. 71].) "Three of those paragraphs (3,

11, and 32) are objected to only to the extent that they 'characterize' the drafters (or enforcers) of

the Anti-Bigamy Law as targeting primarily religious plural families." (*Id.* at 3.)[2] Moreover, the

only fact actually contested by Defendant is Plaintiffs' statement in Paragraph 20 of Plaintiffs'

factual background section that "state officials publicly denounced the Browns as committing

---

[2] This objection rings hollow given Defendant's own willingness to link the 1973 Statute to the legislative history of the federal anti-polygamy campaign and Utah's bid for statehood in the late nineteenth century. (*See, e.g.*, Def.'s Mem. Supp. Cross-Mot. and Resp. 3-4 [Dkt. No. 56].) As a result, the objection ignores the language and plain meaning of the Morrill Anti-Bigamy Act of 1862, the Edmunds Act of 1882, the Edmunds-Tucker Act of 1887, and the Congressional Record pertaining to each, not to mention the Enabling Act of 1894. *See* Sarah Barringer Gordon, THE MORMON QUESTION: POLYGAMY AND CONSTITUTIONAL CONFLICT IN NINETEENTH CENTURY AMERICA 119-45, 200-03 (2002) (discussing the church-state concerns animating Congress as a result of Mormon polygamy). In fact, the Utah Supreme Court acknowledged "the reality that the federal government harbored serious concerns about the possibility that the State of Utah could be ruled de facto by the LDS Church" through the practice of polygamy and other means of maintaining a monopoly on political power in the Territory. *State v. Holm*, 2006 UT 31, ¶ 42, 137 P.3d 726, 734; *see also Late Corp. of the Church of Jesus Christ of Latter-day Saints v. United States*, 136 U.S. 1, 49 (1890); *Society of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 921-30 (Utah 1993) (discussing the history of the State of Utah with a view toward Congress' explicit posture against the Mormon religion). Accordingly, the court disregards Defendant's suggestion about any possible mischaracterization of the extent to which the parties involved at the time were "targeting primarily religious families" in the decades of anti-Mormon federal legislation that define Utah's quest for statehood. The historical record amply demonstrates the explicitly religious nature of Congress' campaign against polygamy in the nineteenth-century Utah Territory and resulting Enabling Act of 1894 and, finally, the Irrevocable Ordinance as cemented in Utah's 1895 Constitution. *See Society of Separationists*, 870 P.2d at 928; UTAH CONST. art. III.

crimes every night on television." (*See* Def.'s Mem. Supp. Cross-Mot. and Resp. 2 [Dkt. No. 56].)[3] The remaining facts are uncontested,[4] and the court therefore finds the following undisputed material facts—quoted though renumbered from Plaintiffs' "Factual Background"— to be relevant to its resolution of the pending motions:

1.    The Statute covers not only polygamy but "cohabitation"—a term that encompasses a broad category of private relations in which a married person "purports to marry another person or cohabits with another person." Utah Code Ann. § 76-7-101 (West 2010).

2.    The practice of married individuals cohabiting with other people can include adulterous relations. Compl. ¶¶ 9-10, admitted in Answer ¶¶ 7-8.

3.    The Browns are members of a religious group that believes polygamy is a core religious practice. Compl. ¶¶111-12; denied in Answer ¶ 48 but well supported by K. Brown Decl. at ¶ 4; J. Brown Decl. at ¶ 3; M. Brown Decl. at ¶ 4.[5]

4.    The Brown family does not have multiple marriage licenses. Compl. ¶ 113; denied in Answer ¶ 48 but well supported by K. Brown Decl. at ¶ 2; J. Brown Decl. at ¶ 2; M. Brown Decl. at ¶ 2.

_____

[3] "Defendant denies this allegation. As he states in his Affidavit: 'I never stated publicly that I would or would not prosecute the Browns, though I am aware that others in my office may have responded to the press to that effect (or at least the press reported that they did).'" (Def.'s Mem. Supp. Cross-Mot. and Resp. 2 [Dkt. No. 56].)

[4] Defendant ultimately acknowledged at oral argument that there is no dispute as to any material fact: "We referenced a couple of facts that we took some issue with, but the overall thrust of it there's no dispute." (Tr. Hrg. Jan. 17, 2013 4:5-7 [Dkt. No. 75].)

[5] Plaintiffs are members of the Apostolic United Brethren Church, a fundamentalist faith derived from nineteenth-century polygamous Mormonism. (*See* Compl. ¶¶111-12; K. Brown Decl. at ¶ 4; J. Brown Decl. at ¶ 3; M. Brown Decl. at ¶ 4.) *See* Anne Wilde, *Fundamentalist Mormonism: Its History, Diversity and Stereotypes, 1886-Present, in* SCATTERING OF THE SAINTS: SCHISM WITHIN MORMONISM 274-80 (Newell G. Bringhurst & John C. Hamer eds., 2007) (providing historical background of the Apostolic United Brethren Church); Brian C. Hales, MORMON POLYGAMY AND MORMON FUNDAMENTALISM: THE GENERATIONS AFTER THE MANIFESTO. 353-67 (2006) (same).

5.      There is only one recorded marriage license in the Brown family—that of Kody and Meri Brown. *See id.*

6.      Prosecutions under the Statute have been rare and published cases in the last three decades only involve religious polygynists. Def.'s Mot. to Dismiss at 5-6 [Dkt. No. 7]; Buhman Decl. at ¶¶ 7-9 [Dkt. No. 8-1]; . . .

7.      Utah government officials are aware of thousands of polygamist families in the state and regularly interact with such families as part of the "Safety Net" program and other governmental programs. Compl. ¶¶ 152-55; admitted in Answer ¶ 55.

8.      "The Sister Wives" is a reality show that explores the daily issues and realities of a plural family.

9.      The content of "The Sister Wives" program includes the defense of plural families and discussion of the Browns' religious beliefs in polygamy.

10.     Utah government officials were aware that the Brown family was a plural or polygamist family for years before the first episode of "The Sister Wives" aired on TLC Network. Compl. ¶¶ 123-24; admitted in Answer ¶ 49;

11.     The investigation of the Browns occurred only [after] the first episode of "The Sister Wives" aired. Compl. ¶ 158; admitted in Answer ¶ 58;

12.     State officials have acknowledged that "The Sister Wives" program triggered their investigation. Compl. ¶ 163; admitted in Answer ¶ 60. This nexus was also acknowledged by Counsel for Defendant in the December 16, 2011 hearing . . . ;

13.     State officials publicly denounced the Browns as committing crimes every night on television. Compl. ¶¶ 163-65; admitted in Answer ¶ 60;

14.    One official connected to the investigation publicly stated the program made prosecution "easier." Compl. ¶ 165; admitted in Answer ¶ 60;

15.    The prosecutors stated that the Brown family moving to Nevada would not prevent them from prosecuting the family. Compl. ¶¶ 167-68; admitted in Answer ¶ 62;

16.    The Defendant admitted, through counsel in the December 16, 2011 hearing, that prosecutors gave interviews discussing the Brown family, their alleged crime of polygamy, and the public investigation;

17.    The Defendant has found no evidence of any crime by the Browns though he maintains future prosecutors can charge them as a matter of discretion and policy. Shortly before [Plaintiffs filed their Motion for Summary Judgment], the Defendant filed a Motion to Dismiss for Mootness and confirmed that the long investigation of the Brown[s] has been closed shortly before the planned summary judgment motions. He seeks to avoid review of the Statute based on the assurance that, while he cannot guarantee that they will not be prosecuted by others for polygamy in the future, he will not prosecute them unless he finds that they have also committed a collateral crime. Def.'s Memorandum in Support of His Motion to Dismiss Plaintiffs' Complaint for Mootness at [4] [Dkt. No. 47]. . . ;

18.    The Defendant has said that there is no guarantee that the Browns will not be prosecuted in the future for polygamy. Counsel for Defendant in the December 16, 2011 hearing . . . (explaining that there are no current plans to prosecute the Brown family but that no one can say whether such prosecutions will occur in the future); [Second] Buhman Decl. ¶¶ 5, 12 [Dkt. No. 47-1];

19.     There has been no allegation of child or spousal abuse by members of the Brown family. Compl. ¶¶ 120-22;

20.     No member of the Brown family has ever been charged with a crime. Compl. ¶ 122; admitted in Answer ¶ 49;

(*See* Pls.' Mem. Supp. Mot. Summ. J. at 2-7 [Dkt. No. 50].)

In addition to the preceding undisputed material facts quoted from Plaintiffs' Motion, the court finds the following additional undisputable material facts relevant to the disposition of the current motions:

21.     Defendant swore under penalty of perjury that "[a]s Utah County Attorney, I have now adopted a formal office policy not to prosecute the practice of bigamy unless the bigamy occurs in the conjunction with another crime or a person under the age of 18 was a party to the bigamous marriage or relationship." (Second Buhman Aff. ¶ 8 [Dkt. No. 47-1].)

22.     Counsel for Defendant represented at oral argument on January 17, 2013 that the Statute is not intended to capture mere adultery or adulterous cohabitation (*see, e.g.*, Tr. Hrg. Jan. 17, 2013, at 53:8-13), but that it is illegal under the Statute to participate in a wedding ceremony between a legally married individual and a person with whom he or she is cohabiting and/or to call that person a wife (*Id.* at 52:21-25; 53:16-21.)

# HISTORICAL BACKGROUND[6]

This decision is fraught with both religious and historical significance for the State of

Utah because it deals with the question of polygamy, an issue that played a central role in the

State's development and that of its dominant religion, The Church of Jesus Christ of Latter-day

Saints (the "LDS Church" or "Mormon Church").[7] The Brown Plaintiffs are not members of the

---

[6] This "Historical Background" section frames the court's "Analysis" below of the multiple constitutional violations Plaintiffs claim are allegedly effected by the Statute by providing relevant interpretive background to *Reynolds v. United States*, 98 U.S. 145 (1879), given the possibility (as urged by Defendant) of simply deferring to *Reynolds* as the answer to religiously motivated cohabitation in 2013, which the court declines to do. Though the court indeed concludes below that there is no "fundamental right" of individuals to enjoy official State recognition or legitimacy of their "purported" polygamous marriages, it does so substantively on Due Process grounds based on a *Glucksberg* analysis rather than based on the type of "social harm" implied in *Reynolds* under that decision's narrow Free Exercise analysis.

[7] The LDS Church's doctrine of polygamy or plural marriage is contained in its canonized book of scripture *The Doctrine and Covenants*. *See Doctrine and Covenants*, Section 132 (noting in the preface that "evidence indicates that some of the principles involved in this revelation were known by [Joseph Smith] as early as 1831"). The LDS Church's founder, Joseph Smith, is believed to have practiced polygamy from as early as 1833 or possibly even 1831. *See* Richard Lyman Bushman, JOSEPH SMITH: ROUGH STONE ROLLING 323 (2005); Todd Compton, IN SACRED LONELINESS: THE PLURAL WIVES OF JOSEPH SMITH 33 (1997); *but see* Brian C. Hales, "Fanny Alger and Joseph Smith's Pre-Nauvoo Reputation," 35 J. MORMON HIST., Fall 2009, at 148 (dating the beginning of the practice to "the 1835-36 period"); *see also* Don Bradly, *Mormon Polygamy Before Nauvoo? The Relationship of Joseph Smith and Fanny Alger*, *in* THE PERSISTENCE OF POLYGAMY: JOSEPH SMITH AND THE ORIGINS OF MORMON POLYGAMY 22-24 (Newell G. Bringhurst and Craig L. Foster eds., 2010) (supporting 1835-36 start date). Although certain key leaders had begun practicing polygamy relatively early, the LDS Church first publicly announced the practice of polygamy as a key religious tenet in 1852. *See Society of Separationists*, 870 P.2d at 923.

But the LDS Church later renounced the practice, first in a "Manifesto" in 1890 under the extreme pressure from the federal government's decades-long campaign against the practice and as part of Utah's effort to gain statehood, *see id.* at 927, and then again in 1904 in an "Official Statement" issued to address renewed scrutiny of the continued, "post-Manifesto" practice of polygamy—scrutiny precipitated by Congress's overwhelming vote to exclude Utah Congressman B.H. Roberts, a practicing polygamist elected in 1898, from being seated in the House in 1899, and then a Congressional inquiry and public hearings about whether to seat Utah Senator-elect Reed Smoot, a monogamous Mormon Apostle, beginning in 1904. B. Carmon Hardy, SOLEMN COVENANT: THE MORMON POLYGAMOUS PASSAGE 246-60 (1992). Since the 1904 Official Statement, the LDS Church has strongly and publicly disapproved of the practice of polygamy, as reinforced by LDS Church President Gordon B. Hinckley in the Church's worldwide General Conference in 1998:

> If any of our members are found to be practicing plural marriage, they are
> excommunicated, the most serious penalty the Church can impose. Not only are those so
> involved in direct violation of the civil law, they are in violation of the law of this
> Church. . . . More than a century ago God clearly revealed unto His prophet Wilford

LDS Church, but do adhere to the beliefs of a fundamentalist church that shares its historical roots with Mormonism.

The proper outcome of this issue has weighed heavily on the court for many months as it has examined, analyzed, and re-analyzed the numerous legal, practical, moral, and ethical considerations and implications of today's ruling. It would be an easy enough matter for the court to do as the Defendant urges and find against the Plaintiffs on the question of religious cohabitation under the Statute, defaulting simply to *Reynolds v. United States*, 98 U.S. 145 (1879) without seriously addressing the much developed constitutional jurisprudence that now protects individuals from the criminal consequences intended by legislatures to apply to certain personal choices, though such legislatures may sincerely believe that such criminal sanctions are in the best interest of society. The court has concluded that this would not be the legally or morally responsible approach in this case given the current contours of the constitutional protections at issue.[8]

The court notes that 133 years after *Reynolds*, non-Mormon counsel for Plaintiffs have vigorously advanced arguments in favor of the right of religious polygamists to practice polygamy (through private "spiritual" marriages not licensed or otherwise sanctioned by the state, a relationship to which the court will refer as "religious cohabitation") that would have perhaps delighted Mormon Apostles and polygamy apologists throughout the period from 1852

---

Woodruff that the practice of plural marriage should be discontinued, which means that it is now against the law of God. Even in countries where civil or religious law allows polygamy, the Church teaches that marriage must be monogamous and does not accept into its membership those practicing plural marriage.

Gordon B. Hinckley, "What Are People Asking About Us?," Conference Report, Oct. 4, 1998, *available at* https://www.lds.org/general-conference/1998/10/what-are-people-asking-about-us?lang=eng.

[8] The court is not impressed with Defendant's characterization of Plaintiffs' serious and substantial legal arguments in support of each of their Constitutional claims (Due Process, Equal Protection, Free Speech, Free Association, Free Exercise, and Establishment of Religion) as merely a "philosophical discussion about legal theories." (Def.'s Reply Cross-Mot. Summ. J. 4 [Dkt. No. 73].)

to approximately 1904. To state the obvious, the intervening years have witnessed a significant

strengthening of numerous provisions of the Bill of Rights, and a practical and morally

defensible identification of "penumbral" rights "of privacy and repose" emanating from those

key provisions of the Bill of Rights,[9] as the Supreme Court has over decades assumed a general

posture that is less inclined to allow majoritarian coercion of unpopular or disliked minority

groups, especially when blatant racism (as expressed through Orientalism[10]/imperialism[11]),

religious prejudice, or some other constitutionally suspect motivation, can be discovered behind

such legislation.

It is worth noting the entrenched nature of an orientalist mindset among ruling elites

during the time period when *Reynolds* was decided, an attitude that surely reached Congress and

---

[9] *See, e.g. Griswold v. Connecticut*, 318, U.S. 479, 481-84 (1965) (holding that the Constitution prohibits Government intrusion upon a marital right to privacy in the choice to use contraceptives by reference to the "penumbras" of various "specific guarantees in the Bill of Rights" which "create zones of privacy").

[10] *See generally* Edward W. Said, ORIENTALISM (Vintage Books 1979) (1978); *see also* Zachary Lockman, CONTENDING VISIONS OF THE MIDDLE EAST: THE HISTORY AND POLITICS OF ORIENTALISM 88-91 (2004) ("It should come as no great surprise that many Orientalists took for granted the superiority of Western civilization and the right of Europeans to rule over Asians and Africans: these assumptions were pervasive in nineteenth-century European culture. Though there were always those who rejected them and opposed colonialism and imperialism, most Europeans (and later Americans) sincerely embraced the notion of the 'white man's burden'—the idea that the civilized white Europeans had a duty to exercise firm but beneficent tutelage over what they regarded as the less advanced, child-like, dark-skinned races and guide them toward civilization" (90).); *id.* at 182-214 (discussing the impact of Said's theory of Orientalism and its aftermath in scholarly discourse, notably his view of the tendency of European powers in the nineteenth century and early twentieth century to view Middle Eastern, African, and Asian cultures as exotic but negatively so, through the power constructs of the colonizer and the colonized, as other and inferior, and the resulting influence of this underlying notion on the scholarly view of the Middle East, Africa and the Orient).

[11] *See, e.g.*, Nathan B. Oman, *Natural Law and the Rhetoric of Empire:* Reynolds v. United States, *Polygamy, and Imperialism*, 88 WASH. U. L. REV. 661 (2011) (arguing that in response to Mormons' natural law reasoning in support of polygamy, the Supreme Court in *Reynolds* took an approach rooted in "nineteenth-century ideals of progress and imperialism that were replacing the earlier, eighteenth-century ideals of universal reason and natural law" by "implicitly liken[ing] the federal government to the British Raj, bringing civilization through law to a benighted race" and using "the rhetoric of imperialism to reject [the Mormons' natural law] arguments, tapping into international narratives of racial hierarchy and the progress of civilization," an approach consistent with and possibly signaling a prelude for, American "imperial adventures at the turn of the [twentieth] century").

the United States Supreme Court as well, as discussed below.[12] Professor Edward Said situated

British, French, and American views of Middle Eastern, African, and Asian cultures and society

(collectively, the "Orient") in their cultural and imperial contexts, arguing that an ideology of the

racial inferiority of the latter peoples emerges in the resulting "Orientalism" of the West, which,

though idealizing the "Orient" in the arts as both exotic and romantic, *see* Said, *supra* note 10, at

98-99, also simultaneously denigrates it as socially and racially inferior, *id.* at 14-15, 92-110.[13]

Said posited that "so far as the West was concerned during the nineteenth and twentieth

centuries, an assumption had been made that the Orient and everything in it was, if not patently

inferior to, then in need of corrective study by the West." *Id.* at 40-41. Indeed, "[t]he Orient was

viewed as if framed by the classroom, the criminal court, the prison, the illustrated manual.

Orientalism, then, is knowledge of the Orient that places things Oriental in class, court, prison, or

manual for scrutiny, study, judgment, discipline, or governing." *Id.* at 41.[14] Thus, Said located

---

[12] The court finds the framework of "Orientalism" as analyzed by the late Professor Edward W. Said of Columbia University to be one potentially useful interpretive model, among others, in analyzing the thought and views of Americans in the late nineteenth century on this particular issue. Professor Nate Oman of William & Mary Law School has provided a similarly persuasive and related interpretive framework in his analysis of *Reynolds* based on the emerging American imperialism of the period.

[13] For example, Said noted that

nearly every nineteenth-century writer (and the same is true enough of writers in earlier periods) was extraordinarily well aware of the fact of empire: this is a subject not very well studied, but it will not take a modern Victorian specialist long to admit that liberal cultural heroes like John Stuart Mill, Arnold, Carlyle, Newman, Macaulay, Ruskin, George Eliot, and even Dickens had definite views on race and imperialism, which are quite easily to be found at work in their writing. So even a specialist must deal with the knowledge that Mill, for example, made it clear in *On Liberty* and *Representative Government* that his views there could not be applied to India (he was an India Office functionary for a good deal of his life, after all) because the Indians were civilizationally, if not racially, inferior.

Said, *supra* note 10, at 14.

[14] Moreover, and of particular relevance here, Said observed that "[t]he period of immense advance in the institutions and content of Orientalism coincides exactly with the period of unparalleled European expansion; from 1815 to 1914 European direct colonial dominion expanded from about 35

"the essence of Orientalism" in "the ineradicable distinction between Western superiority and Oriental inferiority." *Id.* at 42.

Because the United States Supreme Court's 1879 decision in *Reynolds v. United States* displays "the essence of Orientalism" through its explicit "distinction between Western superiority and Oriental inferiority," this is a relevant interpretative framework for evaluating the "crusade" of nineteenth-century American society against Mormon polygamy and the merits of the *Reynolds* decision today.[15] Although the object of the decision was the Mormon Church, an

---

percent of the earth's surface to about 85 percent of it. Every continent was affected, none more so than Africa and Asia." Said, *supra* note 10, at 41.

    [15] *See, e.g.*, Terryl Givens, THE VIPER ON THE HEARTH: MORMONS, MYTHS, AND THE CONSTRUCTION OF HERESY 130-37 (1997) (observing that Mormons were, for nineteenth-century American society, "a handy, ready-made Other" and an "Asian oddity" in an orientalist view); Martha M. Ertman, *Race Treason: The Untold Story of America's Ban on Polygamy*, 19 COLUM. J. GENDER & L. 287, 290-291 (2010) ("Edward Said's work on Orientalism offers some clues as to why [nineteenth-century] cartoonists might have portrayed Mormon polygamists as Black and Asian. Viewing the discourse as Orientalist—essentially an 'us/them' rubric that primarily underpins colonialism—shows that antipolygamy discourse also spoke of Mormon polygamy in 'us/them' terms, treating polygamists not as people, but as problems to be solved. The most valuable insight Orientalism offers here is that framing a group as Oriental—an inherently backward, sensual, and therefore subordinated Other—makes its subjection inevitable. Thus the public imagination's construction of Mormons as members of subject racial groups (Asian and Black, mainly) played a crucial role in subjecting Mormons to federal control."). In fact, "Orientalism has much to contribute to the study of anti-Mormonism that historians are just beginning to see." Christine Talbot, *"Turkey is in our Midst:" Orientalism and Contagion in Nineteenth Century Anti-Mormonism*, 8 J.L. & FAM. STUD. 363, 369-72 (2006) ("Early Orientalist anti-Mormonism depended in large part on the emergence of Orientalism in the context of European imperialism."). Professor Said's paradigm of Orientalism can be used to understand how American society "ordered the anomaly of Mormonism by placing it in familiar binaries of East/West and facilitated a particular understanding of the Mormon project that linked religious coercion, polygamy, and theocratic government together with ideas about race, progress, and empire. By showing that Mormons were 'really' Orientals in American clothing, Orientalism could make sense of the oxymoron of polygamous Americans." *Id.* at 372. Thus,

> [a]nti-Mormons mobilized Orientalist metaphors against Mormons to deploy a politics of race that could account for deeply rooted structures of religious and political authority that anti-Mormons found anti-democratic. Orientalist anti-Mormonism facilitated the links anti-Mormons made among religion, the practice of plural marriage, and political theocracy in a national milieu beset with ideas about race and racial progress. Orientalist tropes facilitated the explanatory triumvirate that connected Mormon religious authority to its peculiar domestic practices to its theocratic rule, and placed polygamic theocracy within the emerging discourses of race and racial difference. For anti-Mormons,

institution virtually entirely comprised of white Americans and European immigrants, rather than

the "Orient" or a people or institution geographically unique thereto, *Reynolds* invokes this

framework because of the comparisons drawn by the Court between Mormons and non-European

peoples and their practices, and the Court's views of the nature of the social harm posed by

Mormon practices. For the *Reynolds* Court, the comparison with non-European peoples and their

practices is precisely what made the Mormons' practice of polygamy problematic.

    With this interpretive framework in mind, it is perhaps a bitter irony of the history at

issue here that it is possible to view the LDS Church as playing the role of both victim and

violator[16] in the saga of religious polygamy in Utah (and America). When the federal

---

Orientalist metaphors illustrated the Mormon betrayal of religious, marital, political, and racial legacies of America like no other.

*Id.* at 372-73. But, of course, "Scholars must approach anti-Mormon Orientalism with great caution" because "Mormons were manufactured into an 'other,' to be sure, but they were not, precisely, a colonized other." *Id.* at 370-71. With this caveat, Orientalism can provide a powerful interpretive lens to the federal government's treatment of the Mormons and shows "the process by which anti-Mormons made Mormons into a racial other against which it defined itself." *Id.* at 372.

[16] Plaintiffs have brought a "colorable claim" under the Establishment Clause, arguing that the 1973 Statute "was born out of a sectarian dispute of Mormons and former Mormons over the practice [of polygamy]—leading to the drafting of a law that allowed the state to threaten arrest for purely private relations of 'spiritual' spouses." (Pls.' Mem. Supp. Mot. Summ. J. 57 [Dkt. No. 50]); *see also Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004) (defining "colorable" to mean that "the plaintiff must show a fair probability or likelihood, but not a certitude, of success on the merits"). Plaintiffs raise this claim in the context of statistics showing that "not only 62 percent of the general population [of Utah], but an estimated 90 percent of the 75 Utah House members are LDS, and . . . 27 of 29 senators." (*Id.* at 51 (internal quotation marks and citations omitted).) Given this demographic context, Plaintiffs argue that the LDS Church is the de facto established religion in Utah, particularly on certain legislative issues on which the LDS Church officially takes a public stand, such as polygamy practiced by Mormon fundamentalists. (*Id.* at 56.)

    As a consequence of the LDS Church's long-standing rejection of polygamy as a doctrine, *see supra* note 7, and its policy to excommunicate those who practice it, Plaintiffs argue that the criminalization of religious cohabitation in Utah through the Statute subjects a targeted group—fundamentalist Mormons who still believe practicing polygamy to be a central tenet of the religion established by Joseph Smith and continued by Brigham Young—to "the moral dictates of the LDS Church" as legislated into criminal law on this issue. (Pls.' Mem. Supp. Mot. Summ. J. 56 [Dkt. No. 50].) This claim seems historically well-founded. *See, e.g.*, Shayna M. Sigman, *Everything Lawyers Know About Polygamy Is Wrong*, 16 CORNELL J.L. & PUB. POL'Y 101, 134-43 (2006) ("During the 1930s, LDS President Heber Grant announced that the Church would cooperate in criminal prosecutions of polygamists. In 1935, the Utah legislature—largely influenced by the LDS Church—made cohabitation a

government targeted Mormon polygamy for elimination during the half century from the passage

of the Morrill Anti-Bigamy Act of 1862 through the Congressional inquiry into the seating of

Utah Senator Reed Smoot from 1904 to 1907,[17] the "good order and morals of society" served as

an acceptable basis for a legislature, it was believed, to identify "fundamental values" through a

religious or other perceived ethical or moral consensus, enact criminal laws to force compliance

with these values, and enforce those laws against a targeted group. In fact, with the exception of

targeting a specific group, this has remained true in various forms (depending on the particular

right and constitutional provision at issue) until the Supreme Court's decision in *Lawrence v.*

*Texas*, 539 U.S. 558 (2003) created ambiguity about the status of such "morals legislation." But

the LDS Church was a victim of such majoritarian consensus concerning its practice of

polygamy[18] as a foundational and identifying tenet of religious faith. *See Reynolds*, 98 U.S. at

---

criminal felony. Accordingly, the legal campaign against polygamists had shifted from the nineteenth century federal attack on the LDS Church to the twentieth century attack on the fundamentalists by not just state and local officials, but also by the LDS Church itself" (136).).

    Plaintiffs outline the Establishment Clause problems of this state of affairs for fundamentalist Mormons and other religious polygamists under both the *Larson* and *Lemon* tests. (*Id.* at 49-57); *see also Larson v. Valente*, 456 U.S. 228 (1982); *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Defendant, however, neither responds to any of Plaintiffs arguments relating to violations of the Establishment Clause nor even mentions the Establishment Clause in any of his filings. But aside from observing that Plaintiffs have raised this unrefuted colorable claim, the court need not engage in a more substantive analysis because the Free Exercise Clause (including its hybrid rights component) and the Due Process concerns raised by the Statute, which Plaintiffs' counsel represented at oral argument would be the "narrowest ground upon which this court can find for the plaintiff[s]" (*See* Tr. Hrg. Jan. 17, 2013, at 47:23-25 [Dkt. No. 75]), provide an independent basis on which to resolve this constitutional dispute.

    [17] *See* Hardy, *supra* note 7, at 246-60.

    [18] Technically, "polygamy," as the established practice among Latter-day Saints from as early as 1833 to the "Second Manifesto" in 1904, which finally put an end to the officially sanctioned practice in the Church, *see* Hardy, *supra* note 7, at 246-60 (describing the background and substance of the LDS Church's 1904 "Official Statement" against polygamy), was only for select men either in the Church hierarchy or appointed by the Church hierarchy to take multiple wives. In other words, it was the institutionalized practice of "polygyny," which is "the state or practice of having more than one wife or female mate at a time." *Miriam-Webster's Collegiate Dictionary* 962 (11th ed. 2007). Conversely, the practice of "polyandry," which is "the state or practice of having more than one husband or male mate at one time," *id.* at 961, was unknown outside of a few instances involving LDS Church founder Joseph Smith, the facts of which are in dispute among scholars of American and Mormon history and controversial among most Latter-day Saints today. *See* Todd Compton, IN SACRED LONELINESS: THE PLURAL WIVES OF JOSEPH SMITH, 4-7 (1997); *cf.* Brian C. Hales, 1 JOSEPH SMITH'S POLYGAMY:

166-67 (noting that Congress was "deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order").

Although the court doubts that *Lawrence* actually must be interpreted to signal the end of the era in which the "good order and morals of society" are a rational basis for majoritarian legislation,[19] there is no question this was the prevailing view in the 1870s. And, in fact, the decades-long "war"[20] by the United States against the LDS Church—beginning with the Republican Party's

HISTORY AND THEOLOGY 303-411 (2011); Richard Lloyd Anderson and Scott H. Faulring, "The Prophet Joseph Smith and His Plural Wives," 10.2 FARMS REVIEW 67, 81 (1998) (reviewing Compton, IN SACRED LONELINESS and noting that "about one-fourth of Joseph [Smith]'s wives were married women, which Mormon historians have characterized as 'polyandry' in a general sense" but arguing from an apologetic perspective that "polyandry applies to Joseph Smith in a more limited sense, for with one exception, there is no reliable information on sexual relations after his being sealed to a married woman," meaning that "[p]olyandry should indicate a category of Joseph's sealings to some married women, without implying simultaneous sexual partners")); *see also* Hardy, *supra* note 7, at 98-99 (discussing Mormon polemics against polyandry in the mid to late nineteenth century by Mormons, including John T. Caine, Utah's territorial delegate, who do not seem to have been aware of Joseph Smith's own approximately twelve polyandrous unions, or "sealings" in Mormon terms).

[19] *Cf. Lawrence*, 539 U.S. at 599 (Scalia, J., dissenting) (observing that the majority's holding overturning *Bowers v. Hardwick*, 478 U.S. 186 (1986) and relying on Justice Stevens' dissenting opinion in *Bowers* "effectively decrees the end of all morals legislation" because "[i]f, as the Court asserts, the promotion of majoritarian sexual morality is not even a *legitimate* state interest, none of the above-mentioned laws [criminal laws against fornication, bigamy, adultery, adult incest, bestiality, and obscenity] can survive rational basis review"). Despite Justice Scalia's dour view in this comment, the court believes the "good order and morals of society" remain a rational basis for much majoritarian legislation under the States' police power, though perhaps now subject to a more nuanced and equitable analysis than before *Lawrence*.

[20] The "Utah War" of 1857 was the sole, short-lived physical manifestation of this conflict. *See generally* Ronald W. Walker, Richard E. Turley & Glen M. Leonard, MASSACRE AT MOUNTAIN MEADOWS 41-49 (2008) (providing general background to the "Utah War"). In sum,

> [t]his armed conflict, known as the Mormon War of 1857 or the Utah War, was not about the right to practice polygamy, but rather the role of the Mormons' theo-democratic 'State of Deseret.' [Brigham] Young and the LDS leadership were unwilling to recognize the federal government and its officials as sovereign for local matters, preferring to govern themselves as a state within the Union. In addition, the LDS's failure to act in accordance with basic constitutional rights, including free press, separation of church and state, and due process, was completely at odds with the federal government and the American public.
>
> After settling with the federal government, the LDS leadership softened its message. Young began to sound more like an extreme state's-righter than a ruler of an independent country. Still, the federal conflict with the Mormons temporarily linked the south and the north, uniting them in the cause of quashing the Mormons. Democrats hoped that

1856 platform of abolishing American chattel slavery and Mormon polygamy as the "twin relics of barbarism"[21] and culminating, depending on how one views the historical episode, with either the Enabling Act in 1894 requiring that Utah ensure that "polygamist or plural marriages are forever prohibited" in Utah as a condition for joining the Union as a State, or the seating of Utah Senator Reed Smoot in 1907[22]—was based on a majoritarian consensus that Mormons were indeed "subversive of good order" in their practice of polygamy. *Id.*

But what exactly was the "social harm"[23] identified by the *Reynolds* Court[24] in the Mormon practice of polygamy that made the practice "subversive of good order"? "Polygamy has always been odious among the northern and western nations of Europe, and, until the establishment of the Mormon Church, was almost exclusively a feature of the life of Asiatic and of African people." *Reynolds*, 98 U.S. at 164.[25] Though Professor Said did not cite *Reynolds* in

---

Buchanan's federal intervention would demonstrate that their party's adherence to states' rights had limitations. One could support local democratic process and still act when faced with the unsavory Mormons.

Sigman, *supra* note 16, at 116-17 (discussing the Utah War generally at 114-18).

[21] Gordon, *supra* note 2, at 55-83 (describing the political environment and legislative campaign against the Mormon practice of polygamy culminating in the Morrill Act).

[22] *See generally* Kathleen Flake, THE POLITICS OF AMERICAN RELIGIOUS IDENTITY: THE SEATING OF SENATOR REED SMOOT, MORMON APOSTLE (2003).

[23] "The Court claimed that the practice of plural marriage had always been 'odious,' yet 'never quite explained *why* [it] was a threat to the public well-being.'" Todd M. Gillett, Note, *The Absolution of* Reynolds*: The Constitutionality of Religious Polygamy*," 8 WM & MARY BILL RTS. J. 497, 513 (2000) (quoting Orma Linford, *The Mormons and the Law: The Polygamy Cases: Part I*, 9 UTAH L. REV. 308, 341 (1964)).

[24] The Waite Court, a majority of whom also four years later unanimously upheld Alabama's morally indefensible anti-miscegenation statute in *Pace v. Alabama*, 106 U.S. 583 (1883), *overruled by Loving v. Virginia*, 388 U.S. 1 (1967).

[25] By 1967, the Supreme Court thankfully had a different perspective of how racial considerations rendered legislation "odious":

There can be no question but that Virginia's miscegenation statutes rest solely upon distinctions drawn according to race. . . . The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States. . . . Over the years, *this Court has consistently repudiated 'distinctions between citizens solely because of their ancestry' as being 'odious to a free people whose institutions are founded upon the doctrine of equality.'* . . . There is patently no legitimate

his text on Orientalism, this expression of the social harm identified in the Mormon practice of polygamy aptly exemplifies the concept. A decade later, the Supreme Court clarified the social harm further, explaining that Mormons were degrading the morals of the country through their religious practices, such as polygamy, which, the Supreme Court declared, constituted "a return to barbarism" and were "contrary to the spirit of Christianity." *Late Corp. of The Church of Jesus Christ of Latter-day Saints v. United States*, 136 U.S. 1, 49 (1890).

It was not just that white American Mormons were engaging in a practice thought to be characteristic of Asiatic and African peoples who were believed, at the time, to be civilizationally and racially inferior, *cf.* Said, *supra* note 10, at 15, but also, as a practice of such peoples, "polygamy leads to the patriarchal principle," which, "when applied to large communities, fetters the people in stationary despotism"—another racist or orientalist observation about this Mormon practice based in the "scientific" perspective of the day. *Reynolds*, 98 U.S. at 166 (citing Professor Francis Lieber, "a prominent intellectual and founder of American political science"[26]); *see also* Gordon, *supra* note 2, at 119-45 (discussing Congress's underlying concern that the Mormon Church was using polygamy to secure direct political dominance of the Territory of Utah (i.e. the "patriarchal principle"), and that this would

---

overriding purpose independent of invidious racial discrimination which justifies this classification. . . . There can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause. . . . These statutes also deprive the Lovings of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment. The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men. . . . Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State."

*Loving*, 388 U.S. at 10-12 (emphasis added) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)).

[26] Edwin Brown Firmage & Richard Collin Mangrum, ZION IN THE COURTS: A LEGAL HISTORY OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS 155 (1988); Sigman, *supra* note 16, at 168-69.

continue in any future State of Utah). The practices were therefore objectionable because they

were characteristic of "oriental" races including "Asiatic" and "African" peoples, both

considered to be morally inferior based on such practices, and civilizationally inferior based on

"the patriarchal principle" attributed to their societies, not to mention racially inferior.

Accordingly, for the *Reynolds* Court, it was "impossible to believe that the constitutional

guarantee of religious freedom was intended to prohibit legislation in respect to this most

important feature of social life," referring to monogamous marriage. *Reynolds*, 98 U.S. at 165.[27]

Rather, "it is within the legitimate scope of the power of every civil government to determine

whether polygamy or monogamy shall be the law of social life under its dominion." *Id.* at 166.

White American Christians, the Court implied, legislate monogamy. *Id.* (comparing Mormon

polygamy to Aztec or other indigenous ritual human sacrifice or the self-immolation of widows

on their husbands' funeral pyres in the British Raj). The only characteristic connecting Mormon

---

[27] This sentiment appears to have been shared by congressional representatives in enacting the Morrill Act at issue in *Reynolds*:

> The favorable House Judiciary Committee Report accompanying the Morrill legislation in 1860 countered the Mormon free exercise argument with the contention that the framers of the Constitution and the First Amendment "did not mean to dignify with the name of religion a tribe of Latter Day Saints disgracing that hallowed name, and wickedly imposing upon the credulity of mankind." Without apology for the blatant inconsistency, that same Report went on to argue that the territorial incorporating ordinance violated the establishment clause because Mormonism was a religion:

> If the odious and execrable heresy of Mormonism can be honored with the name of religion, then the very attempt to incorporate the Church . . . is an effort to accomplish in Utah, what has nowhere else been effected by [federal] authority upon this continent—the establishment of one form of religious worship to the exclusion of all others.

L. Rex Sears, *Punishing the Saints for Their "Peculiar Institution": Congress and the Constitutional Dilemmas*, 2001 UTAH L. REV. 581, 618 (quoting H.R. Rep. No. 36-83, at 2 (1860)). The court notes the irony in a *congressional report* determining that a particular sect in the body politic is an "odious and execrable heresy" as part of a criticism that the sect at issue is potentially violating the Establishment Clause.

polygamy to these two incongruous examples is that polygamy, in the orientalist view of late

nineteenth-century America, was similarly attributed to Asiatic and African races.

In other words, the social harm was introducing a practice perceived to be characteristic

of non-European people—or non-white races—into white American society.[28] "The organization

of a community for the spread and practice of polygamy is, in a measure, a return to barbarism. It

is contrary to the spirit of Christianity and of the civilization which Christianity has produced in

the Western world." *Late Corp.*, 136 U.S. at 49. This observation in *Late Corp.*—unthinkable as

part of the legal analysis in a modern Supreme Court decision given the significant (and

appropriate) development in the interpretation of the protections afforded to religious minorities

under both the Establishment Clause and the Free Exercise Clause in the latter half of the

twentieth century,[29] and racial minorities under the Due Process and Equal Protection Clauses of

the Fourteenth Amendment, as also recognized in the latter half of the twentieth century—was

only a reiteration of the definitive position already taken by the Supreme Court more than a

decade earlier in *Reynolds*. *Cf.* 98 U.S. at 164. Such an assessment arising from derisive societal

views about race and ethnic origin prevalent in the United States at that time has no place in

discourse about religious freedom, due process, equal protection or any other constitutional

---

[28] Although the alleged "individualized harm to women who were subjugated as wives . . . served as a rallying cry of the anti-polygamy movement" in the popular media of the nineteenth century, the "societal harm to the liberal, democratic state" supposedly posed by the patriarchal nature of the Mormons adoption of the supposedly "Asiatic and African" practice of polygyny "was the societal harm aspect that the Supreme Court relied upon in its *Reynolds* decision." Sigman, *supra* note 16, at 168.

[29] As late as 1946, however, the Supreme Court refreshed and relied on this orientalist language from *Late Corp.* in holding that fundamentalist Mormons had violated the Mann Act by transporting plural wives across state lines "for the purpose of prostitution or debauchery, or for any other immoral purpose," where the religious cohabitation of fundamentalist Mormon "spiritual" marriages was held to be an "immoral purpose" of a type with prostitution and debauchery. *Cleveland v. United States*, 329 U.S. 14, 19 (1946) ("Polygamy is a practice with far more pervasive influences in society than the casual, isolated transgressions involved in the *Caminetti* case [of one transporting a woman in interstate commerce so that she should become his mistress or concubine]. The establishment or maintenance of polygamous households is a notorious example of promiscuity.").

guarantee or right in the genuinely and intentionally racially and religiously pluralistic society that has been strengthened by the Supreme Court's twentieth-century rights jurisprudence.

Unfortunately, despite this "orientalist" strain in both *Reynolds* and *Late Corp.*, not to mention myriad statements in the Congressional Record behind the legislation at issue in both of those cases[30] and otherwise relating to the Mormon practice of polygamy spanning the half century from approximately 1856 (essentially the beginning of the federal campaign against polygamy) to 1907 (when Mormon Apostle Reed Smoot was finally seated in the Senate), the Supreme Court has periodically continued to cite *Reynolds* in Free Exercise cases, most notably in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879 (1990). The court views *Smith*'s 1990 invocation of *Reynolds* in its analysis of the free exercise claim at issue there—whether Oregon could deny unemployment benefits to those dismissed from their jobs for the religiously motivated use of peyote, which was defined and prohibited by state statute as a controlled substance—as unfortunate and unnecessary for the holding in *Smith*.[31] That reference (and other similar citations to *Reynolds* by the Supreme Court and the Tenth Circuit) can mistakenly give the impression of endorsing the morally repugnant reasoning in *Reynolds*.[32] But Justice Scalia, writing for the majority in *Smith*, also provided the

---

[30] *See generally* Mary K. Campbell, *Mr. Peay's Horses: The Federal Response to Mormon Polygamy, 1854-1887*, 13 YALE J.L. & FEMINISM 29 (2001) (collecting comments from Congressional debates about the Morrill Act, the Edmunds Act, and the Edmunds-Tucker Act).

[31] Also, the court happens to agree with then Justice Durrant of the Utah Supreme Court that "*Smith* has essentially rewritten the Free Exercise Clause into the Free *Belief* Clause" in "all but abandon[ing] the strict scrutiny standard in the context of free exercise claims, concluding that a generally applicable and neutral law need only satisfy rational basis review." *State of Utah v. Green*, 2004 UT 76, ¶¶ 66, 70, 99 P.3d 820, 835-36 (Durrant, J., concurring) (emphasis in original).

[32] Ironically, the court notes that even *Reynolds* itself contains the key to an analysis for upholding a ban on polygamy in the absence of the racist or orientalist considerations that instead unfortunately became integral to its holding. Specifically, in the process of discussing the moral inferiority of "Asiatic and of African people" to imply the "social harm" posed by Mormon polygamy, the Supreme Court somewhat tangentially engaged in what could almost be considered a proto-*Glucksberg* analysis (see Part II.B.1 below for a discussion of the *Glucksberg* framework for considering a claim based on substantive due process) of the asserted right to practice polygamy. *Reynolds*, 98 U.S. at 164-65

way forward for this case in *Smith*'s identification of a "hybrid rights" framework ancillary to the

primary question of the legislature's ability to enact "a neutral, generally applicable law to

religiously motivated conduct," as discussed below. *Smith*, 494 U.S. at 881.

The court need not be entirely bound by the extremely narrow free exercise construct

evident in *Reynolds*; that case is, perhaps ironically considering the content of the current case,

not controlling for today's ruling that the cohabitation prong of the Statute is unconstitutional. In

fact, the court believes that *Reynolds* is not, or should no longer be considered, good law, but

also acknowledges its ambiguous status given its continued citation by both the Supreme Court

and the Tenth Circuit as general historical support for the broad principle that a statute may

incidentally burden a particular religious practice so long as it is a generally applicable, neutral

law not arising from religious animus or targeted at a specific religious group or practice.

The court therefore defers to *Reynolds* as binding on the limited question of any potential

free exercise right to the actual practice of polygamy. In the religious cohabitation at issue in this

case, however, the participants have "consciously chose[n] to enter into personal relationship[s]

that [they] knew would not be legally recognized as marriage" even though they "used religious

terminology to describe [the] relationship[s]." *State of Utah v. Holm*, 2006 UT 31, ¶ 172, 137

P.3d 726, 773 (Durham, C.J., dissenting).[33] They make no claim to having entered into legal

_____

(citing legal authority as far back as the Statute of James, 1 James 1, ch. 11, § 2 (1603) for the proposition that polygamy has consistently been prohibited in Anglo-American law). Unfortunately, at the time *Reynolds* was decided in 1879 the posture of the *Slaughter-House Cases*, 83 U.S. 36 (1873) (and, perhaps, even *Dred Scott v. Sandford*, 60 U.S. 393 (1857)) still characterized the Supreme Court's jurisprudence on the general concept of what would eventually become known as "substantive due process." Accordingly, this was not a legal doctrine that could be adequately taken into consideration in *Reynolds*, though this doctrine is highly relevant for today's case, as discussed below. (*See* Tr. Hrg. Jan. 17, 2013, at 47:23-25 [Dkt. No. 75] (Plaintiffs' representing that the "narrowest ground upon which this court can find for the plaintiff[s] is under the Due Process Clause").)

[33] Justice Christine M. Durham served as Chief Justice of the Utah Supreme Court from 2002 to 2012 and will therefore be referred to as Chief Justice Durham throughout in reference to her dissenting opinion in *Holm*. Current Chief Justice Matthew B. Durrant will be referred to as Justice Durrant in connection with the *Holm* and *Green* decisions.

unions by virtue of their religious cohabitation, having instead "intentionally place[d] themselves outside the framework of rights and obligations that surround the marriage institution." *Id.* In light of this, despite any applicability of *Reynolds* to actual polygamy (multiple purportedly legal unions), the cohabitation prong of the Statute is not operationally neutral or of general applicability because of its targeted effect on specifically religious cohabitation. It is therefore subject to strict scrutiny under the Free Exercise Clause and fails under that standard. Also, in these circumstances, *Smith*'s hybrid rights exception requires the court to apply a form of heightened scrutiny to Plaintiffs' constitutional claims, including their Due Process claim, since each of those constitutional claims are "reinforced by Free Exercise Clause concerns," 494 U.S. at 882,[34] in light of the specifically religious nature of Plaintiffs' cohabitation. Alternatively, following *Lawrence* and based on the arguments presented by Defendant in both his filings and at oral argument, the State of Utah has no rational basis under the Due Process Clause on which to prohibit the type of religious cohabitation at issue here; thus, the cohabitation prong of the Statute is facially unconstitutional, though the broader Statute survives in prohibiting bigamy.

---

[34] For application of the *Smith* hybrid rights paradigm in the Tenth Circuit, see *Grace United Methodist Church v. City of Cheyenne Board of Adjustment*, 451 F.3d 643, 655 (10th Cir. 2006) (explaining that *Smith* "carved out an exception for 'hybrid rights' claims, holding that a party could establish a violation of the free exercise clause even in the case of a neutral law of general applicability by showing that the challenged governmental action compromised both the right to free exercise of religion and an independent constitutional right"); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295-96 (10th Cir. 2004) (explaining that under the *Smith* hybrid rights exception, "when a free exercise claim is coupled with some other constitutional claim (such as a free speech claim), heightened scrutiny may be appropriate" but that the Tenth Circuit "will only apply the hybrid-rights exception to *Smith* where the plaintiff establishes a fair probability, or a likelihood, of success on the companion claim"); *Swanson by & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 700 & n.5 (10th Cir. 1998) (holding that "the *Smith* hybrid-rights theory . . . at least requires a colorable showing of infringement of recognized and specific constitutional rights").

## ANALYSIS

## I.   NO GENUINE DISPUTE AS TO ANY MATERIAL FACT

Rule 56(a) of the Federal Rules of Civil Procedure requires the court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Under this standard for summary judgment, the moving party must first establish the absence of a genuine issue of material fact on the claims or elements as to which it is moving for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1168-1169 (10th Cir. 2010) ("The moving party has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.") (internal quotation marks removed). Then, "in response to a properly supported motion for summary judgment, a non-movant must produce sufficient evidence for a reasonable trier of fact to find in its favor at trial on the claim or defense under consideration." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Thus, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249.

Ultimately, Defendant only genuinely disputes one fact presented by Plaintiffs as material to their motion. (*See* Def.'s Mem. Supp. Cross-Mot. and Resp. 2 [Dkt. No. 56] (responding to Plaintiffs' allegation that "state officials publicly denounced the Browns as committing crimes

every night on television" by explaining that "I never stated publicly that I would or would not prosecute the Browns, though I am aware that others in my office may have responded to the press to that effect (or at least the press reported that they did)".) As Plaintiffs observe, however, their "factual representation refers to 'state officials,' and thus is neither rebutted nor disproven by a representation concerning Mr. Buhman individually, even if accepted as true." (Pls.' Reply Mot. Summ J. 4 [Dkt. No. 71].) The court agrees. Moreover, Defendant proffered no evidence that would be admissible at a trial either in support of his own motion or in opposition to Plaintiffs' motion. The academic discussion of the "social harm" attributable to fundamentalist Mormon polygamy first presented in Defendant's Reply brief does not constitute the "sufficient evidence" required "for a reasonable trier of fact to find in [his] favor at trial on the claim . . . under consideration." *Nahno-Lopez*, 625 F.3d at 1283; *Anderson*, 477 U.S. at 249. Accordingly, the court finds no genuine dispute of material fact that would preclude the court from engaging the mechanism of summary judgment in this case. As analyzed below, the court finds that Plaintiffs are entitled to summary judgment as a matter of law.

## II.      COHABITATION IN THE 1973 STATUTE

### A.      The Utah Supreme Court's Interpretation of "Marry" in the Statute

Plaintiffs challenge the constitutionality of the Statute on multiple grounds, arguing both that the Statute is facially unconstitutional and unconstitutional as applied to the Plaintiffs. The Statute provides that "[a] person is guilty of bigamy when, knowing he has a husband or wife or knowing the other person has a husband or wife, the person purports to marry another person or cohabits with another person." Utah Code Ann. § 76-7-101(1) (2013). "It is axiomatic that state courts are the final arbiters of state law." *United States v. DeGasso*, 369 F.3d 1139, 1145 (10th Cir. Okla. 2004) (citing *Mullaney v. Wilbur*, 421 U.S. 684 (1975)). The court is therefore bound

by the Utah Supreme Court's interpretation of the Statute, *see R.A.V. v. City of St. Paul*, 505 U.S.

377, 381 (1982), most recently in *State of Utah v. Holm*, 2006 UT 31, 137 P.3d 726.

In *Holm*, the Utah Supreme Court affirmed the defendant's conviction for unlawful

sexual conduct with a minor under section 76-5-401.2 of the Utah Code[35] as well as bigamy

under the Statute, but did not find occasion to construe the phrase "or cohabits with another

person" because it rested its holding as to the bigamy conviction on its interpretation of the term

"marry" and the phrase "purports to marry." 2006 UT at ¶ 33, 137 P.3d at 737 & n.7.[36]

Construing "purports to marry" in the Statute, the Utah Supreme Court analyzed the definition of

"marry" in *Black's Law Dictionary*, including "discrepancies between the definitions provided

for 'marriage' and 'polygamy' in the seventh and eighth editions of *Black's Law Dictionary*"

(opting generally for the definitions provided in the seventh edition), *id.* at ¶ 20 n.5, and the use

of the word "marriage" in other sections of the Utah Code, *id.* at ¶¶ 23-25, and held that "the

term 'marry,' as used in the bigamy statute, includes both legally recognized marriages and those

that are not state-sanctioned." *Id.* at ¶ 18, 137 P.3d at 733. "[T]he plain meaning of the term

'marry,' as it is used in the bigamy statute, supports our conclusion that it encompasses both

marriages that are legally recognized and those that are not." *Id.* at ¶ 21, 137 P.3d at 734.

Because the Statute is unambiguous, the Court held, it was not necessary to "look to other

---

[35] This fact alone distinguishes *Holm* from the present case as there is no allegation or evidence that Plaintiffs have committed sexual assault with a minor or any other illegal or criminal activity aside from allegedly violating the Statute.

[36] The Court noted that

> Because we conclude that Holm's behavior violates the "purports to marry" prong of the bigamy statute, we need not reach Holm's arguments relating to the validity of the cohabitation prong. As indicated above, the jury convicted Holm under both prongs of the bigamy statute, and if, as we conclude, Holm was properly convicted pursuant to the "purports to marry" prong of the bigamy statute, it is of no consequence whether the cohabitation prong was properly applied to him.

*Holm*, 2006 UT at ¶ 33 n.7, 137 P.3d at 737.

26

interpretive tools such as legislative history." *Id.* at ¶ 16, 137 P.3d at 733. Nevertheless, the

Court also found support for its interpretation in those sources. *Id.* at ¶ 26, 137 P.3d at 735.[37]

Thus, the Court held that it was "constrained to conclude that an unlicensed, solemnized

marriage can serve as a subsequent marriage that violates the bigamy statute." *Id.* In other words,

"it is clear that the Legislature intended 'marry' to be construed to include marriages that are not

state-sanctioned." *Id.* at ¶ 22, 137 P.3d at 734. This, in turn, according to the Court, means that

"the bigamy statute does not require a party to enter into a second marriage (however defined) to

run afoul of the statute; *cohabitation alone would constitute bigamy pursuant to the statute's*

*terms*." *Id.* (emphasis added). This broad interpretation of "marry" in the Statute, which itself

includes cohabitation, is the focus of this section of the court's decision together with the

cohabitation prong; the "purports to marry" prong is addressed below in Part III in its relation to

the 1894 Utah Enabling Act and Irrevocable Ordinance in the Utah State Constitution.

   As Plaintiffs correctly note, the Utah Supreme Court's interpretation of "marry" in the

Statute in *Holm* means that the Statute "criminalizes not only privately 'marrying' someone after

having legally married, but also merely cohabiting with a second adult partner after having

married a first partner." (Pls.' Mem. Supp. Mot. Summ. J. 9 [Dkt. No. 50].) This, argue

---

[37] *See Holm*, 2006 UT ¶¶ 40-48, 137 P.3d at 739-41 (reviewing legislative history of the 1892 Territorial Anti-Polygamy Act (later referred to in the Utah Constitution, art. XXIV, § 2, observing the "continuing vitality" of that territorial law), Congress's Utah Enabling Act of 1894 requiring as a condition for statehood that the Utah Constitution include an "irrevocable ordinance" that "polygamous or plural marriages are forever prohibited," and the "irrevocable ordinance" itself as contained in the 1895 Utah Constitution, art. III, § 1). In this analysis, the Court does not appear to have seriously considered Chief Justice Durham's dissenting observation that "the 'well-documented history' to which the majority refers ended long before 1973, when section 76-7-101 was originally enacted." *Holm*, 2006 UT at ¶ 140, 137 P.3d at 762 (Durham, C.J., dissenting) (citing *State v. Tuttle*, 730 P.2d 630, 632 (Utah 1986) for the fact that "in 1973 our legislature 'repealed wholesale all the prior substantive criminal statutes . . . and enacted a sweeping new penal code that departed sharply from the old common law concepts'"). Thus, noted Chief Justice Durham, "[t]he majority fails to explain how that history could be relevant to our interpretation of section 76-7-101." *Id.*

Plaintiffs, is unconstitutional under numerous independent constitutional provisions, as discussed below.

**B.      Strict or Heightened Scrutiny**

Though the court is bound by the Utah Supreme Court's interpretation of the Statute in *Holm* (with the particular relevance of its broad construction of the word "marry"), it is not bound by that Court's denial of Holm's federal constitutional claims. *See Holm*, 2006 UT at ¶¶ 49-87, 137 P.3d at 741-48 (rejecting Holm's federal Free Exercise, Due Process, and Freedom of Association claims). At oral argument, Plaintiffs suggested that "the narrowest ground upon which this court can find for the plaintiff is under the Due Process Clause." (Tr. Hrg. Jan. 17, 2013, at 47:24-25 [Dkt. No. 75].) The court will therefore first examine the constitutionality of the Statute, as interpreted by the Utah Supreme Court in *Holm*, under the Due Process Clause of the Fourteenth Amendment.

*1.      Heightened Scrutiny under the* Glucksberg *Framework*

In its "Due Process Clause," the Fourteenth Amendment provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has held that "[t]he Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). Rather, the Due Process Clause has been held "to cover a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them.'" *County of Sacramento v. Lewis*, 523 U.S. 833 (U.S. 1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Under this doctrine of "substantive due process," the Fourteenth Amendment "forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the

28

infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S.
292, 302 (1993) (emphasis in original).[38] This "heightened protection," *Glucksberg*, 521 U.S. at
720, or "heightened scrutiny"—under which any infringement of a fundamental liberty interest
must be found to be narrowly tailored to serve a compelling state interest—is "*only*" applied to
"fundamental rights" under the substantive due process analysis. *See Lawrence*, 539 U.S. at 593
(Scalia, J., dissenting) (emphasis in original).

The Supreme Court has outlined the framework for evaluating a claim to the existence of
a fundamental right. This "established method of substantive-due-process analysis has two
primary features." *Glucksberg*, 521 U.S. at 720. First, the asserted "fundamental right" (or
"fundamental liberty") must be "deeply rooted in this Nation's history and tradition and implicit
in the concept of ordered liberty, such that neither liberty nor justice would exist if they were
sacrificed." *Id.* (internal citations and quotations omitted). Second, the analysis requires "a
'careful description' of the asserted fundamental liberty interest." *Id.* As a practical matter, the
Tenth Circuit applies this *Glucksberg* framework by addressing the second prong first to narrow
the inquiry: "a plaintiff asserting a substantive due process right must both (1) carefully describe
the right and its scope; and (2) show how the right as described fits within the Constitution's
notions of ordered liberty." *Seegmiller v. Laverkin City*, 528 F.3d 762, 769 (10th Cir. 2008); *cf.*
*Williams v. Att'y Gen. of Ala.* ("*Williams IV*"), 378 F.3d 1232, 1239 (11th Cir. 2004) ("First, in
analyzing a request for recognition of a new fundamental right, or extension of an existing one,

---

[38] The court notes Justice Scalia's somewhat opposite framing of this in his *Lawrence* dissent:
"The Fourteenth Amendment expressly allows States to deprive their citizens of 'liberty,' *so long as 'due
process of law' is provided*." *Lawrence*, 539 U.S. at 592 (Scalia, J., dissenting) (emphasis in original). But
his analysis still returns to the same heightened scrutiny standard for evaluating infringements of
fundamental liberty interests: "Our opinions applying the doctrine known as 'substantive due process'
hold that the Due Process Clause prohibits States from infringing *fundamental* liberty interests, unless the
infringement is narrowly tailored to serve a compelling state interest." *Id.* at 593 (emphasis in original).

we must begin with a careful description of the asserted right.") (internal quotation marks and citation omitted).

If the narrowly asserted right qualifies as "fundamental" based on this two-pronged *Glucksberg* analysis, then "only heightened scrutiny" of the state's interference with such right would be "appropriate." *Seegmiller*, 528 F.3d at 771 (quoting *Glucksberg*, 521 U.S. at 721 for the content of this "heightened protection"—that "the government may not infringe a fundamental liberty interest unless the infringement is narrowly tailored to serve a compelling state interest") (internal quotation marks omitted). If the asserted right does not qualify as "fundamental" under this analysis, "rational basis review" applies, under which "the state may regulate an interest pursuant to a validly enacted state law or regulation rationally related to a legitimate state interest." *Id.* (quoting *Reno v. Flores*, 507 U.S. 292, 305 (1993) ("[N]arrow tailoring is required only when fundamental rights are involved.")). The court first considers Plaintiffs' claim to the heightened protection afforded under the *Glucksberg* substantive due process analysis and finds that prevailing precedent binding on this court precludes the application of heightened scrutiny under the *Glucksberg* framework, both for polygamy and religious cohabitation.[39]

 *a. Polygamy.* Preliminarily, the court finds that "polygamy" fails to qualify as a fundamental right under the *Glucksberg* analysis. In truth, the court disagrees with Defendant's assertion that Plaintiffs are arguing that the fundamental rights analysis (under *Lawrence*) requires "the State to sanction their polygamous marriages." (Def.'s Mem. Supp. Cross-Mot. and

---

[39] The court will in turn consider the Statute's constitutionality under the rational basis review standard in Part II.C below.

Resp. 9 [Dkt. No. 56].)[40] To the contrary, "[t]he Browns have not questioned the right of the state to limit its recognition of marriage and to prosecute those citizens who secure multiple marriage licenses from the state." (Pls.' Opp. Def.'s Mot. Summ. J. 26 [Dkt. No. 72].) But in the interest of completeness on this issue of such acute importance in the State of Utah, the court briefly considers actual "polygamy" under the *Glucksberg* framework before moving on to the "carefully described" liberty interest in religious cohabitation that Plaintiffs are claiming.

As noted above, and perhaps somewhat surprisingly given the court's introductory comments about *Reynolds*, the court finds that there is no "fundamental right" to polygamy under *Glucksberg*. To phrase it with a "careful description" of the asserted right, *see Glucksberg*, 521 U.S. at 721; *Seegmiller*, 528 F.3d at 769, no "fundamental right" exists to have official State recognition or legitimation[41] of individuals' "purported" polygamous marriages—relationships entered into knowing that one of the parties to such a plural marriage is already legally married in the eyes of the State. *See* Utah Code Ann. § 76-7-101. The fundamental right or liberty interest that was under consideration in *Glucksberg* is instructive for the analysis of whether the asserted right to polygamy is "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 721 (internal citations omitted).

*Glucksberg* concerned a challenge to a statute in the State of Washington prohibiting assisted suicide, including physician-assisted suicide. In its analysis, the Supreme Court carefully described the asserted fundamental liberty interest as "whether the 'liberty' specially protected

---

[40] Defendant claims that "[i]n Plaintiffs' Memorandum in Support of their Motion for Summary Judgment they assert that *Lawrence v. Texas*, 539 U.S. 558 (2003), is to be read to require the State to sanction their polygamous marriages."

[41] For example, through provision of a marriage license or application of the system of laws and protections that surround legal marriage, which is a "system of domestic relations based exclusively upon the practice of monogamy as opposed to plural marriage." *Potter v. Murray City*, 760 F.2d 1065, 1070 (10th Cir. 1985).

by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so." *Id.* at 723. The Court referred to the 700 year history of the prohibition of suicide in Anglo-American law (as well as considering other countries' posture toward it), beginning with evidence of its prohibition as early as the thirteenth century in Henry de Bracton's treatise on the Laws of England. *Id.* at 711 (quoting 2 Bracton on Laws and Customs of England 423 (f. 150) (G. Woodbine ed., S. Thorne transl., 1968)).[42] Sir William Blackstone observed that this was still integral to the common law in the eighteenth century in his Commentaries on the Laws of England, which also was "a primary legal authority for 18th and 19th century American lawyers." *Id.* at 712. "For the most part, the early American colonies adopted the common-law approach." *Id.* at 712-19 (discussing the prohibition in the American colonies, early State statutes, and the development of statutes—beginning as early as 1828 in New York—explicitly prohibiting assisted suicide). "By the time the Fourteenth Amendment was ratified, it was a crime in most States to assist a suicide." *Id.* at 715. Finally, "the Model Penal Code also prohibited 'aiding' suicide, prompting many States to enact or revise their assisted-suicide bans." *Id.* at 715-16.

The Court concluded that to identify a fundamental right to assisted suicide, the Court "would have to reverse centuries of legal doctrine and practice, and strike down the considered policy choice of almost every State." *Id.* at 723.[43] The Court also declined to consider the

---

[42] In fact, the Court traced the prohibition on suicide to its ecclesiastical roots before the emergence sometime in the twelfth century of the common law, noting its prohibition in 673 at the Council of Hereford and then reaffirmed by King Edgar in 967. *Id.* at n.9 (citing J. Baker, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 11 (2d ed. 1979) and G. Williams, THE SANCTITY OF LIFE AND THE CRIMINAL LAW 257 (1957)).

[43] An overriding concern of the Supreme Court in the evaluation of substantive due process claims is that "[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action." *Glucksberg*, 521 U.S. at 720. The top priority is allowing the democratic process to address these issues. "We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the

substantive due process interest at issue framed much more broadly as "reflecting a general tradition of 'self-sovereignty'" or "that the 'liberty' protected by the Due Process Clause includes 'basic and intimate exercises of personal autonomy.'" *Id.* at 724 (quoting Brief of Respondents 12). Instead, the Court returned the focus of the analysis to the "careful description" of the asserted fundamental interest, which it framed as "whether the protections of the Due Process Clause include a right to commit suicide with another's assistance." *Id.* at 724. In light of its historical analysis, the Court observed that "[t]he history of the law's treatment of assisted suicide in this country has been and continues to be one of the rejection of nearly all efforts to permit it." *Id.* at 728. Thus, the Court held that "the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause." *Id.*

The prohibition against polygamy has similarly ancient roots in Anglo-American law. The court need not look as far back as the Council of Hereford in 673 A.D. in this fundamental rights analysis; it is sufficient to trace the prohibition to the 1603 Statute of James, "An act to restrain all Persons from Marriage until their former Wives and former Husbands be dead." 1 James 1, ch. 11, § 2 (quoted in Model Penal Code § 230.1 cmt. 1, Background at 371 n.1 (1980)). "Prior to that, problems of plural marriage were dealt with exclusively by the ecclesiastical authorities." Model Penal Code § 230.1 cmt. 1, Background at 371-72. As Chief Justice Durham of the Utah Supreme Court observed, the policy behind this ancient prohibition of polygamy seems to have centered on the often fraudulent nature of a polygamous marriage: "Such an act defrauds the state and perhaps an innocent spouse or purported partner." *Holm*, 2006 UT at ¶ 168, 137 P.3d at 771 (Durham, C.J., dissenting). Moreover, and with increased relevance for the prohibition as carried forward into the laws of most States of the Union, "[i]t

---

liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court." *Id.*

also completely disregards the network of laws that regulate entry into, and the dissolution of, the legal status of marriage, and that limit to one the number of partners with which an individual may enjoy this status." *Id.*

The text of the Statute of James substantiates this, providing as justification for the enactment that "divers evil desposed Persons being married, run out of one County into another, or into Places where they are not known, and there become married, having another Husband or Wife living, to the great Dishonour of God, and *utter undoing of divers honest Men's Children*. . . ." 1 James 1, ch. 11, § 2, art. I (emphasis added). In his Commentaries on the Laws of England, Sir William Blackstone—so important for the American colonists in continuing the institution of England's common law—observed that "bigamy" or "polygamy" was "a felonious offense with regard to this holy estate of matrimony." William Blackstone, 4 COMMENTARIES *163-65.[44] As with suicide, the American colonies adopted this English approach to polygamy and most of them prohibited it from the beginning. *See generally* Model Penal Code § 230.1 cmt. 1, Background at 370-75. As states joined the Union, they either enacted their own anti-bigamy statutes derived from this English precedent or adopted territorial prohibitions on the practice of polygamy, as did Utah by referring in its 1895 Constitution to the 1892 territorial law prohibiting polygamy, *see* UTAH CONST. art. XXIV, § 2. *Id.* The court therefore finds that, as with assisted suicide, no fundamental right exists under the *Glucksberg* framework to engage in polygamy; that is, to enter into a second purportedly legal matrimonial union when already legally married. Many people who currently practice "polygamy," however, including Plaintiffs, do not have any

---

[44] The court notes that Blackstone's treatment, however, already exhibits (as early as the 1760s) an orientalist understanding of polygamy: "For polygamy can never be endured under any rational civil establishment, whatever specious reasons may be urged for it by the eastern nations, the fallaciousness of which has been fully proved by many sensible writers; but in northern countries the very nature of the climate seems to reclaim against it; it never having obtained in this part of the world, even from the time of our German ancestors. . . ." Blackstone at *163-64.

expectation that their purported marriages will be legally recognized even though they describe their often religiously motivated cohabitation as "marriage," "polygamy," or "plural marriage."

   **b. Religious Cohabitation.**   The relationship at issue in this lawsuit, which the court has termed "religious cohabitation," has been aptly described by then Chief Justice Durham of the Utah Supreme Court. Religious cohabitation occurs when "[t]hose who choose to live together without getting married enter into a personal relationship that resembles a marriage in its intimacy but claims no legal sanction." *Holm*, 2006 UT at ¶ 172, 137 P.3d at 773 (Durham, C.J., dissenting). Those who choose to live in these relationships "intentionally place themselves outside the framework of rights and obligations that surrounds the marriage institution." *Id.* A defining characteristic of such cohabitation as lived by Plaintiffs and those similarly situated is that, in choosing "to enter into a relationship that [they know] would not be legally recognized as marriage, [they use] religious terminology to describe the relationship," and this terminology— "'marriage' and 'husband and wife'—happens to coincide with the terminology used by the state to describe the legal status of married persons." *Id.* Stated succinctly, Plaintiffs "appropriate the terminology of marriage, a revered social and legal institution, for [their] own religious purposes," though not purporting "to have actually acquired the legal status of marriage." *Id.* at ¶ 123, 137 P.3d at 773. But this religious cohabitation also fails to qualify as a fundamental right or fundamental liberty interest triggering heightened scrutiny under the *Glucksberg* substantive due process analysis.

   Plaintiffs provide the "careful description" of the asserted fundamental right—the required first step of the analysis in the Tenth Circuit, *see Seegmiller*, 528 F.3d at 769—as follows: "a fundamental liberty interest in choosing to cohabit and maintain romantic and spiritual relationships, even if those relationships are termed 'plural marriage'." (Pls.' Mem.

Supp. Mot. Summ. J. 11 [Dkt. No. 50].) Plaintiffs truncate the *Glucksberg* analysis by reference to *Lawrence*, which they argue establishes "a fundamental liberty interest in intimate sexual conduct" (Pls.'s Opp. Def.'s Mot. Summ. J. 19 n.16 [Dkt. No. 72]), thus prohibiting the state "from imposing criminal sanctions for intimate sexual conduct in the home." (Pls.' Mem. Supp. Mot. Summ. J. 9 [Dkt. No. 50].) "*Lawrence* was the latest iteration in a long series of constitutional decisions amplifying a core principle: the Due Process Clause circumscribes and in some cases virtually forbids state intervention in private relationships and conduct." (Pls.'s Opp. Def.'s Mot. Summ. J. 22 [Dkt. No. 72].)

Plaintiffs' arguments about the meaning and implications of *Lawrence* for the State's ability to criminalize their private conduct of religious cohabitation are very persuasive. But *Lawrence* provides less specific guidance than would be desirable, primarily because the enigmatic decision eschews a formal, technical analysis of the level of detail modeled in the *Glucksberg* framework for analyzing claims to substantive due process protecting carefully described fundamental rights. Unfortunately, the decision also never explicitly identifies the standard of review applied and, though providing a substantive due process discussion that could fairly easily support an interpretation that heightened scrutiny was indeed applied, the Court used some terminology arguably characteristic of rational basis review in ruling Texas' anti-sodomy statute unconstitutional. *See Lawrence*, 539 U.S. at 586 (Scalia, J., dissenting) (arguing that the majority applied "an unheard of form of rational basis review" to strike down Texas' anti-sodomy law). *But see* Lawrence H. Tribe, Lawrence v. Texas*: The "Fundamental Right" That Dare Not Speak Its Name*, 117 HARV. L. REV. 1893, 1917 (2004) (arguing that "the strictness of the Court's standard in *Lawrence*, however articulated, could hardly have been more obvious" and to assume that rational basis review was applied "requires overlooking passage after passage

in which the Court's opinion indeed invoked the talismanic verbal formula of substantive due process but did so by putting the key words in on unusual sequence of another").

Instead, the Supreme Court in *Lawrence* offered a high-level contemplation of a much broader fundamental value, a deeper unifying principle, that it held to transcend specific narrowly defined individual fundamental rights in the "substantive reach of liberty under the Due Process Clause" and expressed in its long line of substantive due process cases. *Lawrence*, 539 U.S. at 564. That is, in overturning *Bowers v. Hardwick*, 478 U.S. 186 (1986), the Court explained that *Bowers* had incorrectly upheld an anti-sodomy statute because the Court had "failed to appreciate the extent of the liberty at stake" and had defined the asserted fundamental right at issue in *Bowers* too narrowly simply as "a fundamental right [of] homosexuals to engage in sodomy." *Id.* at 567-68. "To say that the issue in *Bowers* was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse." *Id.* at 568. Rather, the Court in *Lawrence* identified a deeper liberty interest that ran through its substantive due process line of cases, unifying them by reference to this underlying commitment to liberty itself:

> Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home. And there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence. Freedom extends beyond spatial bounds. Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct.

*Id.* at 562. The Court thus framed the inquiry as "whether the petitioners were free as adults to engage in the private conduct [of homosexual sodomy] in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution." *Id.* at 564. Anti-sodomy statutes such as those in *Bowers* and *Lawrence*, and similar laws "that purport to do no more than

prohibit a particular sexual act," invariably "have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home." *Id.* at 567. Thus, "[t]he statutes do seek to control a personal relationship that, whether or not entitled to formal recognition in the law, *is within the liberty of persons to choose without being punished as criminals*." *Id.* (emphasis added). Moreover, the Court acknowledged that "adults may choose to enter upon this relationship in the confines of their homes and their own private lives and still retain their dignity as free persons. . . . The liberty protected by the Constitution allows homosexual persons the right to make this choice." *Id.*[45]

After broadening the actual liberty interest at issue in *Bowers* and *Lawrence* through this redefinition, the *Lawrence* Court then implicitly seemed to loosely follow the *Glucksberg* framework for analyzing substantive due process claims—though without ever citing to or referencing *Glucksberg*—by proceeding to engage in a brief historical analysis of the asserted liberty interest, finding "the historical grounds relied upon in *Bowers*" to be "more complex than the majority opinion and the concurring opinion . . . indicate." *Id.* at 567-71. In this process, the Court addressed the historical analysis in *Bowers*, while reiterating the broader liberty interest it considered to be at issue, in language that has become one of the key messages of *Lawrence*:

> It must be acknowledged, of course, that the Court in *Bowers* was making the broader point that for centuries there have been powerful voices to condemn homosexual conduct as immoral. The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives. These considerations do not answer the question before us, however. *The issue is whether the majority may*

---

[45] The Court was careful to emphasize that "[t]he present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Lawrence*, 539 U.S. at 578.

> *use the power of the State to enforce these views on the whole society through*
> *operation of the criminal law.*

*Id.* at 571 (emphasis added). The Court then determined that in the applicable historical analysis, the "laws and traditions in the past half century are of most relevance," *id.* at 571-72, including taking into account the "moribund character" of such laws based on an observable "history" or "pattern of nonenforcement with respect to consenting adults acting in private." *Id.* at 572-73. Even if not enforced, criminalizing such private, consensual conduct, is an "invitation to subject homosexual persons to discrimination both in the public and the private spheres" and thus even the continued existence of *Bowers* "as precedent demeans the lives of homosexual persons." *Id.* at 575. As a result, the Court overturned *Bowers*, holding that Justice Stevens' dissenting analysis "should have been controlling in *Bowers* and should control here." *Id.* at 578.[46]

    *Lawrence* involved "two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle" and "are entitled to respect for their private lives." *Id.* Accordingly, based on the broader liberty analysis, the Court held that

> [t]he State cannot demean their existence or control their destiny by making their
> private sexual conduct a crime. Their right to liberty under the Due Process
> Clause gives them the full right to engage in their conduct without intervention of
> the government. 'It is a promise of the Constitution that there is a realm of
> personal liberty which the government may not enter.' [*Planned Parenthood of
> Southeastern Pa. v.*] *Casey*, 505 U.S. [833], 847 [(1992)] . . . . The Texas statute

---

[46] The Court quoted the following portion of Justice Stevens' dissent in *Bowers*:

Our prior cases make two propositions abundantly clear. First, the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack. Second, individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of 'liberty' protected by the Due Process Clause of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons.

*Lawrence*, 539 U.S. at 577-78 (quoting *Bowers*, 478 U.S. at 216 (Stevens, J., dissenting)).

> furthers no *legitimate state interest* which can justify its intrusion into the personal and private life of the individual.

*Id.* (emphasis added). This reference to the Texas statute furthering "no *legitimate state interest* which can justify its intrusion into the personal and private life of the individual" is what seems to frame the holding in the language of rational basis review rather than the heightened scrutiny implied by the entirety of the preceding analysis. *See Lawrence*, 539 U.S. at 586 (Scalia, J., dissenting); *Williams v. Att'y Gen. of Ala.* ("*Williams IV*"), 378 F.3d 1232, 1236 (11th Cir. 2004) (holding that *Lawrence* declined the invitation "to recognize a fundamental right to sexual privacy" and that it "is a strained and ultimately incorrect reading of *Lawrence* to interpret it to announce a new fundamental right—whether to homosexual sodomy specifically or, more broadly, to all forms of sexual intimacy" because *Lawrence* "did not employ fundamental-rights analysis" but rather "it ultimately applied rational-basis review, rather than strict scrutiny, to the challenged statute").

Despite the moral and philosophical appeal of *Lawrence*'s discussion about the Fourteenth Amendment's commitment to a concept of liberty that "protects the person from unwarranted government intrusions into a dwelling or other private places" because it "presumes an autonomy of self that includes . . . certain intimate conduct," *Lawrence*, 539 U.S. at 562, and therefore "gives substantial protection to adult persons in deciding how to conduct their lives in matters pertaining to sex," *id.* at 571, and the resulting inherent persuasiveness of Plaintiffs' arguments that this broadly outlined substantive due process liberty interest applies to the religious cohabitation at issue here, the court is bound by the Tenth Circuit's interpretation of *Lawrence* in *Seegmiller*. It therefore need look no further than *Seegmiller* to find that such religious cohabitation does not qualify for heightened scrutiny under the substantive due process analysis in the Tenth Circuit.

In *Seegmiller*, the Tenth Circuit upheld the District Court's denial of the plaintiff's substantive due process claim asserting the existence of a "fundamental liberty interest to engage in a private act of consensual sex." 528 F.3d at 770. *Seegmiller* is factually distinguishable from this case, however, and is therefore not directly controlling. The *Seegmiller* plaintiff was a police officer who had been reprimanded for having an affair with another police officer who was not a member of her department while the two of them both attended an out-of-town training seminar paid for in part by the city. *Id.* at 764. Her conduct resulted in an investigation and oral reprimand (after she refused to sign the written reprimand presented to her by the city manager) by the city council "based on the provision of the law enforcement code of ethics requiring officers to keep their private life unsullied as an example to all and to behave in a manner that does not bring discredit to the officer or the agency." *Id.* at 765 (internal quotation marks and citation omitted). The reprimand stated that the plaintiff had "allowed her personal life to interfere with her duties as an officer by having sexual relations with an officer" from the county while at the training seminar paid for in part by the city. *Id.* at 766. Ultimately, the Tenth Circuit in *Seegmiller* held that heightened scrutiny did not apply because it concluded that no fundamental right to sexual privacy exists. *Id.* at 771. Rather, the city council's actions easily satisfied rational basis review, the Tenth Circuit held, based on the well-settled principle that "a police department may . . . place demands upon the members of the police force which have no counterpart with respect to the public at large" in the interest of good order within the department, the police department's reputation in the community, and the general task of keeping the peace. *Id.* at 772 (citing *Kelly v. Johnson*, 425 U.S. 238, 245 (1976) and *Shawgo v. Spradlin*, 701 F.2d 470, 483 (5th Cir. 1983)) (internal quotation marks and alterations omitted). This factor is not present here.[47]

---

[47] The court finds that all other police officer cases are similarly distinguishable, including *Potter*

Although *Seegmiller* is factually distinguishable and therefore not directly controlling, the court cannot ignore the Tenth Circuit's specific substantive due process analysis of the asserted "fundamental liberty interest in sexual privacy." *Id.* at 769. In particular, the Tenth Circuit went out of its way to interpret *Lawrence* in this context. Following the Eleventh Circuit's treatment of *Lawrence* in *Williams IV*, the Tenth Circuit in *Seegmiller* observed that "[a] broadly-defined 'right to sexual activity' will clearly not suffice. The Supreme Court has never identified such a right at that level of generality." *Id.* at 770 (quoting *Williams IV*, 378 F.3d at 1236 (explaining that "the [Supreme] Court has never indicated that the mere fact that an activity is sexual and private entitled it to protection as a fundamental right")). Although *Seegmiller* initially, though curiously in light of its later treatment of *Lawrence*, conceded that "no one disputes a right to be free from government interference in matters of consensual sexual privacy," the Court then categorically rejected the plaintiff's claim to the existence of a fundamental right to engage in private consensual sexual conduct. *Id.* at 770. Again, following *Williams IV*, the Tenth Circuit explained that "the [Supreme] Court has never endorsed an all-encompassing right to sexual privacy under the rubric of substantive due process." *Id.*

In support of this conclusion, the *Seegmiller* Court noted (again following *Williams IV*) that *Lawrence* "counsels against finding a broad-based fundamental right to engage in private sexual conduct." *Id.* at 771. The Tenth Circuit observed that "nowhere in *Lawrence* does the [Supreme] Court describe the right at issue [the right to engage in private, consensual

---

*v. Murray City*, 760 F.2d 1065 (10th Cir. 1985) (a police officer was terminated when the city he worked for discovered that he practiced religiously motivated "plural marriage" and therefore was not respecting the law as befits an officer of the law). In *Potter*, long before *Lawrence*, the Tenth Circuit ruled in a single paragraph that there was no privacy interest in religiously motivated plural marriage. *Id.* at 1070-71. Also, before *Smith* and *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the Tenth Circuit simply cited to *Reynolds* and *Cleveland* on the Free Exercise Claim in *Potter*. The fact that the plaintiff in *Potter* was a police officer sworn to uphold state law puts that case into the category of *Seegmiller* and distinguishable on that basis alone. Almost thirty years after *Potter*, the Free Exercise analysis requires more nuance than was on display in *Potter*, as discussed below.

homosexual sodomy] as a fundamental right or a fundamental liberty interest." *Id.* "It instead applied rational basis review to the law and found it lacking." *Id.* (citing key language in *Lawrence* that the Texas statute "furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual" and Justice Scalia's dissenting opinion to conclude that *Lawrence* applied rational basis review).

> Nor did the *Lawrence* Court conclude that an even more general right to engage in private sexual conduct would be a fundamental right. . . . Indeed, as we noted above the [Supreme] Court resolved the constitutionality of Texas's sodomy law in *Lawrence* by applying the rational basis test, rather than heightened scrutiny. . . . If a fundamental right were at stake, only heightened scrutiny would have been appropriate. . . .

*Id.* (citations omitted). The court views the Tenth Circuit's analysis and interpretation of *Lawrence* as binding for this case and, accordingly, finds that it precludes the application of heightened scrutiny to Plaintiffs' substantive due process claim as well, supported as it is by the contention that *Lawrence* establishes "a fundamental liberty interest in intimate sexual conduct." (Pls.'s Opp. Def.'s Mot. Summ. J. 19 n.16 [Dkt. No. 72].) The cohabitation prong of the Statute, however, cannot withstand rational basis review under the substantive due process analysis, as discussed in Part II.C below.

2.     *Strict Scrutiny under the Free Exercise Clause*

The Free Exercise Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST. amend. I. Because the Free Exercise Clause is applicable to the states through incorporation into the Fourteenth Amendment to the United States Constitution, *Smith*, 494 U.S. at 876-77; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), the Statute is subject to evaluation based on this prohibition. The United States Supreme Court has held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law

of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Smith*, 494 U.S. at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)). If, however, a law that burdens religious practice is found not to be neutral or of general applicability, then a court evaluating the constitutionality of the challenged law must apply the strict scrutiny standard, under which the law "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993); *cf. Smith*, 494 U.S. at 886 n.3. This "compelling governmental interest" standard is roughly equivalent to the strict scrutiny applicable to certain claims in other constitutional fields.[48] If such a law is not narrowly tailored to advance a compelling governmental interest, then it violates the Free Exercise Clause. *Hialeah*, 508 U.S. at 546-47. As discussed below, strict scrutiny does not apply to the Statute's prohibition of actual polygamy or bigamy, but is triggered by the Statute's cohabitation prong.

**a. Polygamy.** Of course, *Reynolds* held that Congress's long history of specifically targeting Mormons based on the fear that their practice of polygamy posed a threat to American democracy, *see Holm*, 2006 UT at ¶ 167 & n.20, 137 P.3d at 771 (Durham, C.J., dissenting), and the resulting federal legislation prohibiting polygamy did not violate the Mormons' right to the free exercise of their religion. *Reynolds*, 98 U.S. at 165 ("it is impossible to believe that the constitutional guaranty of religious freedom was intended to prohibit legislation in respect of" religiously motivated Mormon polygamy). *Smith* quoted *Reynolds* as part of the basis for its

---

[48] As the Supreme Court explained in *Smith*, "[t]he 'compelling government interest' requirement seems benign, because it is familiar from other fields. But using it as the standard that must be met before the government may accord different treatment on the basis of race, or before the government may regulate the content of speech, is not remotely comparable to using it for the purpose asserted here. What it produces in those other fields—equality of treatment and an unrestricted flow of contending speech—are constitutional norms; what it would produce here—a private right to ignore generally applicable laws—is a constitutional anomaly." *Smith*, 494 U.S. at 885-86.

holding that "generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified by a compelling governmental interest." *Smith*, 494 U.S. at 890 n.3 & 879.[49] *Reynolds*, therefore, still controls the analysis of straightforward polygamy or bigamy in which there is a claim to multiple simultaneous *legal* marriages.

In any event, the court finds Chief Justice Durham's suggestion in her *Holm* dissent persuasive, that the Statute, enacted in 1973, is actually divorced from the nineteenth-century history of the federal government's anti-polygamy legislation focused specifically against Mormons. *Holm*, 2006 UT ¶ 140, 137 P.3d at 762 (Durham, C.J., dissenting in part) (citing *State v. Tuttle*, 730 P.2d 630, 632 (Utah 1986) which recognized that in 1973 the Utah legislature "repealed wholesale all the prior substantive criminal statutes . . . and enacted a sweeping new penal code that departed sharply from the old common law concepts"). As far as bigamy is concerned, therefore, it has not been sufficiently established that the Statute is necessarily a continuation of the federal government's nineteenth-century legislation at issue in *Reynolds* and *Late Corp.* It would be ludicrous to suggest that the federal legislation at issue in those cases did not specifically target the LDS Church and its practice of polygamy. If it had been sufficiently established and argued that the Statute was an extension of that legislation, the court would likely be pressed to find it is therefore not a neutral law of general applicability on that basis and would be required to apply strict scrutiny to the polygamy part of the law as well, in spite of *Reynolds*,

---

[49] The court agrees with the Utah Supreme Court in *State v. Green*, that the reasoning in *Reynolds* "may not necessarily comport with today's understanding of the language and apparent purpose of the Free Exercise Clause," but that it has "never been explicitly overruled" and, in fact, has been cited by the United States Supreme Court several times in the Free Exercise context to support, for example, such general propositions as that "'not all burdens on religion are unconstitutional'." 2004 UT at ¶ 19, 99 P.3d at 825 (quoting *United States v. Lee*, 455 U.S. 252, 257 (1982)). The Supreme Court also cited *Reynolds* in *Hialeah* for the general principle that "'a social harm may have been a legitimate concern of government for reasons quite apart from discrimination.'" *Id.* (quoting *Hialeah*, 508 U.S. at 535). But the court believes that in each case that *Reynolds* has been cited in modern Free Exercise jurisprudence, the general principle for which it is being cited could be rooted in different precedent less compromised by questionable, openly prejudicial reasoning, both by the Court and in Congress's targeted intent of the law.

given the major developments in the jurisprudence surrounding the protection of the free exercise of religion since the 1870s.[50] Since this has not been established, the court finds that the Statute need not be scrutinized under the strict scrutiny standard as to its treatment of polygamy based on multiple purportedly legal unions, rather than simply based on religious cohabitation.

   ***b. Religious Cohabitation.***   *Reynolds*, however, is not controlling for the cohabitation prong *under the 1973 Statute*. As noted above, the court is bound by the Utah Supreme Court's construction of the term "marry" in the Statute in *Holm*, but the Utah Supreme Court stopped short of construing the cohabitation prong at the center of this lawsuit. *Holm*, 2006 UT at ¶ 33, 137 P.3d at 737 & n.7. The cohabitation prong reads simply "or cohabits with another person." And yet, bound as it is by the *Holm* Court's broad interpretation of the term "marry"—that, "as used in the bigamy statute," the term "includes both legally recognized marriages and those that are not state-sanctioned," *id.* at ¶ 18, 137 P.3d at 733—the court finds that it must apply strict scrutiny to the prohibition of religious cohabitation that this simple phrase effects in the State of Utah.[51] As discussed below, the cohabitation prong does not survive strict scrutiny analysis and must be stricken to save the Statute. *See Citizens for Responsible Gov't State PAC v. Davidson*, 236 F.3d 1174, 1195 (10th Cir. 2000) (following the Supreme Court's "normal rule" that when a state statute is found to be unconstitutional, "partial, rather than facial, invalidation is the required course" because "the same statute may be in part constitutional and in part unconstitutional"). "'The rule that a federal court should not extend its invalidation of a statute

---

[50] The court is also of the opinion that Plaintiffs have brought a "colorable" claim under the Establishment Clause, as discussed above in note 16. *See Axson-Flynn*, 356 F.3d at 1297 (defining "colorable" to mean that "the plaintiff must show a fair probability or likelihood, but not a certitude, of success on the merits"). This finding is relevant to the hybrid rights analysis in Part II.B.3 below.

[51] As the Utah Supreme Court explained in *Holm*, this broad construction of the term "marry" means that "the bigamy statute does not require a party to enter into a second [legal] marriage (however defined) to run afoul of the statute; *cohabitation alone would constitute bigamy pursuant to the statute's terms*." 2006 UT at ¶ 22, 137 P.3d at 734 (emphasis added).

further than necessary to dispose of the case before it' applies with equal force in the First Amendment context." *Id.* (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502 (1985)).

      i.      Common-law marriage affected religious cohabitation in the nineteenth century.

      Multiple treatments in authoritative and persuasive case law of the history of the federal government's nineteenth-century campaign against the Mormon practice of polygamy establish to the court's satisfaction that religious cohabitation was included in the concept of polygamy that was being targeted by the federal government at that time. *Holm*, 2006 UT at ¶¶ 40-48, 137 P.3d at 739-41; *id.* at ¶¶ 149-53, 137 P.3d at 766 (Durham, C.J., dissenting in part) (discussing the 1892 territorial law criminalizing unlawful cohabitation and the historical context of that law); *Society of Separationists*, 870 P.2d at 927-28. But this is not the case with the 1973 Statute. Chief Justice Durham identified the missing puzzle piece in her dissenting opinion in *Holm*, noting that in the nineteenth century there was little, if any, distinction between "polygamous marriage" and "polygamous behavior" including, primarily, unlawful "cohabitation" (which was included as prohibited and punishable behavior in, e.g., the Edmunds Act of 1882). *Holm*, 2006 UT at ¶ 150 n.9, 137 P.3d at 764-65 (Durham, C.J., dissenting in part).

      Chief Justice Durham argued that "[b]ecause common law marriage was recognized in Utah until 1898, 29 Utah Rev. Stat. ch. 1, 1189 (1898), the entry into a polygamous union could be taken as the purported entry into the legal status of marriage." *Id.* at ¶ 150 n.9, 137 P.3d at 765 (Durham, C.J., dissenting in part) (citing *Hilton v. Roylance*, 69 P. 660, 670 (Utah 1902) which had held that participation in a religious ceremony was sufficient to establish a marriage cognizable at common law). Relevant to the court's present analysis, Chief Justice Durham further illustrated this in the context of the Morrill Anti-bigamy Act of 1862 and its focus:

      That statute provided that "all . . . acts and parts of acts heretofore passed by the said legislative assembly of the Territory of Utah, which establish, support,

maintain, shield or countenance polygamy, be, and the same hereby are, disapproved and annulled." *Cope v. Cope*, 137 U.S. 682, 686 . . . (1891) (quoting Morrill Act, ch. 126, § 2, 12, Stat. 501); . . . Among the "acts" to which the Morrill Act referred was undoubtedly the law incorporating the LDS Church, passed in 1851 by the Provisional State Government of the proposed State of Deseret. This law had granted the LDS Church full authority to conduct marriages of its members in accord with Church doctrine. When Deseret's petition for statehood was denied and a territorial government was established instead, the territorial legislature revalidated the laws enacted by the provisional government. Dale L. Morgan, THE STATE OF DESERET 88 (1987) (citing 1852 Utah Laws 222, an October 4, 1851 joint resolution of the territorial legislature). Thus, after 1852, when the Church publicly recognized the doctrine of plural marriage, ceremonies of plural union performed according to Church practice were *legally valid marriages* under territorial law until the Morrill Act declared otherwise. This history demonstrates that the legal status of polygamous unions was a matter of concern. Accordingly, the language prohibiting plural or polygamous "marriage" in the Enabling Act and Ordinance provisions was likely intended to preclude the reenactment of laws granting polygamous unions legal recognition once Utah achieved statehood.

*Id.* at ¶ 151, 137 P.3d at 765 (Durham, C.J., dissenting in part) (emphasis added).

In sum, throughout the entire period of the federal government's campaign against Mormon polygamy—essentially at all times from 1856 until 1898, when Utah ceased to recognize common-law marriage—religious cohabitation (of the type engaged in by Mormons who continued to enter into polygamous unions after the LDS Church's 1890 Manifesto discontinuing the practice of polygamy but before the 1904 "Official Statement", and by fundamentalist Mormons or others today) could arguably have resulted in multiple purportedly *legal marriages* by operation of law. This was certainly the case before statehood under the 1852 territorial statute revalidating the provisional government's 1851 law incorporating the LDS Church and giving it authority to conduct religious marriages known as "sealings" that would be recognized as legal marriages under civil law. Until 1898, therefore, the doctrine of common-law marriage could render a religious cohabitation a purported legal union, particularly in the presence of all the trappings of a legal marriage such as the factors discussed by the majority in

*Holm*.[52] For instance, "[t]here was no argument in *Reynolds* that the defendant did not intend his polygamous union to have legal effect; to the contrary, he argued that polygamous unions were entitled to legal effect under the First Amendment's Free Exercise Clause." *Holm*, 2006 UT at ¶ 150 n.9, 137 P.3d at 765 (Durham, C.J., dissenting in part). Since 1898, however, common-law marriage has no longer been valid in Utah, meaning that if a couple does not have a marriage license, no amount of "appearing to be married" (such as through the factors listed by the *Holm* majority the trappings of a legally recognized marriage, as discussed in *supra* note 52) will enable a couple to claim that they actually enjoy a legal union by operation of law as a result of such outward evidences of marriage. *See, e.g.*, *Schurler v. Industrial Comm'n*, 43 P.2d 696, 697 (Utah 1935) ("In this state a common-law marriage cannot be consummated.").

In fact, an opposite default of "statutory marriage" now prevails in Utah. *See* Utah Code Ann. § 30-1-4.5 (2013).[53] This mechanism often arises in various ways in divorce or bankruptcy

---

[52] The *Holm* majority indicated that such factors in that case included the performance of a religious wedding ceremony "officiated by a religious leader and [which] involved vows typical of a traditional marriage ceremony" (that is, it was essentially indistinguishable from the traditional Mormon "sealing" ceremony), and at which the bride "wore a white dress, which she considered a wedding dress," and that both spouses at all times considered themselves "married," that is, as "husband" and "wife," in the eyes of God and their community, lived in a house together, and engaged in sexual intercourse. *Holm*, 2006 UT at ¶¶ 30-31, 137 P.3d at 736-37. "Although no one of these factors is itself indicative of marriage, looking at the cumulative effect of the factors present in this case it is clear that the relationship formed by Holm and Stubbs was a marriage, as that term is used in the bigamy statute." This broad interpretation of the term "marriage" might not render the cohabitation prong of the 1973 Statute unconstitutional if Utah still recognized common law marriage. But these trappings of "marriage" can no longer potentially result in a purportedly legal union under the doctrine of common law marriage; thus, as a constitutional matter, the religious cohabitation at issue becomes indistinguishable from simple adulterous cohabitation that is widespread and not prosecuted, as discussed below.

[53] The courts are authorized by statute to make a judicial determination that an unsolemnized marriage, under certain circumstances, establishes a legal marriage. Utah Code Ann. § 30-1-4.5 (2013). This would be the case for a cohabiting couple who exhibit many of the trappings of marriage that would otherwise establish a common law marriage if that were recognized in the state. *See* Utah Code Ann. § 30-1-4.5(1)(a)-(e) (listing inclusive required factors as a basis for a court to make such a determination); *Whyte v. Blair*, 885 P.2d 791, 793 (Utah 1994) ("[The judicial determination] merely recognizes that a woman and a man have by their prior consent and conduct entered into a marital relationship, although it was not theretofore formally solemnized or otherwise legally recognized."). If all the enumerated factors required to establish an "unsolemnized marriage" under this statute are met, then a party must petition to

proceedings.[54] In fact, as the *Holm* majority acknowledges, it was used to creative effect in the bigamy prosecution at issue in *State of Utah v. Green*. *See Holm*, 2006 UT at ¶ 23, 137 P.3d at 735.[55] But Utah courts have explicitly held that the implication of this "statutory marriage" provision is that "after a valid, licensed marriage, [a spouse] would not be legally capable of entering an unsolemnized marriage under section 30-1-4.5." *Kunz v. Kunz*, 2006 UT App 151, ¶ 29, 136 P.3d 1278, 1285 (upholding the finding by the domestic commissioner and the trial court "that the existence of the marriage license trumped all other claims" to a prior unsolemnized marriage under Utah Code Ann. § 30-1-4.5). Thus, it could not now be argued, because it is not

---

have it established by "court or administrative order" at some point during the relationship or "within one year following the termination of that relationship." Utah Code Ann. § 30-1-4.5(2) (2013).

[54] For example, in most cases alimony "automatically terminates upon the remarriage or death" of the recipient spouse or "upon establishment by the party paying alimony that the former spouse is cohabitating with another person." Utah Code Ann. § 30-3-5(9), (10) (2013). A spouse with alimony obligations might therefore try to seek a judicial determination under Utah Code Ann. § 30-1-4.5 that the ex-spouse's relationship with another essentially constitutes a marriage (which would otherwise be recognized as a common law marriage in states that retain that doctrine), or to prove that the ex-spouse is "cohabiting" with another person. *See, e.g.*, *Myers v. Myers*, 2011 UT 65 at ¶ 24 n.4, 266 P.3d 806, 811 ("a cohabitation relationship is not necessarily the same thing as an unsolemnized marriage. . . . The latter requires that a couple 'hold themselves out as and have acquired a uniform and general reputation as husband and wife.' Utah Code Ann. § 30-1-4.5(1)(e). Cohabitation has nothing to do with the couple's reputation or with how they present themselves in public. It simply asks whether their relationship bears the hallmarks of marriage"). *See also Clark v. Clark*, 2001 UT 44, PP1-3, 27 P.3d 538 (involving a petitioner who sought a declaration of marriage under section 30-1-4.5 in order to obtain a divorce and divide marital assets); *In re Marriage of Gonzalez*, 2000 UT 28, PP1-2, 1 P.3d 1074 (involving a petitioner who filed for an adjudication of marriage under section 30-1-4.5 in order to determine whether she could claim benefits under a former cohabitant's insurance policy); *State v. Johnson*, 856 P.2d 1064, 1068-69 (Utah 1993) (addressing the appeal of a criminal defendant who sought a declaration of marriage under section 30-1-4.5 in order to qualify for probation under another statute).

[55] "To successfully prosecute Green under Utah's bigamy statute, the State had the burden of establishing that Green was legally married and then purported to marry or cohabit with another woman. In an attempt to bind Green over on the bigamy charges, the State therefore requested a determination by the district court as to whether Green was legally married to Linda Kunz pursuant to section 30-1-4.5. After allowing Linda Kunz to intervene, the district court found that Green and Linda Kunz shared a valid unsolemnized marriage." *Green*, 2004 UT at ¶ 53, 99 P.3d at 833. Almost incredibly, however, "Green was also convicted of . . . rape of a child, Linda Kunz, who was thirteen years old at the time of her first sexual association with Green." *Id.* at ¶ 40 n.14, 99 P.3d at 833. The court is at a loss to understand how a child rape situation could, even long after the fact, provide the facts necessary to fulfill the elements of the "unsolemnized marriage" mechanism found in Utah Code Ann. § 30-1-4.5. The only immediately available inference is that the State prioritized charging and prosecuting Green with bigamous cohabitation under the Statute over the various social harms discussed elsewhere in the opinion.

possible, that religious cohabitation beyond the first spouse could, by operation of law under the

doctrine of common-law marriage, result in purported legal marriages. Though "cohabitation"

might arguably have been a necessary addition to nineteenth-century federal anti-polygamy

legislation in light of this historical context, its inclusion in the Statute effects a constitutional

violation under the Free Exercise Clause, as analyzed in *Hialeah*.

> ii.     The Statute is facially neutral under *Hialeah*.

In *Hialeah* the Supreme Court further examined the *Smith* rule recognizing that a neutral

law of general applicability need not be justified by a compelling governmental interest even if

its incidental effect is a burden on a particular religious practice. 508 U.S. at 531. The *Hialeah*

Court found that although city ordinances against sacrificial or ritual animal killings were indeed

facially neutral in their artful drafting, they nevertheless unconstitutionally targeted specifically

the practices of the Santeria religion for elimination, and thus were not neutral or of general

applicability, because when "their operation is considered," their "design . . . accomplishes a

'religious gerrymander'." *Id.* at 535 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 696 (1970)

(Harlan, J., concurring)). The Court reached this conclusion after evaluating the city ordinances

at issue both in light of "facial neutrality" and "operational neutrality." *Id.* at 533-40. A law is

not neutral if, under either rubric, it is found "to infringe upon or restrict practices because of

their religious motivation." *Id.* at 533. Facial neutrality refers to "the minimum requirement of

neutrality," which is "that a law not discriminate on its face." *Id.* Thus, "[a] law lacks facial

neutrality if it refers to a religious practice without a secular meaning discernable from the

language or context." *Id.*

Here, as in *Hialeah*, it would be difficult to argue that the Statute, and particularly the

cohabitation prong, is not drafted to be facially neutral. The language at issue simply reads "or

cohabits with another person," Utah Code Ann. § 76-7-101(1), not referring to religion or

facially implying a response to religiously motivated conduct. Accordingly, the court agrees with

the Utah Supreme Court in *State of Utah v. Green* that the Statute is facially neutral: "Utah's

bigamy statute explains what it prohibits in secular terms, without referring to religious practices.

The statute does not on its face mention polygamists or their religion. In addition, the word

'cohabit' does not have religious origins or connotations; rather, it is a word of secular meaning."

2004 UT 76, ¶ 25, 99 P.3d 820, 827. But the court cannot agree with the conclusion in *Green*

that the Statute is operationally neutral.

> iii.     The Statute is not operationally neutral under *Hialeah*.

As the *Green* Court noted, "[f]acial neutrality is not determinative." *Id.* at ¶ 26, 99 P.3d at

827 (quoting *Hialeah*, 508 U.S. at 534). "Official action that targets religious conduct for

distinctive treatment cannot be shielded by mere compliance with the requirement of facial

neutrality." *Hialeah*, 508 U.S. at 534. Operational neutrality is evaluated as well because "[a]part

from the text, the effect of a law in its real operation is strong evidence of its object." *Id.* at 535.

The *Green* Court concluded that, different from *Hialeah*,

> Utah's bigamy statute does not similarly operate to isolate and punish only that
> bigamy which results from the religious practices of polygamists. It contains
> no exemptions that would restrict the practical application of the statute only to
> polygamists. In fact, the last reported decision of a prosecution under the current
> bigamy statute in our state courts involved a man who committed bigamy for non-
> religious reasons.

*Green*, 2004 UT at ¶ 28, 99 P.3d at 827 (citing *State of Utah v. Geer*, 765 P.2d 1 (Utah App.

1988)). This treatment inadequately addresses the separate issues of actual bigamy in the Statute,

on the one hand, and cohabitation, which is the issue confronting the court in this case, on the

other. As discussed above, the problematic portion of the Statute is the cohabitation prong, not

the broader prohibition of polygamy through criminalizing bigamy, a prohibition shared by

virtually every state. Thus, the *Green* Court is correct that the Statute, *in its prohibition of actual bigamy*, "does not . . . operate to isolate and punish only that bigamy which results from the religious practices of polygamists." *Id.* Someone fraudulently obtaining a second marriage license in order to enter into a purportedly legal second marriage while still married to someone else (bigamy) would violate the bigamy/polygamy portion of the Statute (independent of the cohabitation prong) whether he or she were acting based on religious motivation or not.[56]

Such "bigamy" is not at issue here. The Plaintiffs here "are not asking for recognition of plural marriages and have neither sought nor secured multiple marriage licenses." (Pls.' Mem. Supp. Mot. Summ. J. 42 [Dkt. No. 50].) Rather, the issue under consideration is whether *the cohabitation prong* is operationally neutral and of general applicability. The court finds that the cohabitation prong fails the operational neutrality analysis and, accordingly, also fails the general applicability requirement since "[n]eutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied."

---

[56] The *Geer* case, relied upon by *Green*, illustrates this point. In *Geer*, the defendant's wife alerted authorities to suspicious activity that possibly indicated her husband was leading a double life. *Geer*, 765 P.2d at 2-3. After arresting Geer on an outstanding Missouri felony warrant, the Utah police discovered that Geer was already married to another woman at the time he married his current wife in Utah. *Id.* at 3. In fact, Geer told police he had been married thirteen times "and was not involved in any divorce proceedings." *Id.* This was actual bigamy, not religious cohabitation interpreted to be equivalent to actual bigamy; this fact alone renders *Geer* inapposite to the present case. The *Green* Court, however, did not seem to identify this distinguishing element and relied on *Geer* as support for the neutrality and general applicability of the Statute. *Green*, 2004 UT ¶ 28 & n.10, 99 P.3d at 827-28. In fact, the *Green* Court found it ironic that although Green was arguing that the Statute is not neutral or generally applicable because it "isolates and punishes only that bigamy which results from the religious practices of polygamists," *id.* at n.10, Geer had argued the opposite, namely that "the State selectively prosecutes only those bigamists who practice bigamy for *other than* religious reasons." *Geer*, 765 P.2d at 3 (emphasis added).

But Geer was charged under the Statute for bigamy—actually having two or more purportedly legal marriages (not religiously cohabiting with another woman while already legally married to a first woman)—an outcome that would have been the same under any state's anti-bigamy statute, including the majority of states that do not have a cohabitation prong. The *Green* Court's conclusion, based primarily on *Geer*, that the Statute does not operationally target religious polygamists in prosecuting *actual bigamy* is therefore beside the point for the present inquiry, which focuses on whether the cohabitation prong is operationally neutral and of general applicability.

*Hialeah*, 508 U.S. at 531. Put simply, as with the ordinances at issue in *Hialeah*, in the operational application of the Statute, "few if any [cohabitations] are prohibited other than [religious cohabitations]." *Id.* at 536. That is, "although [religious cohabitation] is prohibited," virtually any other cohabitation is "unpunished." *Id.*

To unpack this finding, the court notes the commonplace occurrence of cohabitation in contemporary society. As observed by Chief Justice Durham of the Utah Supreme Court, "the cohabitation of unmarried couples, who live together 'as if' they are married in the sense that they share a household and a sexually intimate relationship, is commonplace in contemporary society." *Holm*, 2006 UT at ¶ 169, 137 P.3d at 771-72 (Durham, C.J., dissenting in part) (citing Utah Governor's Comm'n on Marriage & Utah State Univ. Extension, *Marriage in Utah Study* 35-36 (2003), which indicated that "of the 42% of Utah residents between the ages of 18 and 64 who were unmarried, 30% to 46% were currently cohabiting outside of marriage"). The parties did not provide more updated statistics on this metric but the court doubts that the figure for cohabitation in society has decreased over the last decade, or since 2006. Moreover, the court agrees with Chief Justice Durham that "[e]ven outside the community of those who practice polygamy for religious reasons, such cohabitation may occur where one person is legally married to someone other than the person with whom he or she is cohabiting." *Id.* Of course, this is otherwise known as "adultery" and it is independently prohibited in Utah by statute, Utah Code Ann. § 76-7-103 (2013), though in 2006 Chief Justice Durham reported not being able to find any prosecutions under this provision and noted that it appeared that "[t]he most recent adultery prosecution to have reached [the Utah Supreme Court] appears to have been in 1928 under a previous criminal provision." *Id.* at ¶ 169 n.22, 137 P.3d at 772. In addition, Utah state courts have explicitly observed the moribund nature of the statute prohibiting the related offense of

fornication, Utah Code Ann. § 76-7-104 (2013). *See Berg v. Berg*, 2004 UT App. 337, ¶ 15, 100

P.3d 261 (indicating that consenting adults are not prosecuted under Utah's fornication laws).

But most importantly, in this context, Chief Justice Durham observed that "parties to such

[adulterous] relationships [in which one person is legally married to someone other than the

person with whom he or she is cohabiting] are not prosecuted under the criminal bigamy statute"

in addition to not being prosecuted under the essentially moribund fornication or adultery

statutes. *Holm*, 2006 UT at ¶ 169, 137 P.3d at 772.

The Utah Surpeme Court acknowledged in *Green* that it could "envision situations in

which application of the word 'cohabit' could be problematic, and the statute might therefore

deserve legislative consideration." 2004 UT 76, ¶ 52 n.16, 99 P.3d at 833. The Utah legislature,

however, did not accept this invitation to provide clarity. The outcome in *Green*, perhaps, gave it

little reason to see the need for any change—the Court found Green's conduct to be

unambiguously the "kind" of cohabitation that the Statute is ostensibly meant to prohibit:

> The record is clear that Green intended to create and maintain spousal-type
> relationships with Shirley Beagley, LeeAnn Beagley, Cari Bjorkman, and Hannah
> Bjorkmann. He referred to each of these women as a wife, regardless of whether a
> licensed marriage existed. The women likewise considered themselves Green's
> wives and adopted the Green surname. Green spent nights with each woman on a
> rotating schedule and succeeded in impregnating these four women eighteen
> times, collectively. The children born of these associations also use the Green
> surname. Together, Green and the women undertook spousal and parental
> obligations. Although Green and the women did not reside in one house, they
> shared a group of mobile homes, 'Green Haven,' that possessed common areas for
> the entire family's use.

*Id.* at ¶ 47, 99 P.3d at 831-32. Having thus described Green's "cohabitation,"[57] the Court held

that "Green's conduct produced precisely the situation that bigamy statutes aim to prevent—all

---

[57] The "bigamy" at issue in *Green*, since he did not have any marriage licenses with any of his
wives at the time of the prosecution, was cohabitation under the Statute. Green was not legally married to
any of his wives until the prosecution moved for a judicial determination under the "statutory marriage"
provision discussed above (Utah Code Ann. § 30-1-4.5) that Green was legally married to one of his

the indicia of marriage repeated more than once." *Id.* The court respectfully finds this synopsis of

Green's cohabitation and the "intention" of the Statute conveniently too tidy in its failure to refer

to the most important factor of such plural cohabitations in Utah—their religious nature. By

describing the cohabitation at issue in Green this way (ignoring the religious motivation of the

cohabitation in that case), the Court was able to make it seem like the Statute is operationally

neutral and of general applicability: *anyone* engaging in such a cohabitation as Green's would be

subject to prosecution under the Statute; in fact, the *Green* Court found that "law enforcement

officials encountering Green's circumstances would not be left to pursue their own personal

predilections in determining the applicability of Utah's bigamy statute." *Id.* at ¶ 52, 99 P.3d at

832. But this is manifestly not the case.

Specifically, in her *Holm* dissent Chief Justice Durham noted that "the State itself has

indicated that it does not prosecute those engaged in religiously motivated polygamy under the

criminal bigamy statute unless the person has entered a religious union with a girl under eighteen

years old." *Holm*, 2006 UT at ¶ 175, 137 P.3d at 775 (Durham, C.J., dissenting in part).

Moreover, writing for the majority in *Holm*, Justice Durrant (to his credit) expanded from the

*Green* Court's relatively antiseptic description of the "type" of cohabitation that would invite

prosecution, whether engaged in for religious purposes or not, by making specific reference to

the elephant in the room. *Holm*, 2006 UT at ¶¶ 29-31, 137 P.3d at 736-37; *see supra* note 52

(listing the majority's "factors"). That is, in further clarifiying the "factors" that are invariably

involved in a determination of whether the Statute has been violated, the *Holm* majority observed

that these factors prominently include the religious nature of the wedding ceremony (often a

fundamentalist Mormon sealing ceremony virtually identical to the marriage ceremony of the

---

earlier wives so that he could then be prosecuted for simultaneously cohabiting with his other wives under
the Statute. *See supra* note 55 (discussing the creative use of Utah's statutory marriage provision in the
Green prosecution).

LDS Church to which the State gives sanction and recognizes as legally valid) and the resulting religious belief of the participants that they are "married" in the eyes of God if not in the eyes of the State.

In a curious twist, the *Holm* majority argued that this was because "while a marriage license represents a contract between the State and the individuals entering into matrimony, the license itself is typically of secondary importance to the participants in a wedding ceremony." *Id.* at ¶ 32, 137 P.3d at 737. (But the Court provided no support for this conclusory assertion.) Nevertheless, this observation lead to the conclusion that "the crux of marriage in our society, perhaps especially a religious marriage, is not so much the license as the solemnization"—the religious wedding ceremony—because it is the means by which "two individuals commit themselves to undertake a marital relationship." *Id.* In other words, it is the intention of the individuals to be religiously married, whether or not their relationship actually achieves state sanction such that the *legal obligations* of marriage attach, that, for the *Holm* majority, constituted a key consideration in whether the Statute had been violated. *But compare Maynard v. Hill*, 125 U.S. 190, 210-11 (1888).[58] The overall effect of *Holm*'s list of factors—"no one of [which] is itself indicative of marriage"—seems to have been that the religious marriage ceremony or religious motivation of the participants, and not a marriage license, could function as a bright line by which to define the crime of bigamy in Utah. But the court agrees with Chief Justice Durham that "[t]he parties' intent to assume these legal obligations is what distinguishes a ceremony properly considered a 'solemnization' from one that is merely a private religious

---

[58] "Marriage . . . does not require any religious ceremony for its solemnization . . . . [W]hen the contract to marry is executed by the marriage's [solemnization], a relation between the parties is created which they cannot change. Other contracts may be modified, restricted, or enlarged, or entirely released upon consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities." *Holm*, 2006 UT at ¶ 142, 137 P.3d at 762 (Durham, C.J., dissenting in part) (quoting *Maynard v. Hill*, 125 U.S. 190, 210-11 (1888)) (internal ellipses and alterations as in *Holm*).

ritual." *Holm*, 2006 UT at ¶ 142, 137 P.3d at 762 (Durham, C.J., dissenting in part). Thus, had

the parties in *Holm* "intended to marry under state law and to assume the concomitant legal

obligations, a sealing ceremony of the type in which they participated would satisfy the state's

solemnization requirement, *assuming that all other requirements, such as licensure*, were met."

*Id.* at ¶ 143, 137 P.3d at 762 (Durham, C.J., dissenting in part) (emphasis added).[59] Stated

succinctly, the one and only factor that is officially indicative of marriage is the marriage license

which must be present before any kind of solemnization ritual has legal effect creating a

marriage, and fraudulently obtaining more than one license constitutes bigamy.

   The *Holm* majority's recognition of the religious nature of the cohabitations at issue, both

from a historical perspective examining the federal campaign against Mormon polygamy and

with a view to the specific case before it (the religious indicia of the "wedding" between Holm

and Stubbs), brings the operational discrimination of the Statute's cohabitation prong into

sharper focus. Indeed, Plaintiffs point out that virtually all prosecutions under the Statute (with

the exception of *Geer*, which is inapposite here as it concerned multiple marriage licenses and

not bigamy based solely on cohabitation) have been of individuals engaging in religious

cohabitation.[60] And the State's argument in this case further reinforces the conclusion that the

---

   [59] This aptly expresses not only that this is not a chicken-or-egg quandary but also that the *Holm* majority got it backwards—it is the parties' intent to assume the legal obligations of marriage, as demonstrated usually by licensure, that controls and gives legal effect to the solemnization, and not any independent quality of the solemnization itself.

   [60] *See, e.g., Bronson v. Swensen*, 500 F.3d 1099, 1103 (10th Cir. 2007) (plaintiffs sought multiple marriage licenses because they "subscribe[d] to the religious doctrine of plural marriages"); *White v. Utah*, 41 F. App'x 325, 326 (10th Cir. 2002) (plaintiff challenged Anti-Bigamy law because he "ha[d] been a member of or [wa]s currently a member of a religion that espouses polygamy"); *Potter v. Murray City*, 760 F.2d 1065, 1066 (10th Cir. 1985) (police officer terminated because of his practice of plural marriage challenged the Statute based on Privacy and Free Exercise); *Barlow v. Evans*, 993 F. Supp. 1390, 1392 (D. Utah 1997) (plaintiffs challenged housing discrimination based on "defendants' belief that plaintiffs practice polygamy as a religious observance"); *State of Utah v. Holm*, 2006 UT 31, 137 P.3d 726 (challenge to Anti-Bigamy law arising out of "religious marriage ceremony"); *In re Steed*, 2006 UT 10, 131 P.3d 231 (removal of judge based on second wife "he believed himself to be married according to the traditions of their mutual religious faith"); *State of Utah v. Green*, 2004 UT 76, 99 P.3d 820 (plaintiff

cohabitation prong is not operationally neutral but in its application primarily applies to those involved in religious cohabitation. In an exchange with the court at oral argument, Assistant Attorney General Jerrold S. Jensen, counsel for Defendant, argued as follows:

[Scenario 1:]

THE COURT:  Let's assume that a man chooses to have intimate relationships with three different women, each of whom resided in different residences, and he has children with all of them, would that be violative of—would that be polygamist conduct? . . . Let's assume that he does not have a marriage license or recognized public document saying he's married to any of them.

MR. JENSEN:  That would not be—I don't think that would be termed polygamy because there's no marriage.[61]

(Tr. Hrg. Jan. 17, 2013, at 7:18-8:9 [Dkt. No. 75].)

[Scenario 2:]

THE COURT:  Let's assume your situation, that a man is legally by law recognized as married to one woman and then he has intimate sexual relationships continuing with two other women, but he doesn't make any professions of any commitment to these women, he just engages in adulterous conduct. Does the statute come into play in those circumstances?

MR. JENSEN:  I don't think it does. The cohabitation would apply if they were living in one household and cohabiting as a man and plural wives. . . . The situation you presented is no different than someone having an affair.

(*Id.* at 9:23-10:11.)

[Scenario 3:]

THE COURT:  Now, let's—to understand your position, let's assume the same scenario, legal marriage to one woman, intimate relationships with two additional women, but as to one of those women he makes a public pronouncement that says

---

challenged Anti-Bigamy law because it infringed on "his marital practices in violation of his right to freely exercise his religion"); *In re Adoption of W.A.T.*, 808 P.2d 1083 (Utah 1991) (petition for adoption denied because Plaintiff was "also 'married' [to a second wife] in accordance with petitioners' religious belief and practice of plural marriage).

[61] Of course, this was the case in *Green*, *see supra* note 55, and the prosecution therefore decided to apply for an adjudication of a legal marriage between Green and one of his early wives in order to be able to charge Green with bigamy under the Statute on the basis of his cohabitation with further women whom he called his "wives" and to whom he believed himself to be spiritually united in "marriage."

I'm committed to this woman, I'm going to take care of her for the rest of her life, does that change the analysis?

MR. JENSEN:  Well, I don't know that it changes the analysis. The polygamy aspect of this requires that there be a marriage of some sort, a second or third or fourth marriage.

THE COURT:  But that's the problem is deciding what constitutes a marriage for purposes of this act. Does the public pronouncement that I intend to be committed to this woman, I will take care of her and her children for as long as she lives, is that enough to make a marriage?

MR. JENSEN:  I'm not sure that's enough to make a marriage, no.

(*Id.* at 11:23-12:5.)

[Scenario 4:]

THE COURT:  Okay. Let's suppose that he says the same thing, but he says it to his Jewish rabbi, does that now become a polygamist marriage? And the rabbi says I bless you and recognize you as husband and wife.

MR. JENSEN:  Well, if they are holding themselves out as husband and wife, I would recognize that as marriage.

THE COURT:  So is it the recognition by a religious organization that it believes that they are living together in a recognized relationship by the religion sufficient?

MR. JENSEN:  No, no, no. . . . I think it's the representation that they make to the world as to what is their relationship. If they make it as husband and wife, then that constitutes marriage under the statute.

THE COURT:  If they say we're not husband and wife, we just live together, then it's not under the statute.

MR. JENSEN:  Then it's not governed under the statute.

(*Id.* at 12:6-13:4.)

Given the confusion apparent in this exchange, the court sought further clarification,

receiving input from Defendant's counsel that further confirmed for the court that the

cohabitation prong is not, in fact, operationally neutral:

THE COURT:  What I'm looking for is [for] you to help me find what is that distinguishing factor? And frankly on the face of this history it appears to be religion.

MR. JENSEN:  Well, there is no question that polygamy is associated with religion in this state. Not all of the cases that have been prosecuted in this state are against people that assert religion as a defense. There has been cases in which there was not religion.

THE COURT:  But aren't those cases all where there was legally recognized marriages claimed as to both spouses.

MR. JENSEN:  Yes, yes, yes.

THE COURT:  That's a different scenario than what we're talking about here. . . .

(*Id.* at 16:2-16.) The State's final attempt to clarify further underscored that the cohabitation

prong is not operationally neutral as required by *Hialeah*:

MR. JENSEN:  [B]ut the issue as to cohabitation in the statute, and I think the statute has to be looked at clearly, the cohabitation in the statute only applies when someone holds themselves out to be married. *That is a different situation than cohabitation that generally exists in the state.* . . . it's not marriage but they know the other person is married. So they're cohabiting. That is different than just cohabitation. Two people can go out and cohabit, and let's admit, it goes on all the time. But in this situation under the statute they're not prosecuted unless the one cohabiting knows that person is married. It's the same as with marriage.

THE COURT:  So it applies to an adulterous relationship? By definition, adultery is a person who is married and has intimate relationships with another person to whom he is not married. That's what you've just described.

MR. JENSEN:  All right, Your Honor. But let's look at how this really works in practice. *In practice there is the marriage, it may not be recognized by the state, but it is a marriage, it's performed, there is a wedding ceremony performed, there are vows exchanged.* The problem is proving it. The federal government had that problem in the 1880s. That's why they added cohabitation to the Edmunds Statute. The same thing with the Utah statute. The problem was proving that they were married, so they have added cohabitate, but the person has to cohabitate knowing that other person is married. . . .

THE COURT:  So tell me what's different between adultery and what you've just described.

MR. JENSEN:  The one is that they claim to be married. But just because the state can't prove it doesn't mean it hasn't happened. That's what's happening in the [religious] polygamist communities.

THE COURT:  So it's the expression of the fact that the person is a wife that makes it illegal.

MR. JENSEN:  Yes.

(*Id.* at 51:17-53:22 (emphasis added).)

The transition from "Scenario 3" to "Scenario 4" in the above exchange raises concerns for the court about the Statute's operational neutrality. Consistent with the *Holm* Court's treatment, this exchange reveals that the essential difference between the adulterous cohabitation that "goes on all the time" (*Id.* at 52:12) in the State and the cohabitation at issue in the Statute seems to be the existence of a wedding ceremony by which the participants are recognized as "husband" and "wife" or otherwise become motivated to believe they are justified in holding themselves out to the world as "married" even though they are not in fact married in the eyes of the State. Given the fact that all prosecutions under the Statute's cohabitation prong (as opposed to straightforward bigamy with multiple marriage licenses) have been of those cohabiting for religious reasons underscores that, in practice, the law is not operationally neutral under *Hialeah*. The State's argument reveals that the object of the Statute "is to infringe upon or restrict practices because of their religious motivation." *Hialeah*, 508 U.S. at 533. This it may not do unless it is a narrowly tailored means of advancing a compelling state interest.

    iv.    The Statute is not generally applicable under *Hialeah*.

As the Supreme Court held in *Hialeah*, '[n]eutrality and general applicability are related, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 532-33. That is, the "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 543. The

State's pattern of enforcement of the Statute raises particular concerns about its general applicability. First, although the State has indeed prosecuted religious cohabitation, Chief Justice Durham observed in her *Holm* dissent that "the State itself has indicated that it does not prosecute those engaged in religiously motivated polygamy under the criminal bigamy statute unless the person has entered a religious union with a girl under eighteen years old." *Holm*, 2006 UT at ¶ 175, 137 P.3d at 775 (Durham, C.J., dissenting in part). This is a counterintuitive policy in light of the State's passionate arguments that the rampant abuses reported from the religious polygamist communities—which have been driven underground by this Statute and its predecessors—pose social harm constituting a rational basis for the legislation. (Tr. Hrg. Jan. 17, 2013, at 26:20-27:18; 29:14-30:12 [Dkt. No. 75].) Second, this prosecutorial laissez-faire is complicated by situations such as in *Green* and this case, where prosecutors deviated from this "policy" of non-prosecution because the participants openly discussed their religious cohabitation in the media.[62]

Third, much of the Statute's usefulness, apparently, lies in the State's perception that it can potentially simply charge religious polygamists under the Statute when it has insufficient evidence of other crimes. As the *Green* Court noted, "the closed nature of polygamist communities makes obtaining evidence of and prosecuting these crimes challenging." *Green*, 2004 UT at ¶ 40, 99 P.3d at 830. Thus, a rational basis for the Statute, according to *Green*, is the State's "interest in protecting vulnerable individuals from exploitation and abuse." *Id.* As already

---

[62] *Green*, 2004 UT at ¶ 6, 99 P.3d at 823 ("Between 1998 and 2001, Green appeared on various television shows with the women, consistently referring to the women as his wives, and the women likewise acknowledged spousal relationships."). In this case, Plaintiffs argue, and the court acknowledges, that although "the government has tried to assure the public and the court that it was not engaged in a general enforcement campaign against polygamy and has opted not to prosecute many known polygamous families," Defendant has gone "so far as to argue that the Brown family brought the investigation and public accusations on themselves by choosing to go public" on the *Sister Wives* television show. (Pls.' Mem. Supp. Mot. Summ. J. 43 [Dkt. No. 50]; "Factual Background," *supra*, ¶¶ 13-17.)

noted, this rationale is illogical in the face of the general policy not to prosecute religious polygamists. Moreover, Chief Justice Durham observed that "I am unaware of a single instance where the state was forced to bring a charge of bigamy in place of other narrower charges, such as incest or unlawful sexual conduct with a minor, because it was unable to gather sufficient evidence to prosecute these other crimes." *Holm*, 2006 UT at ¶ 175, 137 P.3d at 775 (Durham, C.J., dissenting in part). The court agrees, therefore, that it would seem "inappropriate to let stand a criminal law simply because it enables the state to conduct a fishing expedition for evidence of other crimes." *Id.*[63]

Finally, the State's explicit "policy of selective prosecution," *id.*, is fatal to any claim to general applicability. In his attempts to buttress his standing and mootness arguments at earlier stages of this litigation, Defendant swore under penalty of perjury that "[a]s Utah County Attorney, I have now adopted a formal office policy not to prosecute the practice of bigamy unless the bigamy occurs in conjunction with another crime or a person under the age of 18 was a party to the bigamous marriage or relationship." (Second Buhman Aff. ¶ 8 [Dkt. No. 47-1]; *see also* Def.'s Mem. Supp. Mot. Dismiss for Mootness at [4] [Dkt. No. 47].) But Defendant also admitted that there is no guarantee that the Brown will not be prosecuted in the future for polygamy (under a successor in office, for instance). (*See* Second Buhman Aff. ¶¶ 5, 12 [Dkt. No. 47-1].)

Each of these points weighs against a finding that the cohabitation prong of the Statute is "generally applicable" as required by *Hialeah*. Because those who religiously cohabit fall within the Statute (according to *Holm* and the State's argument here) but those who adulterously cohabit

---

[63] Moreover, reviewing the outcome in *Green*, *Holm*, and *State of Utah v. Kingston*, 2002 UT App. 103, 46 P.3d 761, Justice Durham observed that "[i]t appears from these three cases that the State may be using its ability to prosecute offenders under [the Statute] as a means of imposing additional punishment for an already-charged offense rather than as a proxy prosecution for conduct that is otherwise unchargeable." *Holm*, 2006 UT at ¶ 175 n.29, 137 P.3d at 775 (Durham, J., dissenting in part).

do not, as explained by the State, the court finds that the Statute has "every appearance of a prohibition that society is prepared to impose upon [religious cohabitation] but not upon itself." *Hialeah*, 508 U.S. at 533. In sum, the cohabitation prong of the Statute is neither operationally neutral nor generally applicable ("interrelated" as these two elements are, *id.* at 531) based on the absence of common-law marriage as a mechanism that potentially "recognizes" cohabitation as a legal union, the commonplace occurrence of adulterous cohabitation in contemporary society, the complete lack of prosecution for adultery or fornication, *Holm*'s identification of the trappings of a religious marriage ceremony as a trigger for prosecution under the majority's broad definition of the term "marry," the history of enforcement which, aside from *Geer* (a case that is distinguishable because it was based on the defendant's fraudulent possession of multiple marriage licenses) reveals a focus exclusively on fundamentalist Mormon "polygamy," i.e. religious cohabitation, despite a general policy in the State not to prosecute religiously motivated polygamy, and, relatedly, the apparently limitless prosecutorial discretion by individual State officials, such as Defendant, to decide whether and when (and against whom) to enforce the cohabitation prong of the Statute.

> v.      The cohabitation prong is not narrowly tailored to advance a compelling state interest.

Because the cohabitation prong of the Statute is not operationally neutral or generally applicable, it must be "justified by a compelling governmental interest" and "narrowly tailored to advance that interest." *Hialeah*, 508 U.S. at 533; *cf. Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) (discussing compelling interests). The "policy of selective prosecution" (discussed above) alone supports the "conclusion that a blanket criminal prohibition on religious polygamous unions is not necessary to further the state's interests, and suggests that a more narrowly tailored law would be just as effective." *Holm*, 2006 UT at ¶ 175, 137 P.3d at 775 (Durham, C.J.,

dissenting in part). More methodically, however, each of the "state interests" found by *Green* to be supported by a rational basis do not survive strict scrutiny.

First, the *Green* Court discussed the State's interest in regulating marriage, an interest which "has resulted in a network of laws, many of which are premised upon the concept of monogamy," and held that the Statute is rationally related to that interest. *Green*, 2004 UT at ¶ 37-38, 99 P.3d at 829-30 (citing *Potter v. Murray City*, 760 F.2d 1065, 1070 n.8 (10th Cir. 1985)). In fact, *Potter* found this network of laws supporting "a system of domestic relations based exclusively upon the practice of monogamy as opposed to plural marriage" to be a "compelling" state interest. *Potter*, 760 F.2d 1070. The *Holm* Court, also applying rational basis review, re-emphasized this State interest in protecting monogamous marriage as a social institution. *Holm*, 2006 UT at ¶¶ 56-63, 137 P.3d at 743-45. Applying strict scrutiny, however, the court agrees with Chief Justice Durham that "the state has an important interest in regulating marriage, but only insofar as marriage is understood as a legal status." *Id.* at ¶ 168, 137 P.3d at 771 (Durham, C.J., dissenting in part). The court therefore finds Chief Justice Durham's observation to be well-taken, that the Statute

> protects marriage, as a legal union, by criminalizing the act of purporting to enter a *second legal union*. Such an act defrauds the state and perhaps an innocent spouse or purported partner. It also completely disregards the network of laws that regulate entry into, and the dissolution of, the *legal status of marriage*, and that limit to one the number of partners with which an individual may enjoy this status.

*Id.* (emphasis added). As argued above, the incongruity between criminalizing religious cohabitation but not adulterous cohabitation, or rather selectively prosecuting the former while not prosecuting the latter at all, demonstrates that the cohabitation prong is not narrowly tailored to advance a compelling state interest. *See id.* at ¶ 169, 137 P.3d 771-72. "That the state perceives no need to prosecute nonreligiously motivated cohabitation, whether one of the parties

66

to the cohabitation is married to someone else or not, demonstrates that, in the absence of any claim of legal marriage, neither participation in a religious ceremony nor cohabitation can plausibly be said to threaten marriage as a social or legal institution." *Id.* at at ¶ 170, 137 P.3d 772. Thus, "any interest the state has in maintaining this network of laws does not logically justify its imposition of criminal penalties on those who deviate from that domestic structure, particularly when they do so for religious reasons." *Id.* Accordingly, "such criminal penalties are simply unnecessary to further the state's interest in protecting marriage." *Id.*

The court acknowledges, as did Chief Justice Durham, that "some in society may feel that the institution of marriage is diminished when individuals consciously choose to avoid it," but agrees that "it is generally understood that the state is not entitled to criminally punish its citizens for making such a choice, even if they do so with multiple partners. . . ." *Id.* at ¶ 170, 137 P.3d at 773. The court adopts the remainder of Chief Justice Durham's reasoning in paragraphs 170 through 173 on why the Statute fails strict scrutiny on this State interest enunciated in *Green.* In short, neither the *Holm* majority nor the Defendant adequately explains "how the institution of marriage is abused or state support for monogamy threatened simply by an individual's choice to participate in a religious ritual with more than one person outside the confines of legal marriage." *Id.* at ¶ 184, 137 P.3d at 777-78.

But the court also feels compelled to identify an absurdity in the State's position against religious cohabitation in this context of trying to "protect" the institution of marriage by criminalizing religious cohabitation. At a time of much discussion in society about problems arising from the decline in rates of people marrying or the increased age at which people decide to marry, the Statute penalizes people for making a firm marriage-like commitment to each other,

even though they know that their religious cohabitation does not result in state-sanctioned or

recognized marriages. As Plaintiffs trenchantly noted, the State's position

> would suggest that Kody Brown would have avoided any criminal exposure if he
> had simply maintained relations with multiple women, had children by them, but
> never expressed a belief in being spiritually bonded to them. Since he committed
> to these women and his children, the case is treated as undermining marriage by
> the Defendant and justifying criminalization under the statute.

(Pls.' Mem. Opp. Def.'s Mot. Summ. J. 26 [Dkt. No. 72].) In fact, Defendant's counsel

confirmed this to be the case by identifying the relationship at issue in "Scenario 4" above as

violating the Statute but not "Scenario 3". (Tr. Hrg. Jan. 17, 2013, at 12:6-13:4. [Dkt. No. 75].)

"It is the state that is defining cohabitation and plural relationships as marriage and then

criminalizing those private relationships as inimical to the institution of marriage. The Browns

have not questioned the right of the state to limit its recognition of marriage and to prosecute

those citizens who secure multiple marriage licenses from the state." (Pls.' Mem. Opp. Def.'s

Mot. Summ. J. 26 [Dkt. No. 72].) Encouraging adulterous cohabitation over religious

cohabitation that resembles marriage in all but State recognition seems counterproductive to the

goal of strengthening or protecting the institution of marriage. The court thus cannot believe that

this approach constitutes a narrowly tailored means of advancing the compelling state interest of

protecting the institution of marriage.

Second, the *Green* Court held that, under rational basis review, the Statute addresses the

State's "interest in preventing the perpetration of marriage fraud, as well as its interest in

preventing the misuse of government benefits associated with marital status." 2004 UT at ¶ 39,

99 P.3d at 830. The Statute's relationship to this interest makes even less sense to the court than

the first interest discussed above, particularly when reviewed under strict scrutiny.

> This interest focuses on preventing the harm caused to the state, to society, and to
> defrauded individuals when someone purports to have entered the legal status of

> marriage, but in fact is not eligible to validly enter that status because of a prior
> legal union. This interest is simply not implicated here, where no claim to the
> legal status of marriage has been made.

*Holm*, 2006 UT at ¶ 174, 137 P.3d at 773-74 (Durham, C.J., dissenting in part). Moreover, it is

"difficult to understand how those in polygamous relationships that are ineligible to receive legal

sanction are committing welfare abuse when they seek benefits available to unmarried persons."

*Id.* at ¶ 181, 137 P.3d at 777. The court agrees with Chief Justice Durham's analysis of this point

and accordingly finds the cohabitation prong of the Statute not even rationally related to this

inapposite State interest.

Third, and of most concern to the court, the *Green* Court focused on "the State's interest

in protecting vulnerable individuals from exploitation and abuse." *Green*, 2004 UT at ¶ 40, 99

P.3d at 830. The *Green* Court continued: "The practice of polygamy, in particular, often

coincides with crimes targeting women and children. Crimes not unusually attendant to the

practice of polygamy include incest, sexual assault, statutory rape, and failure to pay child

support." *Id.* (citing Richard A. Vazquez, Note, *The Practice of Polygamy: Legitimate Free

Exercise of Religion or Legitimate Public Menace? Revisiting* Reynolds *in Light of Modern

Constitutional Jurisprudence*, 5 N.Y.U. J. LEGIS. & PUB. POL'Y 225, 239-45 (2001)). But, once

again, the court agrees with Chief Justice Durham's assessment of *Green*'s rational basis review

of this "State interest":

> Because the [*Green* Court applied rational basis review under the First
> Amendment challenge], the court was content to rely on assertions in a student
> law review piece that polygamy was frequently related to other criminal conduct,
> together with two local cases, including the case of Green himself. However,
> reviewing this assessment in light of the heightened scrutiny I believe is called for
> here, I cannot conclude that the restriction that the bigamy law places on the
> religious freedom of all those who, for religious reasons, live with more than one
> woman is necessary to further the state's interest in this regard. Upon closer
> review, the student Note is unconvincing. The State has provided no evidence of a
> causal relationship or even a strong correlation between the practice of polygamy,

whether religiously motivated or not, and the offenses of 'incest, sexual assault, statutory rape, and failure to pay child support,' cited in *Green*, [2004 UT] at ¶ 40. Moreover, even assuming such a correlation did exist, neither the record nor the recent history of prosecutions of alleged polygamists warrants the conclusion that [the Statute] is a necessary tool for the state's attacks of such harms. For one thing, *I am unaware of a single instance where the state was forced to bring a charge of bigamy in place of other narrower charges, such as incest or unlawful sexual conduct with a minor, because it was unable to gather sufficient evidence to prosecute these other crimes.* The State has suggested that its initial ability to file bigamy charges allows it to gather the evidence required to prosecute those engaged in more specific crimes. Even if there were support for this claim in the record, *I would consider it inappropriate to let stand a criminal law simply because it enables the state to conduct a fishing expedition for evidence of other crimes.* Further, the State itself has indicated that it does not prosecute those engaged in religiously motivated polygamy under the criminal bigamy statute unless the person has entered a religious union with a girl under eighteen years old. Such a *policy of selective prosecution* reinforces my conclusion that a blanket criminal prohibition on religious polygamous unions is not necessary to further the state's interests, and suggests that a more narrowly tailored law would be just as effective.

*Holm*, 2006 UT at ¶ 175, 137 P.3d at 775 (Durham, C.J., dissenting in part) (internal citations omitted) (emphasis added). Like Chief Justice Durham, the court does "not reach this conclusion lightly." *Id.* at ¶ 176, 137 P.3d at 775. The court is aware of the many reports[64] that circulate implying "the possibility that other criminal conduct may accompany the act of bigamy." *Id.*

---

[64] Defendant refers to some such reports, with which the court is familiar, in his Reply Memorandum (Dkt. No. 73). Nevertheless, Defendant provided no competent evidence appropriate for summary judgment that could influence the court's consideration. Despite this deficiency, the court has indeed heavily weighed the reports and finds genuinely tragic any difficulties, suffering, or abuse that minors or others might have faced or continue to face in the closed, insular religious polygamist communities that exist in Utah and the broader cultural region ranging from Alberta, Canada down to Northern Mexico. This court's role is to weigh the constitutionality of the specific issue before it. The social harm posed by the practice under consideration is a relevant focus of inquiry, but evidence must be proffered that the court can properly recognize at this phase of the proceeding. The social harms implied by *Reynolds* arising from Mormon polygamy—that it introduced practices of Asiatic and African peoples into Christian Western civilization and assisted the Mormon Church in maintaining despotic, anti-democratic patriarchal control over the entire region, threatening all of American democracy—are no longer relevant, to say the least, regardless of Defendant's protestations to the contrary. *See Holm*, 2006 UT at ¶ 167 n.20, 137 P.3d at 770 (Durham, J., dissenting in part) (citing Maura Strassberg, *The Crime of Polygamy*, 12 TEMP. POL. & CIV. RTS. L. REV. 353, 406 (2003) for the observation that while the "perceived social danger may have justified the criminalization of polygamy during the nineteenth and early twentieth centuries, . . . fundamentalist polygyny does not today pose the same kind of threat to federal and now state sovereignty over significant areas of the West"). But, different from the nineteenth

> Such conduct may even, as was suggested in *Green*, be correlated with the practice of polygamy in a community that has isolated itself from the outside world, at least partially in fear of criminal prosecution for its religious practice. . . . [But] despite the difficulties that are always associated with gathering evidence in closed societies, the state is held to the burden of proving that individuals have engaged in conduct that is criminal because it is associated with actual harm. *The State of Utah has criminal laws punishing incest, rape, unlawful sexual conduct with a minor, and domestic and child abuse.* Any restrictions these laws place on the practice of religious polygamy are almost certainly justified. However, the broad criminalization of the religious practice itself as a means of attacking other criminal behavior is not.

*Id.* (emphasis added). Such stories are tragic; the court believes, however, that striking the cohabitation prong could actually make prosecuting the underlying crimes easier. It seems to the court that the Statute has unintentionally become a bottleneck to the straightforward prosecution of these other crimes precisely because of the State's general policy not to prosecute religiously motivated polygamy under the Statute in the absence of age concerns or evidence of "collateral" crimes. With the cohabitation prong stricken, the Statute can no longer function as this kind of barrier, and investigators and prosecutors can focus directly on the independent crimes that are being committed, if any. Accordingly, despite the gravity of this concern, the court finds that the cohabitation prong not only is not narrowly tailored to advance a compelling State interest but that it actually inhibits the advancement of this compelling State interest of "protecting vulnerable individuals from exploitation and abuse." *Green*, 2004 UT at ¶ 40, 99 P.3d at 830.

For all of these reasons, the cohabitation prong of the Statute cannot survive strict scrutiny and must be stricken as a facial violation of the free exercise of religion under the First Amendment.

---

century, this is an era in which women have received full legal and moral personhood in society. The court believes that with the cohabitation prong stricken, the communities engaging in religious cohabitation will have less of a need to be underground and the State can more directly prosecute the independent crimes that are sometimes alleged to be rampant in those communities. Women who have and are aware of their rights will be less likely to end up in abusive situations.

    3.    *Heightened Scrutiny under* Smith'*s Hybrid Rights Analysis*

In the alternative, Plaintiffs' claims also exemplify a hybrid rights situation of the type identified by Justice Scalia writing for the majority in *Smith*. "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press." 494 U.S. at 881. In fact, "it is easy to envision a case in which a challenge on freedom of association grounds would likewise be reinforced by Free Exercise Clause concerns." *Id.* at 882. This is the case envisioned by Justice Scalia because Plaintiffs' various colorable constitutional claims relating to the cohabitation prong of the Statute, including a claim under freedom of association, are "reinforced by Free Exercise Clause concerns." *Id.*

In considering constitutional challenges under the *Smith* hybrid rights paradigm, the Tenth Circuit has observed that *Smith* "carved out an exception for 'hybrid rights' claims, holding that a party could establish a violation of the free exercise clause even in the case of a neutral law of general applicability by showing that the challenged governmental action compromised both the right to free exercise of religion and an independent constitutional right." *Grace United Methodist Church v. City of Cheyenne Board of Adjustment*, 451 F.3d 643, 655 (10th Cir. 2006). In *Axson-Flynn v. Johnson*, the Tenth Circuit explained that "when a free exercise claim is coupled with some other constitutional claim (such a free speech claim), heightened scrutiny may be appropriate." 356 F.3d 1277, 1295 (10th Cir. 2004). The Tenth Circuit had earlier observed the "difficulty of applying the *Smith* hybrid-rights exception." *Swanson by & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 700 (10th Cir. 1998). But the *Swanson* Court held that a hybrid rights claim under *Smith* "at least requires a

*colorable showing* of infringement of recognized and specific constitutional rights." *Id.*

(emphasis added). The Court did not, however, at that time further define what a "colorable

claim" for hybrid rights purposes would entail because plaintiffs there had merely invoked "a

general right such as the right to control the education of one's child" rather than a specific

colorable constitutional claim. *Id.* The Court in *Axson-Flynn* provided the definition of a

"colorable claim" that is controlling for the present analysis, holding that "colorable" in the

hybrid rights context under *Smith* means that a plaintiff "must show a fair probability or

likelihood, but not a certitude, of success on the merits" on the companion constitutional claim.

*Axson-Flynn*, 356 F.3d at 1296-97.[65]

The court finds that each of Plaintiffs' companion constitutional claims—the Freedom of

Association claim, the Substantive Due Process Claim, the Equal Protection Claim, the Free

Speech Claim, or the Establishment Clause claim, each as argued in Plaintiffs' Memorandum in

Support of their Motion for Summary Judgment (Dkt. No. 50), and each largely or entirely

unopposed by Defendant (with the exception of the Substantive Due Process claim)—makes a

"colorable showing" of a constitutional violation, thus requiring heightened scrutiny of the

Statute under *Smith*. *Swanson*, 135 F.3d 694, 700 & n.5; *Axson-Flynn*, 356 F.3d at 1295-97.

As discussed above and for those reasons, the cohabitation prong of the Statute cannot

withstand heightened scrutiny as to any compelling state interest and must be stricken when

reviewed against that standard.

---

[65] "Our approach strikes a middle ground between the two extremes of painting hybrid-rights claims too generously and construing them too narrowly. . . . The adoption of a 'non-frivolous' standard would open the floodgates for hybrid-rights claims. . . . On the other hand, it makes no sense to adopt a strict standard that essentially requires a *successful* companion claim because such a test would make the free exercise claim unnecessary. If the plaintiff's additional constitutional claim is successful, he or she would typically not need the free exercise claim and the hybrid-rights exception would add nothing to the case." *Axson-Flynn*, 356 F.3d at 1296-97 (emphasis in original).

### C.     Rational Basis Review under the Due Process Clause

As noted above, Plaintiffs' counsel stated at oral argument that, given the Supreme Court's decision in *Lawrence*, "the narrowest ground upon which this court can find for the plaintiff is under the Due Process Clause." (Tr. Hrg. Jan. 17, 2013, at 47:24-25 [Dkt. No. 75].) The court finds that the cohabitation prong does not survive rational basis review under the substantive due process analysis; accordingly, it need not consider Plaintiffs' various other claims under the lower standards of review corresponding to those claims.

Though the court has followed the Tenth Circuit's lead in *Seegmiller* as to the application of *Lawrence* to the fundamental rights question, *Lawrence* becomes controlling for the rational basis review analysis. Following the Eleventh Circuit in *Williams IV*, the Tenth Circuit held in *Seegmiller* that *Lawrence* applied rational basis review in striking down Texas' homosexual sodomy statute. *Seegmiller*, 528 F.3d at 771. In doing so, the *Seegmiller* Court also stated that "no one disputes a right to be free from government interference in matters of consensual sexual privacy." *Id.* at 769.

Consensual sexual privacy is the touchstone of the rational basis review analysis in this case, as in *Lawrence*. The court believes that Plaintiffs are correct in their argument that, in prohibiting cohabitation under the Statute, "it is, of course, the state that has equated private sexual conduct with marriage." (Pls.' Opp. to Def.'s Mot. Summ. J. 25 [Dkt. No. 72].) That is, in the case of people who have not even claimed to be legally married—are not making any claim to legal recognition of their unions or the network of laws surrounding the institution of marriage—"[i]t is the state that is treating the relationship as a form of marriage and prosecuting on that basis." (*Id.*) As such, this, in effect, criminalizes "the private consensual relations of adults." (*Id.*) Each of the State interests identified in *Green* surface again, this time to be

considered under rational basis review. Once again, the court looks to Chief Justice Durham's

astute and commanding analysis[66] in recognizing the concern that the *Holm* majority's approach

"may give the impression that the state is free to criminalize any and all forms of personal

relationships that occur outside the legal union of marriage." *Holm*, 2006 UT at ¶ 185, 137 P.3d

at 778 (Durham, C.J., dissenting in part).

> While under *Lawrence* laws criminalizing isolated acts of sodomy are void, the
> [*Holm*] majority [and Defendant here] [seem] to suggest that the relationships
> within which these acts occur may still receive criminal sanction. Following such
> logic, nonmarital cohabitation might also be considered to fall outside the scope
> of federal constitutional protection. Indeed, the act of living alone and unmarried
> could as easily be viewed as threatening social norms.

*Id.* Interestingly, Defendant argued that "[n]either Utah's constitutional provision banning

polygamy, nor the State's bigamy statute criminalizing polygamy, prohibit Plaintiffs' private

sexual conduct." (Def.'s Mem. Supp. Cross-Mot. and Resp. 10 [Dkt. No. 56].) But returning to

Defendant's counsel's position in his exchange with the court at oral argument, the adulterous

cohabitation in "Scenario 3" would not be actionable whereas the religious cohabitation

described in "Scenario 4" would violate the Statute. (Tr. Hrg. Jan. 17, 2013 11:23-13:4 [Dkt. No.

75].) The only difference between the two examples is the religious element and the resulting

belief of participants to be justified in holding themselves out to the public as "husband" and

"wife" despite knowing that their "marriage" is not a legal union in the eyes of the State. Both

scenarios—the adulterous cohabitation and the religious cohabitation—"involve minors" as the

children born to women involved in such relationships, "involve public conduct," and involve

"economic implications to [women] and children." (Def.'s Mem. Supp. Cross-Mot. and Resp. 10

[Dkt. No. 56].)

---

[66] Indeed, the court found her *Holm* dissent so comprehensive, persuasive, and germane that it
would have preferred to simply adopt it in its entirety as the answer to the conundrum presented to it in
this case, if there had been some structural way to coherently do so.

Adultery, including adulterous cohabitation, is not prosecuted. Religious cohabitation, however, is subject to prosecution at the limitless discretion of local and State prosecutors, despite a general policy *not* to prosecute religiously motivated polygamy. The court finds no rational basis to distinguish between the two, not least with regard to the State interest in protecting the institution of marriage:

> Essentially, the Court's decision in *Lawrence* simply reformulates the longstanding principle that, in order to "secure individual liberty, . . . certain kinds of highly personal relationships" must be given "a substantial measure of sanctuary from unjustified interference by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 . . . (1984). . . . Whether referred to as a right of "intimate" or "intrinsic" association, as in *Roberts*, 468 U.S. at 618, a right to "privacy," as in *Griswold v. Connecticut*, 381 U.S. 479, 485 . . . (1965), and *Eisenstadt v. Baird*, 405 U.S. 438, 453 . . . (1972), a right to make "choices concerning family living arrangements," as in *Moore v. City of East Cleveland*, 431 U.S. 494, 499 . . . (1977) (plurality), or a right to choose the nature of one's personal relationships, as in *Lawrence*, 539 U.S. at 574, this individual liberty guarantee essentially *draws a line around an individual's home and family and prevents governmental interference with what happens inside, as long as it does not involve injury or coercion or some other form of harm to individuals or society.*

*Holm*, 2006 UT at ¶ 186, 137 P.3d at 778 (Durham, C.J., dissenting in part) (emphasis added). This court shares serious concerns about the potential for injury and harm in closed religious polygamist communities, but notes that each such crime can and should be prosecuted on its own independent basis under the Utah statutes specifically designated for those purposes, including "criminal laws punishing incest, rape, unlawful sexual conduct with a minor, and domestic and child abuse." *Id.* at ¶ 176, 137 P.3d at 775. Defendant referred to various reports documenting such abuses in Utah's religious polygamist communities. "But based on stories like these, Utah has made a legislative policy determination that the practice of polygamy is harmful to society and therefore should be prohibited." (Def.'s Reply 11 [Dkt. No. 73].) This cannot be a rational basis for the cohabitation prong of the Statute, however, because the State has specifically formulated a general policy not to prosecute religiously motivated polygamy, though when it has

proceeded anyway, it has invariably been against religiously cohabiting individuals, usually in

cases in which the defendant has been convicted of the "collateral crime" at issue anyway.

Again, the court finds that there can be no rational basis for this approach, particularly under

*Lawrence* and its focus on the deeper liberty interests at issue in the home and personal

relationships.

Finally, as noted above, with regard to the State's "interest in preventing the perpetration

of marriage fraud, as well as its interest in preventing the misuse of government benefits

associated with marital status," *Green*, 2004 UT at ¶ 39, 99 P.3d at 830, the court similarly finds

that the cohabitation prong of the Statute is not rationally related to this interest. This is because,

as observed by Chief Justice Durham, it is "difficult to understand how those in polygamous

relationships that are ineligible to receive legal sanction are committing welfare abuse when they

seek benefits available to unmarried persons." *Id.* at ¶ 181, 137 P.3d at 777.

The cohabitation prong of the Statute does not survive rational basis review and must be

stricken as a violation of substantive due process under *Lawrence*.

### D.     Void for Vagueness under the Due Process Clause

Plaintiffs also argue that the Fourteenth Amendment's Due Process Clause "prohibits the

states . . . from enacting criminal laws so vague as to render it impossible for citizens to know in

advance whether he or she is in compliance with them." (Pls.' Mem. Supp. Mot. Summ. J. 9

[Dkt. No. 50].) "As generally stated, the void-for-vagueness doctrine requires that a penal statute

define the criminal offense with sufficient definiteness that ordinary people can understand what

conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory

enforcement." *Gonzales v. Carhart*, 550 U.S. 124, 148-149 (U.S. 2007) (quoting *Kolender v.

Lawson*, 461 U.S. 352, 357 (1983). Unlike in *Carhart*, the Statute fails both requirements. The

issues with the Statute's interpretation, requiring extensive familiarity with the history of the federal government's nineteenth-century prohibition of Mormon polygamy and Utah's quest for statehood in the same time period, are discussed above. This invites skepticism about whether the Statute gives Utah residents "of ordinary intelligence a reasonable opportunity to know what is prohibited." *Carhart*, 550 U.S. at 149 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

But the more glaring problem with the Statute is its "arbitrary or discriminatory enforcement." *Id.* "The requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values, *reduces the danger of caprice and discrimination in the administration of the laws*, enables individuals to conform their conduct to the requirements of law, and *permits meaningful judicial review*." *Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984) (emphasis added). Unlike in *Roberts*, the Statute implicates these concerns. There is no discernible limit to prosecutorial discretion, and, in fact, prosecution seems to have been random at best over the decades. And virtually all prosecutions seem to have been targeted at religiously motivated cohabitation, as noted above.

Here, the State seems to have various policies about whether to prosecute polygamists. Defendant himself has sent mixed signals about his intention to prosecute, currently claiming in an affidavit (when it was expedient for his motion to dismiss based on mootness) that he has established a policy that his office will not prosecute religiously motivated cohabitation (or cohabitation at all) absent the presence of some collateral crime. (Second Buhman Aff. ¶ 8 [Dkt. No. 47-1]; *see also* Def.'s Mem. Supp. Mot. Dismiss for Mootness at [4] [Dkt. No. 47].). But Defendant disclaims adherence to this policy by any successors in his office. *Id.*

These various policies create substantial uncertainty about whether one will be prosecuted under the Statute if engaging in religiously motivated cohabitation, or simple cohabitation with no religious motivation, or for one but not the other, or even about whether the Statute is moribund as a result of widespread prosecutorial inaction. The apparently limitless prosecutorial discretion in whether and whom to prosecute under the Statute "vests virtually complete discretion in the hands of [law enforcement and prosecutors] to determine whether" people cohabiting in the State of Utah for whatever reason, but particularly those involved in religiously motivated cohabitation, have violated the Statute's cohabitation prong. *Carhart*, 550 U.S. at 150 (quoting *Kolender*, 461 U.S. at 358 (invalidating a statute regulating loitering)).

The cohabitation prong is therefore void for vagueness and will be stricken.

## III.   "PURPORTS TO MARRY" IN THE 1973 STATUTE

### A.   Construction of the Statute

The court has found the phrase "or cohabits with another person" to be unconstitutional under various constitutional provisions and has ordered it to be stricken. With the cohabitation prong thus stricken, the Statute now reads as follows: "A person is guilty of bigamy when, knowing he has a husband or wife or knowing the other person has a husband or wife, the person purports to marry another person ~~or cohabits with another person~~." Utah Code Ann. § 76-7-101(1) (2013). As noted above, the court must interpret the Statute in conformity with the broad construction of the Utah Supreme Court's most recent consideration of the Statute in *Holm*. As a result, striking the cohabitation prong does not end the court's analysis because the phrase "purports to marry another person" becomes similarly problematic under the *Holm* majority's interpretation.

The *Holm* majority agreed that "purports" means "to profess or claim falsely; to seem to be." 2006 UT at ¶ 17, 137 P.3d at 733. The perplexity of the *Holm* majority's construction of the term "marry" (as discussed in Part II.A above), however, requires the court's further attention. As noted above, the *Holm* majority ultimately concluded that "the bigamy statute does not require a party to enter into a second marriage (however defined) to run afoul of the statute; *cohabitation alone would constitute bigamy pursuant to the statute's terms*." *Id.* at ¶ 22, 137 P.3d at 734 (emphasis added).

Under this broad interpretation of the term "marry," the phrase "purports to marry another person" raises the same constitutional concerns addressed in relation to the cohabitation prong above. But the court cannot resolve this difficulty by similarly striking the "purports to marry" prong because without it, the Statute becomes both legally and syntactically meaningless. And yet, it is not the role of federal courts in the constitutional framework of checks and balances to "rewrite a state law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988). The court must therefore apply the "canon of constitutional avoidance," under which "[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Carhart*, 550 U.S. at 153 (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (internal alterations and quotation marks omitted)). "Courts employ two mechanisms to preserve unconstitutional statutes from wholesale invalidation. First, if a statute is readily susceptible to a narrowing construction that will remedy the constitutional infirmity, the statute will be upheld. If the language is not readily susceptible to a narrowing construction, but the unconstitutional language is severable from the remainder of the statute, that which is constitutional may stand while that which is unconstitutional will be rejected."

*Citizens for Responsible Gov't State PAC v. Davidson*, 236 F.3d 1174, 1194 (10th Cir. 2000)

(internal quotation marks and citations omitted).

As discussed in Part II above, the unsalvageable cohabitation prong has been stricken as

unconstitutional.[67] But as to the remainder of the Statute, "[i]t is well-settled that a federal court

must uphold a statute if it is '"readily susceptible" to a narrowing construction that would make

it constitutional'." *Id.* (quoting *Am. Booksellers*, 484 U.S. at 397). To be "readily susceptible" to

a "narrowing construction that would make it constitutional," such narrowing or alternative

---

[67] "In order to determine whether partial invalidation of a state statute is appropriate, federal courts look to state law." *Davidson*, 236 F.3d at 1195. "Under Utah law, 'When reviewing the construction of statutes, the general rule is that statutes, where possible, are to be construed so as to sustain their constitutionality. Accordingly, if a portion of the statute might be saved by severing the part that is unconstitutional, such should be done.'" *J.R. v. State of Utah*, 261 F. Supp. 2d. 1268, 1295 (D. Utah 2003) (quoting *State of Utah v. Lopes*, 1999 UT 24, ¶ 18, 980 P.2d 191). This is especially the case if the court determines that "the legislature would have passed the statute without the objectionable part." *Id.* (internal quotation marks and citation omitted); *Doe v. Rampton*, 366 F. Supp. 189, 199 (D. Utah 1973) (Anderson, J., concurring in part and dissenting in part) ("A statute bad in part is not necessarily void in its entirety. Provisions within the legislative power may stand if separable from the bad. . . . But a provision, inherently unobjectionable, cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall."). This is often obvious based on "the inclusion within a statute of a 'saving clause'" or "severability clause." *Id.* (quoting *Stewart v. Utah Pub. Serv. Comm'n*, 885 P.2d 759, 779 (Utah 1994)).
    Where, as here, there is no severability clause, the court considers "whether the statutory provisions are so dependent upon each other that the court should conclude the intention was that the statute be effective only in its entirety." *Id.* (internal quotation marks and citations omitted). Moreover, "[t]he presence or absence of a severability clause is rarely determinative of the severability of a statute." *EEOC v. Plessey, Inc.*, No. 78-1383, 1984 U.S. Dist. LEXIS 18709 (D. Kan. Mar. 12, 1984) (holding that an "unconstitutional legislative provision is severable even though the [Act] contains no severability clause, because neither the express language of the statute nor the Act's legislative history makes it 'evident that the legislature would not have enacted' the remainder of the Act in the absence of the [invalid part of the Act]. *See Buckley v. Valeo*, 424 U.S. 1, 109 . . . (1976). Mere uncertainty about the legislature's intent is insufficient to satisfy the test announced in *Buckley v. Valeo*."). Here, the court has found that the cohabitation prong is severable in its unconstitutionality because the rest of the Statute is not "so dependent upon [the cohabitation prong] that the court should conclude the intention was that the statute be effective only in its entirety." *J.R.*, 261 F. Supp. 2d. at 1295. This is particularly the case under the court's "narrowing construction" of the rest of the Statute "that would make it constitutional," as further discussed below. *Davidson*, 236 F.3d at 1194. Here, therefore, as in *J.R.*, the court finds that the cohabitation prong is severable because "[t]o the extent, then, that [the cohabitation prong] may be denied conclusive effect under the United States Constitution . . . the balance of [the Statute] appear[s] to be severable from the affected [clause] and [does] not depend upon [the cohabitation prong] to achieve [its] purposes." *Id.* at 1296.

construction must be "reasonable and readily apparent." *Id.*; *see also Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998) (statute must be 'genuinely susceptible' to narrowing construction); *City of Houston v. Hill*, 482 U.S. 451, 468 (1987) ('fairly' or 'obviously susceptible'); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975) ('easily susceptible').

The Statute can be saved after striking the cohabitation prong by adopting Chief Justice Durham's interpretation of the "purports to marry" phrase (and the term "marry") from her dissent in *Holm* as the "reasonable and readily apparent" narrowing construction.

## B. Understanding the Enabling Act and the Irrevocable Ordinance

As explained in Part II.A above, the *Holm* majority held that "the plain meaning of the term 'marry,' as it is used in the bigamy statute, supports our conclusion that it encompasses both marriages that are legally recognized *and those that are not*." *Holm*, 2006 at ¶ 21, 137 P.3d at 734 (emphasis added). This means, according to the *Holm* majority, that "an unlicensed, solemnized marriage can serve as a subsequent marriage that violates the bigamy statute," *id.* at ¶ 26, 137 P.3d at 735, meaning also that the term "marry" included "cohabitation alone" as "constitut[ing] bigamy pursuant to the statute's terms." *Id.* at ¶ 22, 137 P.3d at 734.

The *Holm* Court settled on this very broad construction of the term "marry" based in part on a historical analysis of the federal government's nineteenth-century campaign against Mormon polygamy, Utah's bid for statehood including the Enabling Act in 1894 requiring that Utah ensure that "polygamist or plural marriages are forever prohibited" in Utah as a condition for joining the Union as a State, and the Irrevocable Ordinance to this effect that was ultimately included in the 1895 Utah State Constitution. In fact, the *Holm* majority's analysis of the meaning of the term "marry" appears to have been driven largely by a desire to conform to its perception of the "legislative history" relevant to the nineteenth-century federal anti-polygamy

campaign and specifically the relation between the Utah constitutional convention's peculiar decision to refer in the State Constitution to the territorial law prohibiting polygamy, *see* UTAH CONST. art. XXIV, § 2, and the "Irrevocable Ordinance" included in article III, section 1 of the Utah Constitution. *See Holm*, 2006 at ¶¶ 40-48, 137 P.3d at 739-41.

Congress's Utah Enabling Act of 1894 culminated a long road to statehood for Utah—an effort extending from 1849 to 1894. *See Society of Separationists*, 870 P.3d at 922-929. In relevant part, the Enabling Act required in Section 3 that

> [t]he Constitution shall be republican in form, and make no distinction in civil or political rights on account of race or color, except as to Indians not taxed, and not to be repugnant to the Constitution of the United States and the principles of the Declaration of Independence. And said Convention shall provide, *by ordinance irrevocable without the consent of the United States* and the people of said State
>
> First. That perfect toleration of religious sentiment shall be secured, and that no inhabitant of said State shall ever be molested in person or property on account of his or her mode of religious worship: *Provided, That polygamous or plural marriages are forever prohibited.*

Ch. 138, 28 Stat. 107 (1894), 1A Utah Code Ann. 44 (2013) (emphasis added). In conformance with this provision of the Enabling Act, Utah's constitutional convention included the following "Irrevocable Ordinance" in article III of the 1895 Utah State Constitution:

> The following ordinance shall be irrevocable without the consent of the United States and the people of this State:
>
> First: -- Perfect toleration of religious sentiment is guaranteed. No inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship; but polygamous or plural marriages are forever prohibited.

UTAH CONST. art. III, § 1. Finally, the framers of the Utah Constitution included specific reference to the 1892 territorial law prohibiting polygamy in the general provision continuing territorial laws:

> All laws of the Territory of Utah now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations, or are altered or repealed by the Legislature. The act of the Governor and Legislative Assembly of the Territory of Utah, entitled, "An Act to punish polygamy and other kindred offenses," approved February 4th, A.D. 1892, in so far as the same defines and imposes penalties for polygamy, is hereby declared to be in force in the State of Utah.

UTAH CONST. art. XXIV, § 2.

On the basis of this historical background, the *Holm* majority concluded that "[t]he framers of our state constitution viewed the reaffirmation of the 1892 territorial law criminalizing bigamy as directly related to the irrevocable ordinance." *Id.* at ¶ 46, 137 P.3d at 741. Thus, "the framers of our state constitution understood the irrevocable ordinance to mandate the prevention of polygamy and not to merely prohibit government recognition of polygamy." *Id.* at ¶ 46, 137 P.3d at 741. At the very least, the Enabling Act and resulting Irrevocable Ordinance raise "equal footing" concerns. *See Society of Separationists*, 870 P.2d at 928 (noting that "some have questioned the constitutionality of the requirement that the United States government agree to any revocation of the ordinance").[68] But the court finds it remarkable to contemplate the deeper implications of the *Holm* majority's interpretation: that a State Constitution would not only define and limit the powers of the State government as against its citizens but would also purport to limit the liberty of those citizens. The court finds it a worrisome proposition that a

---

[68] "In particular, delegation of part of the amending process of a state constitution to the federal government raises the question of whether the state has been admitted into the Union on an equal footing with sister states." John J. Flynn, *Federalism and Viable State Government--The History of Utah's Constitution*, 1966 UTAH L. REV. 311, 323 n.89. (citing *Coyle v. Smith*, 221 U.S. 559 (1911)). *But see Holm*, 2006 UT ¶ 40 n.9, 137 P.3d at 739 (dismissing Holm's equal footing argument based on *Potter v. Murray City*, 760 F.2d 1065, 1067 (10th Cir. 1985)). In *Potter*, the Tenth Circuit observed that "[i]f the original ban on polygamy and plural marriage was invalid, the State's power to incorporate such provisions in its Constitution and its laws remained. If there was an unlawful coercion in the Enabling Act, the Supreme Court of Utah observed some time ago that there has been no attempt to change the State's laws, 'nor is such attempt likely.'" 760 F.2d at 1067 (quoting *State v. Barlow*, 153 P.2d 647, 654 (Utah 1944)). *Potter's* exceptionally speculative observation is, however, beside the point because the equal footing argument is unnecessary under the narrowing construction that the court adopts today from Chief Justice Durham's *Holm* dissent.

Constitution stray from limiting government's powers and protecting citizens' rights to explicitly limiting the liberty of citizens. In a republican form of government, the State has plenty of opportunity to restrict citizens' actions, in conformance with a rights-protecting Constitution, through legislative activity and need not do so in the Constitution itself. Chief Justice Durham's interpretation of the historical background, and the Enabling Act and Irrevocable Ordinance in particular, also alleviates this broad concern raised by the *Holm* majority's position.

In fact, the *Holm* majority allowed that Chief Justice Durham's differing historical interpretation of this history, and particularly the Irrevocable Ordinance, was "one plausible interpretation" that "comports with the reality that the federal government harbored serious concerns about the possibility that the State of Utah could be ruled de facto by the LDS Church." *Holm*, 2006 UT 31, ¶ 42, 137 P.3d at 739. The court agrees that Chief Justice Durham's historical analysis is a "plausible interpretation" of the historical record and meaning of the events that took place during Utah's very lengthy and difficult bid for statehood. In truth, the court finds it not only "plausible" but likely; Chief Justice Durham's interpretation is at least "reasonable and readily apparent," rendering the "purports to marry" phrase of the Statute "readily susceptible" to her narrowing construction, which the court now adopts. *Davidson*, 236 F.3d at 1194. Under this interpretation, at the time when the doctrine of common-law marriage could potentially render religious cohabitation a legal union, the Irrevocable Ordinance was intended to prohibit Utah's state government from ever legally sanctioning or recognizing such polygamous "marriages."

Before addressing the historical background, Chief Justice Durham noted that she did not believe that "the [1973] legislature, having so carefully structured the various prerequisites of marriage in state law, as well as the rights, duties, and obligations that state law accords married

persons, would use the term 'marry' in [the Statute], alone among all statutory provisions, to

mean not only entry into a legally recognized marriage but also entry into any relationship that is

accepted as marriage in whatever custom or tradition the parties consider applicable." 2006 UT

at ¶ 138, 137 P.3d at 760 (Durham, C.J., dissenting in part). The court shares Chief Justice

Durham's "view" of the Statute, that its purpose

> is to impose criminal penalties on those who purport to enter a legal union that is
> in fact void under [Utah Code Ann.] section 30-1-2(1). I understand the
> declaration in section 30-1-2, that certain "marriages" are prohibited and void, to
> mean that any attempt by those described to enter into a legal union in fact results
> only in a purported marriage. The contrary reading suggested in the concurrence
> simply leads to the perplexing question, in what sense can the state legislature
> prohibit and declare void a relationship that does not claim any legal status? The
> majority attempts to bolster the logic of its position by pointing to definitions of
> bigamy that refer to "marrying" one person while being legally married to
> another. [2006 UT] at ¶ 22 n.6. The majority concludes that such definitions are
> "nonsensical if the term 'marry' is considered limited to legally recognized
> marriage." [*id.*] In my view, the majority too easily discounts the possibility that
> such definitions were simply inartfully drafted. I suspect that our legislature in
> fact recognized that such definitions made no logical sense, and this is why [the
> Statute] criminalizes "purport[ing] to marry," rather than "marrying," one person
> while legally married to another.

*Id.* at ¶ 138 n.4, 137 P.3d at 761.[69] Also, the court agrees that "the [*Holm*] majority fails to

explain why the breadth of [the cohabitation prong] should conclusively determine our

---

[69] Helpfully, Chief Justice Durham provided a number of directly relevant examples of this:

Significantly, this court has commonly used the phrase "purported marriage" to mean a
marriage that was represented as legally valid by at least one party, but that in fact was
void under state law. *See, e.g.*, *Kent v. Kent*, 28 Utah 2d 34, 497 P.2d 652, 653 (Utah
1972) (describing as a "purported marriage" the plaintiff's union with a man who was
"unable to contract a valid marriage" because he was married to someone else); *Buck v.
Buck*, 19 Utah 2d 161, 427 P.2d 954, 955 (Utah 1967) (describing as a "purported
marriage" a "union" that was "legally invalid" because the man's divorce was not yet
final); *Thomas v. Children's Aid Soc'y*, 12 Utah 2d 235, 364 P.2d 1029, 1031 (Utah
1961) (describing as a "purported marriage" a marriage that was "*void ab initio*" because
one of the parties was already married); *Cecil v. Cecil*, 11 Utah 2d 155, 356 P.2d 279,
280-81 (Utah 1960) (describing as a "purported marriage" a marriage that was legally
invalid because one party was judged incompetent); *Popp v. Roth*, 9 Utah 2d 96, 338 P.2d
123, 124 (Utah 1959) (stating that a man who "purportedly married" a woman when he
was already married did not "enter into a valid marriage"); *In re Vetas' Estate*, 110 Utah

interpretation of the parallel 'purports to marry' prong." *Id.* at ¶ 139, 137 P.3d at 761. Based on

this "reasonable and readily apparent" narrowing construction of "marry" and, accordingly,

"purports to marry" under the Statute, the court agrees with Chief Justice Durham that the

"purports to marry" prong should be interpreted "as referring to an individual's claim of entry

into a legal union recognized by the state as marriage. The phrase does not encompass an

individual's entry into a religious union where there has been no attempt to elicit the state's

recognition of marital status or to procure the attendant benefits of this status under the law, and

where neither party to the union believed it to have legal import." *Id.* at ¶ 141, 137 P.3d at 763-

64.

       This narrowing construction is actually supported by Chief Justice Durham's informed

and logical interpretation of the same historical background which so concerned the majority,

arguably precipitating its broad interpretation of "marry" and "purports to marry." Chief Justice

Durham explained that the Irrevocable Ordinance (i.e. article III, section 1 of the Utah State

Constitution)

> declares that "polygamous or plural *marriages* are forever prohibited." Utah
> Const. art. III, 1 (emphasis added). Here, as elsewhere in Utah law, I understand
> the term "marriage" to refer only to a "legal union." *See, e.g.*, Utah Const. art. I,
> 29(1) ("Marriage consists only of a legal union between a man and a woman."). 
> Understood in this way, article III, section 1, by its plain language, does not
> prohibit private individual behavior but instead prevents Utah's state government,

---

> 187, 170 P.2d 183, 184 (Utah 1946) (describing as a "purported marriage" a marriage
> that was not "solemnized as required by our statutes," and was thus void); *Jenkins v.
> Jenkins*, 107 Utah 239, 153 P.2d 262, 263 (Utah 1944) (describing as a "purported
> marriage" a marriage that was void under the law because one party's divorce was not
> final when the marriage occurred); *In re Waters' Estate*, 100 Utah 246, 113 P.2d 1038,
> 1039 (Utah 1941) (describing as a "purported marriage" a marriage that was void because
> one party's prior divorce had not been valid); *Sharp v. Seventh Judicial Dist. Court*, 81
> Utah 236, 17 P.2d 261, 262-63 (Utah 1932) (describing as a "purported marriage" a
> marriage that was void under the law as it then existed because one party suffered from
> epilepsy and syphilis).

*Holm*, 2006 UT at ¶ 138 n.4, 137 P.3d at 761 (Durham, C.J., dissenting in part).

to whom the ordinance is addressed, from recognizing a particular form of union as a "marriage."

The majority concludes that article III, section 1 is a restriction on individual rights rather than on state government. It justifies this conclusion primarily by reference to the proceedings of Utah's 1895 constitutional convention, which reflect the drafters' concern with following the federal requirements set forth in the Utah Enabling Act, ch. 138, 28 Stat. 107 (1894). Specifically, the majority emphasizes some delegates' concern that the federal government intended, through the Enabling Act, not only to prevent Utah from recognizing polygamous unions as valid marriages, but also to require that the state impose criminal penalties on polygamy. However, the majority's own analysis makes it clear that the drafters did not address this concern by revising article III, section 1; rather, they simply reaffirmed the validity of a territorial statute. *See* Utah Const. art. XXIV, 2 (declaring in force an 1892 law "in so far as the same defines and imposes penalties for polygamy"). Moreover, that statute criminalized only polygamous marriage, not polygamous behavior. 1892 Utah Laws ch. VII, 1, at 5-6 (defining "polygamy" as "ha[ving] a husband or wife living" and "marr[ying] another," or as "marr[ying] more than one woman" on the same day). The majority reasons that because the drafters thought it necessary to affirm the criminalization of polygamous marriage in article XXIV, they must therefore have intended the reference to polygamous marriage in article III, section 1 to place all private polygamous relationships outside constitutional protection.

My review of the history of Utah's statehood leads me to conclude otherwise, and further bolsters my understanding of the term "marriage" in article III, section 1. I read both the Enabling Act and the ordinance provisions, to the extent the latter can be identified with the former, as carrying forward a restriction that Congress had placed on Utah's territorial government beginning with the Morrill Act, 12 Stat. 501 (1862). That statute provided that "'all . . . acts and parts of acts heretofore passed by the said legislative assembly of the Territory of Utah, which establish, support, maintain, shield or countenance polygamy, be, and the same hereby are, disapproved and annulled.'" *Cope v. Cope*, 137 U.S. 682, 686, 11 S. Ct. 222, 34 L. Ed. 832 (1891) (quoting Morrill Act, ch. 126, § 2, 12 Stat. 501); *see In re Handley*, 7 Utah 49, 24 P. 673, 674-75 (Utah 1890) (citing Morrill Act). Among the "acts" to which the Morrill Act referred was undoubtedly the law incorporating the LDS Church, passed in 1851 by the Provisional State Government of the proposed State of Deseret. This law had granted the LDS Church full authority to conduct marriages of its members in accord with Church doctrine. When Deseret's 1850 petition for statehood was denied and a territorial government was established instead, the territorial legislature revalidated the laws enacted by the provisional government. Dale L. Morgan, THE STATE OF DESERET 88 (1987) (citing 1852 Utah Laws 222, an October 4, 1851 joint resolution of the territorial legislature). Thus, after 1852, when the Church publicly recognized the doctrine of plural marriage, ceremonies of plural union performed according to Church practice were legally valid marriages under territorial law until the Morrill

Act declared otherwise. This history demonstrates that the legal status of polygamous unions was a matter of concern. Accordingly, the language prohibiting plural or polygamous "marriage" in the Enabling Act and Ordinance provisions was likely intended to preclude the reenactment of laws granting polygamous unions legal recognition once Utah achieved statehood.

The above discussion illustrates that when the term "marriage" in the Ordinance provision is understood, as I believe it must be, as denoting a legal status, the meaning of the provision is plain and in accord with territorial history. It could then be argued that the provision establishes that, as a matter of constitutional law, the state's refusal to recognize polygamous unions as legal marriages may not be construed as discriminatory treatment of those who engage in such unions as a matter of religious practice. However, this case does not present that issue since, as discussed above, Holm has made no claim to legal recognition.

Additional history, far from demonstrating the drafters' intent to exclude particular private behavior from access to constitutional protections, raises the possibility that the drafters anticipated some relief from governmental interference for those relationships already in existence. In addition to the provision criminalizing polygamous marriage, quoted above, the 1892 Act contained a separate provision criminalizing unlawful cohabitation, which it defined as "any male person . . . cohabit[ing] with more than one woman." Id. § 2, 1892 Utah Laws at 6. Yet, the unlawful cohabitation provision, unlike the polygamy provision, was not specifically mentioned in article XXIV, section 2. The unlawful cohabitation provision was therefore subject to the general statement in article XXIV, section 2 that "[a]ll laws of the Territory of Utah now in force, *not repugnant to this Constitution*, shall remain in force until they expire by their own limitations, or are altered or repealed by the Legislature." Utah Const. art. XXIV, § 2 (emphasis added). Accordingly, that provision would remain valid only if the state courts did not deem it unconstitutional, and only as long as the legislature kept it in effect. It is not inconceivable that the drafters, while conceding that polygamous unions could never receive legal recognition, believed that private polygamous practice, including cohabitation with former "wives" and their children, might continue.

*Id.* at ¶¶ 149-53, 137 P.3d at 764-66 (footnote citations omitted).[70]

---

[70] Chief Justice Durham further strengthened this analysis by noting that

[t]he "cohabits" prong of the current criminal bigamy statute, Utah Code section 76-7-101(1), extends the definition of polygamy beyond that contained in the 1892 Act by incorporating, to a certain extent, the 1892 concept of unlawful cohabitation. Whereas under the 1892 Act a person would be guilty of polygamy only if he purported to marry two individuals at once, under section 76-7-101(1) a person is guilty of bigamy if he cohabits with one individual while married to another. See Utah Code Ann. § 76-7-101(1). Thus, even if article XXIV, section 2 were interpreted as imposing a

The court has carefully evaluated the *Holm* majority and dissent's competing interpretations of the historical record on this issue. Chief Justice Durham's dissenting opinion provides a more persuasive and logical treatment of both the historical record and the relevant legal issues, particularly in light of the need for a "reasonable and readily apparent" alternative interpretation of the term "marry" and "purports to marry" upon striking the cohabitation prong as unconstitutional. *Davidson*, 236 F.3d at 1194. Accordingly, the court adopts the above quoted historical analysis for purposes of this opinion and finds the Statute "readily susceptible" to Chief Justice Durham's narrowing construction of those terms on the basis of her historical treatment of the development of the Irrevocable Ordinance and its relevance to the Statute. This narrowing construction is necessary to save the Statute from being invalidated in its entirety, which would be required for the reasons analyzed in Part II, under the majority's interpretation of those terms in the Statute. Instead, under this narrowing construction, the Statute remains in force, submitting anyone residing in Utah, knowing he has a wife or she has a husband or knowing the other person has a husband or wife, to prosecution for the crime of bigamy for entering into any further purportedly legal union.

## CONCLUSION

The court finds the cohabitation prong of the Statute unconstitutional on numerous grounds and strikes it. As a result, and to save the Statute, the court adopts the interpretation of "marry" and "purports to marry," and the resulting narrowing construction of the Statute, offered by the dissent in *State of Utah v. Holm*, 2006 UT 31, ¶¶ 131-53, 137 P.3d 726, 758-66, thus allowing the Statute to remain in force as prohibiting bigamy in the literal sense—the fraudulent

---

constitutional requirement that polygamy, as defined in the 1892 Act, be criminalized, such a conclusion would have no bearing on the constitutionality of the "cohabits" prong of the current criminal bigamy statute.

*Holm*, 2006 UT at ¶ 153 n.13, 137 P.3d at 766 (Durham, C.J., dissenting in part).

or otherwise impermissible possession of two purportedly valid marriage licenses for the purpose of entering into more than one purportedly legal marriage.

The court does not at this time consider Plaintiffs' claim under 42 U.S.C. § 1983.

Accordingly, the court GRANTS IN PART Plaintiffs' Motion for Summary Judgment (Dkt. No. 49) and DENIES Defendant's Cross Motion for Summary Judgment (Dkt. No. 55). The court also terminates as moot Plaintiffs' Motion to Strike Defendant's Cross-Motion for Summary Judgment. (Dkt. No. 60.)

SO ORDERED this 13th day of December, 2013.

BY THE COURT:

Clark Waddoups
United States District Court Judge